IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OSCAR WALDEN, JR.,                     )
                                       )
                    Plaintiff,         )
                                       )       Case No. 04 C 0047
        v.                             )
                                       )       Judge Mark Filip
CITY OF CHICAGO, et al.,               )
                                       )
                    Defendants.        )

MEMORANDUM OPINION AND ORDER

Plaintiff Oscar Walden, Jr. ("Plaintiff" or "Walden") has sued Defendants City of

Chicago (also "City"), Chicago Police Department ("CPD") Captain William Ryan, CPD

Lieutenant Golden, CPD Detective Leon Sweitzer, and CPD Officers Joseph Faculak

("Faculak"), William O'Brien ("O'Brien"), William Murphy ("Murphy"), and Edward Walsh

("Walsh"), in a multi-count complaint with claims alleged under both federal and state law.

(D.E. 1.)[1] The case involves Plaintiff's arrest and prosecution in 1952 for rape, which resulted in

Plaintiff's conviction by a jury for the charged crime. *See generally Illinois v. Walden*, 169

N.E.2d 241 (Ill. 1960) (denying post-conviction petition following jury verdict of guilty).

Plaintiff served approximately fourteen years in prison, and he was released on parole in 1965.

(D.E. 1 at 12.) Plaintiff received a general pardon in 1978 from then-Governor James R.

Thompson, and in 2003, then-Governor George Ryan granted a pardon of innocence to Plaintiff.

(*Id.* at 3.) The consequences of this second pardon are discussed at some length below.

All of the police officer defendants appear to be dead. (The complainant-rape victim also

_____

[1]        The various docket entries in the case are cited as "D.E. __."

died long ago.) The case appears to be proceeding forward in any meaningful sense only against the City of Chicago, although Plaintiff also seeks to hold the City liable under various theories for the alleged misconduct of the police officers.[2]

Plaintiff alleges claims under 42 U.S.C. § 1983, concerning the actions of the individual defendants, which include claims regarding: deprivation of a right to fair trial and wrongful conviction (Count I); false arrest and imprisonment (Count II); torture and physical abuse (Count III); coercive interrogation (Count IV); and an Equal Protection claim under 42 U.S.C. §§ 1983 & 1985 (Count V). Plaintiff also advances a *Monell* policy claim against the City of Chicago relating to Counts I-V (Count VI). Walden advances numerous state law claims, including false imprisonment (Count VII); malicious prosecution (Count VIII); intentional infliction of emotional distress (Count IX); conspiracy (Count X); and a *respondeat superior* claim and an indemnification claim pursuant to 745 ILCS 10/9-102 ("Section 9-102 ") against the City (Counts XI and XIII, respectively). This case is before the Court on the City of Chicago's Motion to Dismiss ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.E. 20.) As explained below, the Motion is denied in part and granted in part.

## BACKGROUND FACTS[3]

Over a half century ago, on November 24, 1951, Ms. Elsie Anderson was attacked and raped by an African-American man on the South Side of Chicago, on 103rd Street between

---

[2]   It appears that Plaintiff originally sued the current Cook County State's Attorney, Richard Devine, and an Assistant State's Attorney who actually was involved in the 1952 prosecution, but that those defendants have been dismissed voluntarily. (D.E. 20 at 1, n.2.)

[3]   The background facts are taken from Plaintiff's Complaint (D.E. 1) and are assumed to be true, as precedent requires, for present purposes. The Court takes no position concerning whether any of the allegations are actually well founded.

2

Wabash Avenue and Michigan Avenue. (D.E. 1 ¶ 15.) On January 11, 1952, CPD Officers

Faculak, O'Brien, and Walsh arrested twenty-year old Oscar Walden, Jr., in the vicinity of 106th

Street and Torrence in Chicago while Walden was on his way to work. (*Id.* ¶ 16-17.) At the time

of the arrest, Plaintiff had a clean record. (*Id.* ¶ 17.) He had never been arrested and had no

experience dealing with the police. (*Id.*)

It is not clear from the complaint what prompted the police to arrest Walden, and the

complaint alleges that at the time Walden was arrested, he had never been identified, either in

person or by photograph, as the person who attacked Ms. Anderson. (*Id.* ¶ 19.) (The Illinois

Supreme Court opinion in *Illinois v. Walden*, 169 N.E.2d 241 (Ill. 1960), suggests events that are

not included in the Complaint, as discussed briefly below.) After Walden was arrested, the

officers took Walden to the Kensington Police Station at 115th Street and Indiana Avenue. (*Id.* ¶

18.) On the day of Walden's arrest, police went to Ms. Anderson's home and brought her to the

station. (*Id.* ¶ 20.) As the officers interrogated Walden, Ms. Anderson sat in the same room and

watched. (*Id.* ¶¶ 21-22.) Ms. Andersen never indicated that Walden was her attacker. (*Id.* ¶¶ 22,

24.)

After this brief encounter, CPD officers, including Faculak, O'Brien, and Walsh,

removed Plaintiff from the room and questioned him further. (*Id.* ¶ 25.) During this questioning,

Plaintiff repeatedly requested counsel and asked for his wife. (*Id.* ¶ 26.) The officers refused all

these requests. (*Id.*) The police officers then informed Plaintiff that he was being accused of

raping Ms. Anderson. (*Id.* ¶ 27.)

The interrogation continued and the officers began to kick Plaintiff in the shins to attempt

to coerce him to confess to the rape. (*Id.* ¶¶ 28-29.) After about an hour, Walden was taken to

the 11th Street police station, where the police administered a lie detector test before transporting him to the Burnside police station at 91st Street and Cottage Grove. (*Id.* ¶ 29.) Walden spent the night of January 11, 1952, in custody at the Burnside station. (*Id.* ¶ 30.)

On the morning of January 12, 1952, police returned Walden to the Kensington police station. (*Id.* ¶ 31.) Faculak falsely told Walden that he had failed the lie detector test, grabbed Walden's arm, forced him to the back of the police station, and accused him of lying when he denied attacking Ms. Anderson. (*Id.*) In fact, Plaintiff had not failed the lie detector test; the results were apparently inconclusive. (*Id.* ¶ 32.) At the back of the police station, Plaintiff was placed in a room and was joined by Faculak, Sweitzer, and several other officers. (*Id.* ¶ 33-34.) Sweitzer told Walden that if he did not confess, he would be transferred to the 11th Street police station because they treated prisoners brutally there. (*Id.* ¶ 33.) Golden, Ryan, and Sweitzer then went to lunch, leaving other officers to continue the interrogation. (*Id.* ¶ 35-36.)

Faculak encouraged Walden to give a confession, and told Plaintiff that if he admitted to the crime he would be treated leniently. (*Id.* ¶ 38.) When Plaintiff asserted his innocence, Faculak took more proactive measures of interrogation. (*Id.* ¶ 39-40.) With Sweitzer (who had returned from lunch) sitting in a chair directly in front of Plaintiff, Faculak grabbed Walden's left hand, bent his fingers back, and scratched them until they were bloody. (*Id.* ¶ 40.) Sweitzer knocked Walden's head back and forth, stating to Walden, "You are lying, nigger," when Walden denied committing the rape. (*Id.* ¶ 41.) Faculak also at times kicked Plaintiff in the shins. (*Id.* ¶ 43.) Plaintiff continued to deny the accusations against him. (*Id.* ¶ 42.)

Faculak then ordered another officer to "go get the rope," and he told Plaintiff that they were going to string him up to a high bar, remove his clothes, and whip him with a rubber hose

4

until he confessed. (*Id.* ¶ 44.) Faculak also told Plaintiff that his failure to confess would result in Plaintiff's father losing his job, his family being evicted, and that the police would put Plaintiff's mother, father, sisters and brothers in different jails. (*Id.* ¶ 46.) Faculak also told Walden that he would plead for leniency for Walden if Walden confessed, and that Walden would get six months in jail or probation. (*Id.* ¶ 48.)

While Plaintiff continued to protest his innocence, Faculak instructed him to say that he was walking down the south side of 103rd Street with a knife on or about 10:00 p.m. on November 24, 1951, when he saw a woman coming towards him. (*Id.* ¶ 49.) Faculak further instructed Plaintiff to say that he grabbed the woman, pulled her into a vacant lot, and raped her. (*Id.*) Intimidated and coerced, Plaintiff agreed to confess as instructed. (*Id.* ¶ 50.) Faculak ordered Plaintiff to go with him and apologize to Ms. Anderson, which Plaintiff did. (*Id.* ¶ 51.)

At some point, certain police officers, including Walsh, went to Plaintiff's house and, without a warrant, seized Plaintiff's hat and coat. (*Id.* ¶¶ 52-53.) They proceeded to soil the garments to make them look more like the coat and hat Ms. Anderson described her attacker as wearing. (*Id.* ¶ 54.) In front of Ms. Anderson and several officers, Plaintiff was required to put on the dirty coat and hat and to appear before her. (*Id.* ¶¶ 55-56.)

O'Brien and Walsh took Plaintiff to another room and ordered him to confess to the attack on Ms. Anderson while Murphy typed up Plaintiff's statement. (*Id.* ¶ 57.) Fearing for his safety, Plaintiff related a story consistent with the one Faculak had conveyed to him. (*Id.* ¶ 58.) During the recitation, however, Plaintiff broke down and said that he would not go any further with the untrue story. (*Id.*) Sweitzer then shoved Walden and told him to continue. (*Id.* ¶¶ 59-

5

60.) Eventually, Plaintiff related a false confession and signed a false statement because he feared for his safely and for the welfare of his family. (*Id.* ¶ 64.)

Then an Assistant State's Attorney (ASA) walked into the room and asked Plaintiff to give an oral statement concerning the crime, but Plaintiff refused and said that he had been forced to confess. (*Id.* ¶¶ 65-66.) The ASA then asked Faculak and Sweitzer whether they had beaten or threatened Plaintiff to obtain his confession, and the officers denied knowledge of any mistreatment. (*Id.* ¶¶ 68-70.) The ASA, however, examined Plaintiff and saw physical injuries. (*Id.* ¶ 72.) Various police officers falsely reported that Plaintiff had been positively identified by Ms. Anderson as her attacker during the first encounter between them at the police station, on January 11, 1952. (*Id.* ¶ 74.)

Defendants reduced Plaintiff's statements to official reports and communicated them to prosecuting attorneys who presented the evidence at hearings and at trial in Plaintiff's prosecution. (*Id.* ¶ 75.) As a result of these reports, prosecutors decided to bring criminal charges against Plaintiff, accusing him of rape. (*Id.* ¶ 76.) Throughout the course of the trial, various Defendants presented the fabricated and coerced evidence and suppressed any indication that the information was false or misleading. (*Id.* ¶¶ 77-78.)

As a direct and proximate result of Defendants' actions, Plaintiff's motion to suppress his confession was denied and he was convicted by jury of rape. (*Id.* ¶ 79.) Walden was sentenced to seventy-five years in prison, and he served the first twenty months of it on Death Row at the Cook County Jail. (*Id.*) Subsequently, Plaintiff filed a petition for post-conviction relief, which was eventually denied by the Illinois Supreme Court. (*Id.* ¶¶ 80-82.)

In 1965, Walden received parole, and on November 18, 1965, he was released from prison. (*Id.* at 12.) In 1978, Plaintiff received a general pardon from then-Governor James Thompson. (D.E. 20 at 2.) On January 13, 2003, fifty-one years after Walden was first taken into custody, he received a pardon of innocence from then-Governor George Ryan for his conviction and seventy-five year prison sentence. (D.E. 1 ¶ 13.) Approximately one year after receiving his pardon of innocence, Plaintiff brought this suit.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *accord Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In ruling on the motion, the Court accepts all well-pleaded facts alleged in the complaint as true and accords the plaintiff every reasonable inference from those facts. *See McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 614 (7th Cir. 2001). In considering a motion to dismiss, a court may also take judicial notice of matters in the public record. *See Patay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *accord Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).

## DISCUSSION

I.    Multi-Count Issues

As to several counts of Plaintiff's complaint, the City raises the same objections. The

Court will address these arguments first and then will proceed to analyze the arguments of the City that are unique to individual counts of Plaintiff's complaint.

A.    Timeliness of Plaintiff's Claims

For Plaintiff's federal claims under Section 1983, the appropriate statute of limitations is two years. *Wiley v. City of Chicago*, 361 F.3d 994, 996 (7th Cir. 2004). Under the Tort Immunity Act, the statute of limitations for civil actions commenced under state law against state employees and entities is one year. 745 ILCS 10/8-101(a) (West 2004).

Federal law determines when a Section 1983 action accrues. *Sellars v. Perry*, 80 F.3d 243, 245 (7th Cir. 1996). Since the conduct at issue occurred in 1952, both parties seem to agree that Plaintiff's Section 1983 claims are time-barred unless the principles enunciated in *Heck v. Humphrey*, 512 U.S. 477 (1994), operate to postpone the accrual of Plaintiff's claims. *See, e.g., Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, *6 (N.D. Ill. Oct. 25, 2004); *see also Hobley v. Burge*, No. 03 C 3678, 2004 WL 1243929, at *4 (N.D. Ill. June 3, 2004).

1.    Threshold Retroactivity Issues

This case involves a very unusual set of facts—including two separate gubernatorial pardons almost thirty years apart and a plaintiff seeking to bring claims related to his prosecution and conviction, which conviction was entered following a jury verdict over fifty years ago. Perhaps most unique, however, is the potential applicability of the Supreme Court's decision in *Heck*, and the retroactivity question that exists concerning applicability of that decision.

The parties have not focused heavily on retroactivity issues. To the extent such issues have been aired in the briefing, the dialogue has focused on whether the Supreme Court's

8

decision in *Monell v. New York City Dept. of Soc'l Servs.*, 436 U.S. 658 (1978), should be applied retroactively so as potentially to ground liability against the City of Chicago. *See* D.E. 20 at 9-10 & n.8. In this regard, the City asserts that "[p]ursuant to the test set forth in *Chevron Oil*, the *Monell* decision was a clear break in the established law regarding municipal liability in § 1983 litigation and municipalities would suffer great inequity by its retroactive application." *Id.* at 10 n.8 (discussing *Chevron Oil v. Huson* 404 U.S. 97 (1971)); *see also* D.E. 23 at 8 (Plaintiff's response); D.E. 30 at 1-2 (City's reply arguing against retroactivity).

The retroactivity question concerning *Heck* (and, to a more limited extent, *Monell*) seems to be of substantial significance in terms of fairly analyzing the viability of Plaintiff's claims. The Court is reluctant, in the absence of meaningful adversarial briefing on the issue, to speak definitively, and the Court reserves the right to revisit the subject at the summary judgment or pretrial stages based on further argument of the parties. Nonetheless, the issue cannot be avoided at this juncture, given the impact that *Heck* plays on the motion to dismiss.

When analyzing the question of the retroactive application of *Heck* and *Monell*, the Court starts with the Supreme Court's teaching in *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86 (1993), which canvassed a landscape of arguably divergent approaches to retroactivity issues in prior precedent. After discussing that prior precedent, including *Chevron Oil*, the Court adopted the following rule:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. [. . . .]

*Id.* at 97; *see also id.* at 90 ("[W]e hold that this Court's application of a rule of federal law to the

9

parties before the Court requires every court to give retroactive effect to that decision."). In *Harper*, the Supreme Court also instructed that "our decision today makes it clear that 'the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case' and that the federal law applicable to a particular case does not turn on 'whether [litigants] actually relied on [an] old rule [or] how they would suffer from retroactive application' of a new one." *Id.* at 95 n.9 (quoting *James B. Beam Distilling Co. v. Georgia* 501 U.S. 529, 543 (1991) (opinion of Souter, J.)) (brackets in *Harper*); *see also Harper*, 509 U.S. at 98 ("[T]he legal imperative to apply a rule of federal law retroactively after the case announcing the rule has done so must prevail over any claim based on a *Chevron Oil* analysis") (internal quotation marks and brackets and citation omitted); *Leroy v. Illinois Racing Bd.*, 39 F.3d 711, 715 (7th Cir. 1994) (explaining that Seventh Circuit decision "applied its holding to the parties, and that decision is therefore fully retroactive") (citing *Harper*).

This Court proceeds cautiously, because retroactive application of *Heck* at least arguably produces an anomalous result in this case. (The City certainly appears to believe as much, based on its views concerning related issues.) That result occurs because *Heck* precludes a putative Section 1983 litigant from even advancing a damages claim related to his "allegedly unconstitutional conviction or imprisonment, or for any other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless and until that plaintiff can "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . ." *Heck*, 512 U.S. at 486-87. In this case, as explained below, under state law, Plaintiff's conviction was not expunged in a

10

manner that the law would regard as indicative of his factual innocence, as opposed to merely as indicative of his being forgiven for the crime, until some fifty years after the conviction was entered following the jury trial.

Thus, if *Heck* applies retroactively, it may in at least one sense revive claims that might have been time-barred under the City's view of law in the Seventh Circuit at and around the time when Plaintiff was released from prison in 1965. (At that time, at least in the City's view, Plaintiff would have been entirely free to advance his *Heck*-barred claims, so the statute of limitations on such claims would have run long ago.) The potential for revival or resurrection of claims potentially stems from the fact that *Heck* in effect tolls the statute of limitations for relevant claims (by precluding the plaintiff from bringing them at all), such that the limitations period does not begin to run until one of the preconditions to suit articulated in *Heck* is satisfied.

All of the cases the Court has located in its research have applied *Heck* retroactively. For example, there is substantial circuit court authority finding that *Heck* applies retroactively. *See, e.g., Abella v. Rubino*, 63 F.3d 1063, 1064 (11th Cir. 1995) (per curiam); *Boyd v. Biggers*, 31 F.3d 279, 282, n.2 (5th Cir. 1994). To be sure, both *Abella* and *Boyd* (like many others cases), applied *Heck* retroactively to cases that were in the judicial system at the time *Heck* was rendered. Other cases naturally have applied *Heck* to bar suits concerning events that predated *Heck*, without analysis of whether those suits might not have been barred in the particular jurisdiction at the date of the events and prior to the issuance of *Heck*. *See, e.g., Rice v. Nat'l Sec. Council*, 244 F. Supp. 2d 594, 601 (D.S.C. 2001); *Stocker v. Hood*, 927 F. Supp. 871, 872 n.3 (E.D. Pa. 1996). And in *Cunningham v. Eyman*, No. 95 C 2900, 2000 WL 748098 (N.D. Ill. June 9, 2000), Judge Moran stated that:

> [T]he Supreme Court has decreed that the courts give retroactive effect to every rule of
> federal law announced by the Court, regardless of whether the events in the lawsuit
> predate or postdate announcement of the rule. *See Harper v. Virginia Dep't of Taxation*,
> 509 U.S. 86, 95 (1993). Replying on *Harper*, other courts have found that the *Heck* rule
> applies retroactively to civil rights actions . . . .

*Id.*, 2000 WL 748098, at *5 (collecting cases); *see also Castillo v. Zuniga*, No. 01 C 616, 2002

WL 398519, at *4-5 (N.D. Ill. Mar. 14, 2002) (applying *Heck* to determine whether claims

alleging false arrest and related excessive force in 1989 were tolled under *Heck*, and therefore

were cognizable in the wake of plaintiff's unopposed 2000 post-trial petition to reverse

conviction on grounds of innocence, but finding that *Heck* was inapplicable to the specific claims

as applied).

    In addition, although the issue does not appear to have been actively litigated in the case,

in *Newsome v. McCabe* 256 F.3d 747 (7th Cir. 2001), the Seventh Circuit explained that *Heck*

would have barred claims related to the 1980 conviction and subsequent imprisonment of a civil

rights plaintiff who subsequently received a pardon of innocence from the Illinois Governor in

1995. *Id.* at 749. Specifically, the Seventh Circuit stated that the plaintiff's "claim based on

wrongful conviction and imprisonment did not accrue until the [1995] pardon." *Id.* (citing *Heck*

*v. Humphrey*, 512 U.S. 477 (1994). This appears, based on the Court's own research, to be the

clearest direction on the subject from the Seventh Circuit.

    The Court will not speak definitively, given the limited treatment that this issue has

received in the briefing. On the basis of the Court's own research, however, the Court will

follow the path sketched in *Harper*, *Newsome*, and *Cunningham* and will apply *Heck* in fully

retroactive fashion, such that the Court will analyze whether the Plaintiff's various claims would

12

have been *Heck*-barred prior to his second pardon, irrespective of whether Seventh Circuit law applied a "*Heck*" analog at the time Plaintiff was released from jail in 1965. The Court, of course, reserves the right to revisit this topic in the event that the parties present compelling authority suggesting a modified approach.[4]

        2.    *Heck* and the 2003 Pardon from then-Governor Ryan

Under *Heck*, if a claim by Walden on a Section 1983 claim "would necessarily imply the invalidity of his conviction or sentence," the statute of limitations does not begin to run on such a federal claim until his conviction or sentence has been vacated or otherwise resolved in his favor. *Heck*, 512 U.S. at 486-487. Specifically, *Heck* held that

> to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been *reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus*, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* (emphasis added). This teaching requires a look at whether either the 1978 pardon from Governor Thompson, on the one hand, or whether the 2003 pardon from then-Governor Ryan, on the other, served to nullify Walden's 1952 conviction sufficiently so as remove any *Heck* bar that might bear on when the Section 1983 claims could first be advanced. *See Gauger v. Hendle*, 349 F.3d 354, 361 (7th Cir. 2003). As explained below, the Court holds that the 1978 pardon did not

---

    [4]    The Court respectfully declines the City's request to refuse to apply *Monell* retroactively under *Chevron Oil v. Huson*, 404 U.S. 97 (1971), at least as the argument was presented. (D.E. 20 at 10 n.8.) *Harper* substantially if not essentially jettisoned *Chevron Oil. See Harper*, 509 U.S. 85, 95-97 & n.9 (1993).

nullify or meaningfully undermine the 1952 rape conviction under Illinois law, and that expungement only occurred under Illinois law with the 2003 innocence pardon from then-Governor Ryan.

A substantial portion of this case turns on the meaning and significance of a general pardon, on the one hand, and a pardon of innocence, on the other, under Illinois law. (The issue is relevant under *Heck*, and it also is relevant because Defendant argues that it impacts when state claims could be brought under Illinois law.) Defendant's argument in this regard boils down to the following: Governor Thompson's pardon of Walden in 1978 amounted to an acquittal, and an acquittal is tantamount to an invalidation of his conviction (under *Heck*) (D.E. 20 at 5) and a termination of the proceedings in Walden's favor (under state law). If 1978 is the point of accrual, then all of Plaintiff's claims are time-barred. Plaintiff, however, maintains that his claims did not accrue until January 13, 2003, the time at which he received a pardon of innocence. Plaintiff alleges that the general pardon differs from a pardon of innocence and that while the 1978 pardon "acquitted" Plaintiff of further punishment, it did not undermine or negate the validity of Walden's prior conviction. (D.E. 23 at 3.) As explained below, the Court concurs with Plaintiff's assessment of Illinois law.

Since at least 1977 Illinois has adhered to the view that "two forms of pardon are presently used by the Governor of this state, one based upon the innocence of the defendant and the other merely pardoning the defendant without reference to his innocence." *People v. Chiappa*, 368 N.E.2d 925, 926 (Ill. App. Ct. 1977). Consequently, "the guilt of the defendant is absolved by a pardon only where the same [pardon] states that it is based upon the innocence of the defendant. We therefore adhere to the finding that a general pardon . . . does not absolve the

14

defendant from guilt but forgives him for having committed the offense." *Id.* at 926-27. In other words, a general pardon "merely releases an inmate from custody and supervision," and it does not act to erase or negate an offender's conviction. *Talarico v. Dunlap*, 685 N.E.2d 325, 327 (Ill. 1997); *see also People v. Glisson*, 372 N.E.2d 669, 670 (Ill. 1978) ("The granting of a [general] pardon does not expunge the record. It merely provides official forgiveness[.]"). In a recent case, Illinois law was articulated as follows:

> Since the very essence of a pardon is forgiveness or remission of penalty, assessed on the basis of the conviction of the offender, a pardon implies guilt; it does not obliterate the fact of the commission of the crime and the conviction thereof. In other words, a pardon involves forgiveness but not forgetfulness. Accordingly, we find that petitioner's pardon did not erase his convictions. Rather, the pardon merely served to release petitioner from further punishment.

*People v. Thon*, 746 N.E.2d 1225, 1230 (Ill. App. Ct. 2001) (internal citations omitted).

All of this teaching strongly indicates that, under Illinois law, Plaintiff's conviction was not wiped clean until 2003 when he received a pardon of innocence.

Nonetheless, the City maintains that even if, as a usual matter, a general pardon under Illinois law does not automatically invalidate a conviction, it should in this case because the wording of the 1978 pardon stated that plaintiff was "acquitted" (D.E. 20 at 5, 8) and that an acquittal is tantamount to termination of the criminal case in the plaintiff's favor and an invalidation of the conviction. This contention is not persuasive when analyzed within the confines of Illinois law.

In *People v. Thon*, a former convict who received a gubernatorial pardon for past convictions petitioned the Circuit Court of Du Page County to expunge his arrest records for

15

those convictions. 746 N.E.2d at 1226.[5] As in the instant case, the gubernatorial pardon at issue

in *Thon* stated that it "acquitted" the plaintiff and "restored [him] to all his rights of citizenship

which may have been forfeited by his convictions." *Id.* at 1229. Nonetheless, *Thon* held that the

pardon did not terminate the plaintiff's prosecution in his favor. Rather, *Thon* held that the

pardon acted as a general pardon, which "does not obliterate the fact of the commission of the

crime and the conviction," but rather "releases an inmate from custody and supervision." *Id.* at

1230. Implicitly, *Thon* borrowed from the *Chiappa* decision the conclusion that unless the

pardon specifically and explicitly states that it is based on the innocence of the defendant, the

pardon is to be considered general, and thus does not absolve the criminal defendant of guilt. *Id.*;

*accord Chiappa*, 368 N.E.2d at 926. Given the stock, standard form of the pardon granted to

Walden in 1978, it cannot be assumed that the mere existence of the word "acquitted" invalidated

his conviction under Illinois law. Furthermore, the phrase immediately succeeding "acquitted"

stated that Walden was "discharged of and from all further imprisonment"—precisely the tenets

of a general pardon. (D.E. 20, Ex. B.) Therefore, the Court holds that the gubernatorial pardon

Plaintiff received on June 30, 1978 was a general pardon. As such, it did not invalidate his

conviction or act to terminate Plaintiff's conviction in his favor for purposes of *Heck* and the

corresponding state law requirements. Walden's causes of action thus did not accrue with the

---

[5]     The Court notes that in Illinois, having a conviction expunged and receiving a
pardon for innocence are separate things. Whereas only the Governor is allowed to grant
pardons, and he may do so "for all offenses on such terms as he thinks proper," the power to
expunge is controlled by a statute and requires the authorization of the legislature. *Thon*, 746
N.E.2d at 1229. Nonetheless, for this case the relevant points are the same since both cases
interpret the meaning of a general pardon.

16

signing of Walden's 1978 general pardon.[6]

## II.  Individual Claims

### A.  Federal Claims: Counts I through VI

#### 1.  Count I: Deprivation of a Right to Fair Trial and Wrongful Conviction Under the Fourteenth and/or Fourth Amendment

Defendant does not argue that a prior lawsuit by Plaintiff alleging a deprivation of a right to a fair trial and a wrongful conviction would not have undermined Plaintiff's conviction. Defendant's only argument for this count is that Plaintiff's claim accrued with his 1978 general pardon. This argument has already been rejected. Consequently, Defendant's motion to dismiss Count I is denied.

#### 2.  Count II: False Arrest and Wrongful Imprisonment Under the Fourth Amendment

For its motion to dismiss, Defendant argues that Count II, which is a Section 1983 claim under the Fourth Amendment for false arrest and imprisonment for the ensuing thirteen-plus years (1952-65), is time-barred. Specifically, Defendant claims that the cause of action for false arrest accrued at the time of Plaintiff's arrest. (D.E. 20 at 6.) Defendant contends that even if the

---

[6]      In its reply brief, the City offers several arguments for the first time. These include the suggestion that then-Governor George Ryan's second "innocence" pardon of Walden "breach[ed] the Separation of Powers Doctrine of the Illinois Constitution." (D.E. 30 at 1.) These arguments also include the contention that the existence of probable cause for Plaintiff's arrest and prosecution (in the City's view, grounded in the alleged fact that complainant/rape victim identified Plaintiff in connection with his arrest and testified that he was her assailant during the trial) bars Plaintiff's state law claims. (*Id.* at 6.) Because these arguments were advanced for the first time in the reply brief, and because Plaintiff accordingly did not have a full and fair opportunity to respond, the Court will not consider the arguments at the motion to dismiss phase.

statute of limitations on those claims was tolled while Plaintiff was in prison (under the state of the law as it alleged existed in the 1960s), the statute of limitations would have run on those claims by 1970 in any event because no *Heck*-bar existed in the law at that time. Defendant further maintains that, even if *Heck* were to apply, Plaintiff's Fourth Amendment claims (perhaps even all of Plaintiff's Section 1983 claims) could have been brought prior to the 2003 innocence pardon because Plaintiff's "criminal conviction rested on evidence obtained without regard to the incidents occurring after his arrest" and therefore the claims would not have impugned the validity of the conviction. (D.E. 30 at 4.)

The Seventh Circuit has taught that Section 1983 claims for improper arrests or searches often accrue at the time of the challenged arrest or search, regardless of subsequent proceedings. *See Wiley v. City of Chicago*, 361 F.3d 994, 996-97 (7th Cir. 2004); *Gauger v. Hendle*, 349 F.3d 354, 361 (7th Cir. 2003); *Perez v. Sifel*, 57 F.3d 503, 505 (7th Cir. 1995). This approach is based on the fact that "a wrongful arrest claim does not necessarily undermine a conviction; one can have a successful wrongful arrest claim and still have a perfectly valid conviction." *Wiley*, 361 F.3d at 997 (internal citations omitted).

Still, as Plaintiff notes, precedent teaches that this approach is no more than a general rule. *See id.* ("[T]his general approach must not be understood as a rule to be applied in every case."). As the Seventh Circuit recently held, *Heck* sometimes dictates a different result because "sometimes a successful challenge to a false arrest can indeed impugn the validity of the plaintiff's conviction," such that a putative Section 1983 plaintiff will have to wait until his criminal conviction is set aside to bring any claim. *Id.* (quoting *Gauger v. Hendle*, 349 F.3d 354, 361 (7th Cir. 2003)); *see also Patterson v. Burge*, 328 F. Supp. 2d 878, 896 (N. D. Ill. 2004). In

18

other words, if a plaintiff is arrested and prosecuted solely or perhaps principally on the basis of, for example, allegedly planted drugs or a coerced confession stemming from a false arrest, "a[n] attack on the arrest would necessarily challenge the legality of a prosecution premised on the [illegally gained evidence]." *Wiley*, 361 F.3d at 997; *see also Gauger*, 349 F.3d at 361 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)); *Patterson*, 328 F. Supp. 2d at 896-97 (holding that *Heck* prevented the plaintiff from advancing his Fourth Amendment claims until his conviction was overturned where the "only evidence" used at trial stemmed from coerced and fabricated testimony). By way of contrast, for example, if the allegedly coerced confession was but one of several pieces of evidence, including sufficient untainted evidence, an attack on the arrest would not challenge the legitimacy of the conviction.

The Court first proceeds to analyze whether Plaintiff's false arrest claim is *Heck*-barred. The City argues that Plaintiff could have attacked the lawfulness of his arrest without challenging the propriety of his conviction. Specifically, the City claims that the rape victim-complainant identified Plaintiff at trial, and the City asserts that the victim-complainant provided other testimony at trial. The Court cannot credit this assertion, at least at this stage of the proceedings, as the assertion is unsupported by any evidence and the proceedings are at the motion-to-dismiss stage (where Plaintiff's allegations control) in any event. The City also asserts that

> [a]fter the rape and while still in the hospital, the victim confronted 15 to 20 suspects and viewed other suspects after her release from the hospital. She identified no one. The victim saw the [P]laintiff at 103rd and Michigan and recognized him as the man who had attacked her. She stated that once the plaintiff saw her, he went into a drug store, then emerged almost at once and dashed across the street and boarded a northbound streetcar. A few weeks later, an employee of the drug store saw the [P]laintiff boarding a bus and notified the police. His arrest was based on an identification of him by the victim and an employee of the drug store. . . .

19

D.E. 30 at 4 (citing *People v. Walden*, 169 N.E. 2d 241, 242 (Ill. 1960)). In connection with this factual assertion, the City also makes the related legal assertion that the "clear and convincing testimony of a rape victim is sufficient under Illinois law to support a rape conviction." *Id.* n.3 (citing *People v. Anderson*, 20 Ill. App. 3d 840 (Ill. App. Ct. 1974)).

The question of whether an attack on the legality of the arrest would in effect challenge the legitimacy of the conviction is not suited to resolution at this stage of the proceedings. It is not possible, for example, to know whether the victim-complainant's trial testimony was "clear and convincing," assuming *arguendo* that the City's contention about Illinois law is correct. Moreover, the circumstances reported in the 1960 *Walden* opinion concerning the arrest are not particularly clear—at least as to how the identification testimony between the victim and the drugstore employee some weeks thereafter fit together so as to persuasively lead to the conclusion that the person in question was the Plaintiff. *Compare* D.E. 1 ¶ 19 (complaint alleging that when Plaintiff was arrested, he had "not been identified, either in person or by photograph, as the person who attached Ms. Anderson"). Finally, in the absence of the trial record (which the City suggests is available), it is not possible to fairly evaluate whether the pre-arrest identification evidence and alleged in-court identification were central pieces of evidence, or whether the allegedly tainted evidence (in the form of the coerced confession and the victim identification at the police station) that is asserted to have flowed from the unlawful arrest really was the heart of the prosecution's case. Under the circumstances, the City has not persuaded the Court that *Heck* did not bar pursuit of the false arrest claim. *See Gauger*, 349 F.3d at 361 (citing *Wong Sun*); *see also Castillo*, 2002 WL 398519, at *10 & n.14.

In Count II, Walden also argues that his subsequent incarceration for some fourteen years

violated his Fourth Amendment right to be free from an unreasonable seizure. (D.E. 1 ¶ 93.) This claim under the Fourth Amendment is defective under Seventh Circuit law. Specifically, the Seventh Circuit teaches that Section 1983 claims for false imprisonment and false arrest may be based only on unlawful arrests and/or detentions occurring up to the point of arraignment. *See Wiley*, 361 F.3d at 998 ("[W]e have held that the scope of a Fourth Amendment claim is limited up until the point of arraignment; 'the interest in bring prosecuted groundlessly is not an interest that the Fourth Amendment protects.'") (quoting *Gauger*, 349 F.3d at 362-63); *Patterson*, 328 F. Supp. 2d at 894-95. Accordingly, Plaintiff's Fourth Amendment contention concerning his fourteen-year imprisonment is not well-founded under Seventh Circuit law, although the damages encompassed in that claim may be encompassed within other claims that survive the motion to dismiss (*e.g.*, the fair trial claim, or the state law malicious prosecution claim).

     3.    Count III: Section 1983 Claim for Torture and Physical Abuse Under the Fourth Amendment

Count III accuses the defendants of using torture and physical abuse, as well as threats to commit torture and physical abuse, to coerce Walden to confess to the rape of Ms. Anderson, all in violation of Walden's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments. (D.E. 1 at 15-17.) Defendant maintains that these claims, like the claim in Count II, are time-barred since Walden's alleged injuries accrued at the time of his interrogation. (D.E. 20 at 6 (citing *Gonzalez v. Entress*, 133 F.3d 551, 555 (7th Cir. 1998)).

If Plaintiff's claim "necessarily demonstrates the invalidity of [a] conviction," the claim could not be brought while his conviction stood (*i.e.*, until January 13, 2003). *Heck*, 512 U.S. at 481-82. Applying *Heck* to the facts of this case, the Court concludes that Walden's claim in

21

Counts III is timely. *See, e.g., Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) (question

of whether a *Heck*-bar exists must be carefully analyzed in fact-specific manner based on

plaintiff's allegations and other evidence in the case). Walden's complaint alleges that the

central evidence used to convict him at trial was his coerced confession, the fabricated testimony

of officers who had beaten and intimidated him, and an allegedly flawed and tainted

identification of Walden by Ms. Elsie Anderson. A more fulsome exploration of the evidence

underlying the jury verdict may (or may not) fairly invite a second look at this issue at the

summary judgment stage.[7] However, on the basis of the papers filed, it appears that the

allegations of torture and abuse contained in Count III "are inextricably intertwined with the

allegations of coercion . . . which produced the critical evidence—a fabricated and involuntary

confession"—used to convict Walden. *Patterson*, 328 F. Supp. at 897; *accord Orange v. Burge*,

No. 04 C 0168, 2005 WL 742641, *7 (Mar. 30, 3005) (Holderman, J.) (collecting several recent

district court cases in the Northern District of Illinois in which claims of torture that produced

allegedly central evidence in the form of coerced confessions were found to be timely after

gubernatorial pardons because the claims previously would have been *Heck*-barred); *see also*

*Arizona v. Fulminante*, 499 U.S. 279, 292 (1991) (White, J., dissenting in part) (stating that a

"defendant's own confession is probably the most probative and damaging evidence that can be

admitted against him").

---

[7]     Defendant alleges that Ms. Anderson also identified Walden prior to his arrest,
although the subject is somewhat cloudy in the Illinois Supreme Court's 1960 *Walden* opinion
concerning what the identification testimony from Ms. Anderson (and related testimony from a
drug store employee concerning events some weeks after Ms. Anderson's initial sighting)
actually was.

Since Plaintiff's well-pleaded complaint contains allegations sufficient to conclude that his conviction was based primarily on his coerced confession and alleged acts directly related to it, for purposes of the motion to dismiss at least, the Court holds that Plaintiff could not have challenged his alleged torture, physical abuse, or coercive interrogation without impugning his conviction. Therefore, under *Heck*, Plaintiff's Section 1983 claims for coercive interrogation and torture did not accrue until his conviction was wiped away with the innocence pardon in 2003. Because Walden filed this suit on January 5, 2004, his claim in Counts III is timely.

    4.    Count IV: Section 1983 Claim for Coercive Interrogation Under the Fifth and Sixth Amendments

In Count IV, Walden advances a Section 1983 claim for coercive interrogation and a coerced confession related to the alleged acts and threats of torture encompassed in Count III. Most of the analysis for Count IV tracks the analysis for Count III, and the Court will not repeat it here.

Nonetheless, in its opening brief, Defendant includes a lengthy footnote alleging that Count IV should be dismissed for two other reasons. First, Defendant argues that "there is no constitutional cause of action for compensation pursuant to §1983 for Fifth Amendment violations concerning compelled self-incrimination." (D.E. 20 at 3 n.4.) Second, Defendant argues that Plaintiff has not alleged a Sixth Amendment violation in connection with his allegedly coercive interrogation. As explained, the first of these arguments is rejected and the second is credited, such that Count IV is dismissed in part.

    a.    Fifth Amendment Claim Concerning Coercive Interrogation and Confession and Prosecution Without Due Process of Law

23

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Defendant asserts that *Chavez v. Martinez*, 538 U.S. 760 (2003), held that the Fifth Amendment protection against self-incrimination does not provide any basis for civil liability. The Court respectfully rejects Defendant's argument, as the Court believes it overreads the holding in *Chavez*, which ruled that the plaintiff in that case was not entitled to a Section 1983 claim for a violation of his Fifth Amendment right because, unlike the instant case, his coerced statements were never used against him in a criminal prosecution. *See Chavez*, 538 U.S. 766 ("We fail to see how . . . [plaintiff] can allege a violation of the [Fifth Amendment] right, since . . . [plaintiff] was never prosecuted for a crime, let alone compelled to be a witness against himself.") (plurality opinion); *id.* at 769 (instructing that "mere coercion does not violate the test of the Self-Incrimination clause *absent use of the compelled statements in a criminal case against the witness*") (plurality opinion) (emphasis added); *id.* at 777 (Souter, J., concurring in part and delivering the judgment of the Court in part) (finding, where statements were not used against the declarant at any criminal trial, that allowing a Fifth Amendment/Section 1983 suit would be improper).

Nothing in *Chavez*, however, suggests that the Supreme Court rejected the idea of civil recovery under Section 1983 for the use of coerced confessions in actual criminal prosecutions. The Supreme Court was dealing with what was, at least in a majority of the Court's view, a more attenuated situation where no prosecution of the criminal defendant ever eventuated. (Even under those circumstances, the Court found that a substantive due process violation under the 14th Amendment might occur; that was the purpose of the Court's remand of the case. *See id.* at

779-80 (Souter, J., concurring in part and delivering the judgment of the Court in part).)

The Seventh Circuit has not spoken to the precise issue raised by Defendant's motion in the wake of *Chavez*, but it has summarized the holding of *Chavez* consistent with this opinion. Specifically, *Allison v. Snyder*, 332 F.3d 1076 (7th Cir. 2003), recently described the holding in *Chavez* as follows:

> A majority of the Justices concluded in *Chavez v. Martinez* that courts may not award damages against investigators who wrongfully induce suspects to supply incriminating information that is *never used in a criminal prosecution*. Four Justices (Thomas, J., joined by Rehnquist, C.J., and O'Connor & Scalia, JJ.) held this because the self-incrimination clause applies only to evidence used in a criminal case; two Justices (Souter, J., joined by Breyer, J.) held this because any judicially crafted expansion of the clause should be implemented by remedies other than money damages. . . . [A] different majority (Souter, J., joined by Stevens, Kennedy, Ginsburg & Breyer, JJ.) left open the possibility that damages could be awarded under a substantive-due-process theory in the event of genuine physical or mental coercion to speak . . .

*Id.* at 1080 (internal citations omitted) (emphasis added); *accord Rucks v. Owens*, No. 02 C 50490, 2003 WL 22287391, at *2 (N.D. Ill. Oct. 2, 2003) ("Because there was no use of any statements given by [the plaintiff] in a criminal prosecution against her, any mere coercive interrogation . . . does not violate the Self-incrimination Clause of the Fifth Amendment, and plaintiffs cannot maintain a section 1983 claim in that regard."). As a result, the Court does not believe that *Chavez* is properly read to hold that a plaintiff never can recover damages for a coerced confession that is actually used to help convict him at a trial. Accordingly, Defendant's motion to dismiss based on *Chavez* is respectfully rejected.[8]

---

[8]    The Court notes that the result in *Moton v. Protine*, No. 02 C 8591, 2004 WL 609312, *6 (N.D. Ill. Mar. 25, 2004), is not inconsistent with this Court's ruling. In *Moton*, no police interrogation ever even occurred. *See id.* at * 6, n.7. In dicta, *Moton* did say that under *Chavez*, "there is no cause of action under Section 1983 for violations of Miranda and the Fifth Amendment privilege against self-incrimination." *Id.* However, this statement in a single

   b.  Plaintiff's Sixth Amendment Claim Concerning His Allegedly
       Coerced Confession Is Unfounded

Plaintiff's asserts that he was wrongly denied the Sixth Amendment right to counsel in connection with his allegedly coerced confession. (D.E. 1 ¶ 100.) As explained below, this claim is dismissed.

A court must answer three questions to determine whether a violation of a person's Sixth Amendment right to counsel has occurred: (1) whether the right to counsel had attached at the time of the confession or court proceeding at issue; (2) if so, whether the accused executed a valid waiver of his right to counsel; and (3) absent a valid waiver, whether police conduct violated the accused's right to counsel. *See, e.g., United States v. Spruill*, 296 F.3d 580, 585 (7th Cir. 2002) (citing *Quadrini v. Clusen*, 864 F.2d 577, 585 (7th Cir. 1989)). Under the Sixth Amendment, "an accused person is entitled to counsel at critical stages of a criminal prosecution after the initiation of adversarial criminal proceedings 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Spruill*, 296 F.3d at 585 (quoting *Kirby v. Illinois*, 406 U.S. 682 (1972)). An interrogation occurs during the "critical stage" of a criminal prosecution, and thus the Sixth Amendment right to counsel attaches, "at any interrogation after the initiation of formal criminal proceedings against the accused." *Spruill*, 296 F.3d at 585 (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)).

At the time of his interrogation, no adversarial criminal proceeding had been instituted against Walden. Therefore, his Sixth Amendment right to counsel had not yet attached.

---

footnote was not essential to the *Moton* analysis. In any event, this Court respectfully disagrees with *Moton* to the extent it suggests that *Chavez* found, for example, that no recovery under Section 1983 is permissible in relation to a coerced confession that is later used in a criminal prosecution of the civil rights plaintiff.

Consequently, Defendant's motion to dismiss Count IV is granted in part as it relates to the Sixth Amendment claim.

5.  Count V: Equal Protection Claim Under The Fourteenth Amendment

In Count V, Plaintiff asserts that the police officers acted as they did (*e.g.*, committed the alleged acts of torture, false arrest, coercive interrogation, etc.) because he is an African-American and, as a result, the officers violated his right to equal protection under the Fourteenth Amendment. (D.E. 1 ¶¶ 103-04.) Defendant has moved to dismiss Walden's equal protection claim as untimely. (D.E. 23 at 7.) More specifically, Plaintiff alleges discriminatory actions in connection with his 1952 arrest, interrogation, and subsequent prosecution and conviction. Defendant argues that even if these claims were tolled during the period of time Plaintiff was imprisoned and therefore did not accrue until his release from jail in 1965, Plaintiff had no more than five years under the then-applicable statute of limitations. (*Id.*)

To state a viable Section 1983 equal protection violation, Walden must allege (1) that he is a member of a protected class; (2) that he was similarly situated to members of a protected class; (3) that he was treated differently than members of the unprotected class; and (4) that defendants acted with a discriminatory intent. *See, e.g., Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, *10 (N.D. Ill. Oct. 25, 2004) (citing *Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001)). Plaintiff has successfully pled all four elements. He alleges he is an African-American and that he was treated differently than similarly situated whites. He sufficiently pleads racist intent (D.E. 1 ¶ 103) and he also specifically asserts that during one of the alleged episodes of abuse, when Plaintiff denied that he attacked Ms. Anderson, Officer

27

Faculak said to Plaintiff, "You are lying, nigger," which is strong circumstantial evidence of discriminatory animus. (*Id.* ¶ 41.)

Where there are a number of acts that are the subject of other Section 1983 claims (e.g., false arrest, Fifth Amendment violation, etc.), some of which are time-barred and some of which are not, a plaintiff may not assert a Section 1983 equal protection claim for the time-barred applications. *See Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075,*8 (Oct. 13, 2004) (citing *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999), and evaluating only those alleged actions that were within the limitations period in assessing a Section 1983 equal protection claim). Plaintiff may bring an equal protection claim for those aspects of his other Section 1983 claims that are not time barred or otherwise defective. Accordingly, the City's motion to dismiss is granted in part and denied in substantial part.

### 6. Count VI: *Monell* Claim Against the City of Chicago

In Count VI, Walden alleges that the individual police officers' actions were the product of and amounted to the maintenance of unlawful *de facto* policies, practices, or customs of the City of Chicago and its Police Department. (D.E. 1 ¶¶ 106-107.) Plaintiff alleges that such policies and practices violated 42 U.S.C. § 1983.

Defendant argues that Plaintiff has failed to state a claim on which relief can be granted because *Monell v. New York City Dept. of Soc'l Servs.*, 436 U.S. 658 (1978), was not decided until well after Plaintiff was arrested, prosecuted, and released from prison. (D.E. 20 at 9.) A *Monell* claim is an action for municipal liability when alleged violations occur as a result of city policy or practice. *Hobley*, 2004 WL 2658075, at *8. The gist of Defendant's argument is that

28

Plaintiff cannot rely on *Monell* for any of its claims, since such reliance would require *Monell* to be applied retroactively, which it should not be, Defendant argues, under the teachings of *Chevron Oil v. Huson*, 404 U.S. 97 (1971). (D.E. 20 at 10 n.8.) As previously explained, the Supreme Court's decision in *Harper* substantially if not entirely abandoned *Chevron Oil. See, e.g., Harper v. Virginia Dep't of Taxation*, 509 U.S. 85, 95-97 & n.9 (1993). Given this teaching in *Harper*, and the other language in *Harper* discussed above, the Court respectfully declines the invitation not to apply *Monell* retroactively. *See Harper*, 509 U.S. at 90 ("[W]e hold that this Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to that decision.").

The Court also notes that Defendant may not be correct in its assertion that "the state of the law at the time of plaintiff's arrest and interrogation . . . was that municipalities were immune as to their governmental functions and that immunity had not been abrogated by the Civil Rights Act." (D.E. 20 at 9.) For support, Defendant footnotes various circuit court cases from the 1950s. However, in *Monell*, the majority held that *Monroe v. Pape*, 365 U.S. 167 (1961), "was a departure from prior practice," at least "insofar as it completely immunize[d] municipalities from suit under § 1983." *Monell*, 436 U.S. at 695.[9] *Monell* further suggests that in 1952, one of the times Defendant states the Court should consider in its motion to dismiss, municipalities could be defendants in Section 1983 suits. *Id.* (collecting cases). *Monell* also distinguished the cases cited in *Monroe* supporting the conclusion that municipalities did not qualify as "persons" under

---

[9]     *Monell* also concluded that "the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell*, 436 U.S. at 690 (emphasis in original).

29

Section 1983 by holding that it "has never been the law" that "state-law immunities [can override] the § 1983 cause of action," despite any contentions to the contrary. *Id.* at 695, n.59. Thus, even if one were to assess whether a "*Monell*" theory could be advanced in 1952, when Defendant asserts that the question must be analyzed, the cases cited by the *Monell* Court to explain its holding, and the legislative history cited in *Monell*, would strongly appear to dictate that Plaintiff's claim would be viable in any event. Defendant's motion to dismiss Plaintiff's *Monell* claim is denied.

      B.     State Claims: Counts VII through XIV

           1.     Counts VII through X: False Imprisonment, Malicious Prosecution, Intentional Infliction of Emotional Distress, and Conspiracy

Defendant objects to Counts VII through X of Plaintiff's complaint for false imprisonment, malicious prosecution, intentional infliction of emotional distress, and conspiracy on the same grounds: that Walden's state criminal proceedings were terminated in his favor in 1978, through his receipt of Governor Thompson's general pardon. (D.E. 20 at 8.) (In this regard, the City admits that Plaintiff's state "claims did not accrue until the termination of [P]laintiff's state criminal proceedings in his favor." (*Id.* at 8 (collecting cases).) Specifically, Defendant alleges that the pardon amounted to an acquittal, and that an acquittal is tantamount to a termination of proceedings in Plaintiff's favor. (*Id.*) The Court has already rejected this argument. The Court, following a number of Illinois state court cases, including *People v. Thon*, 746 N.E.2d 1225 (Ill. Ct. App. 2001), holds that the 1978 pardon did not result in a termination of the proceedings in Plaintiff's favor, but that the 2003 pardon did. As a result, the state causes of action accrued in 2003.

30

2. Counts XI and XIII: *Respondeat Superior* and Section 9-102 Claims Against the City of Chicago

In Counts XI and XIII, Plaintiff seeks to hold the City of Chicago liable for the actions of its officers for their alleged conduct against Walden in 1952 under the doctrine of *respondeat superior* and the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102 (West 2004), respectively. "Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Woods v. Cole*, 693 N.E.2d 333, 336 (Ill. 1998). Municipalities may not be liable for Section 1983 claims under the doctrine of *respondeat superior*. *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). Thus, Count XI relates to Walden's state law claims only.

Relatedly, Section 9-102 provides that a "local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable in the manner provided in the Article." 745 ILCS 10/9-102. Therefore, a local public entity would be directed to pay a tort judgment or settlement of a liable employee acting in the scope of his duty. *See, e.g., Wilson v. City of Chicago*, 120 F.3d 681, 685 (7th Cir. 1997) (holding that a claim brought under Section 9-102 survived defendant's motion to dismiss since police officer was acting within scope of his employment with city when he tortured suspects to obtain confessions, as required for city to be derivatively liable for civil rights judgment against officer).

Defendant appears to maintain that Plaintiff's *respondeat superior* and Section 9-102 claims should be dismissed because the named police officers apparently are not going to be

31

actual defendants in the case (since they have not been served and appear to be deceased) and therefore cannot be found personally liable. As a result, the City argues, the City cannot be held liable since "[v]icarious liability cannot exist without primary liability." (D.E. 20 at 11.) In responding to the argument, Plaintiff maintains that whether the individual officers are defendants in the lawsuit is irrelevant to Plaintiff's claim. (D.E. 23 at 12-13.)

Defendant's argument is unpersuasive, at least as presented. It appears that, under Illinois law, whether a primary defendant is actually ordered to pay damages or is not named in the complaint is not relevant to determining liability under *respondeat superior*. *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994) (holding that "'it is sufficient for recovery against a public entity to prove that an identified employee would be liable even though that employee is not named a defendant in the action'") (quoting *McCottrell v. Chicago*, 481 N.E.2d 1058, 1060 (Ill. App. Ct. 1985)). Instead, a plaintiff must only demonstrate that an agent *would be* liable; he need not actually cause him to be liable in a court proceeding. *See McCottrell*, 481 N.E.2d at 1060. To the extent Plaintiff's argument is that the officers could not be held liable because the claims against them are time barred, that argument also fails. Defendant's ground for maintaining Walden's claims are time-barred has been that Walden's state law-based causes of action accrued in 1978, and that the statute of limitations had passed by the time the Walden actually filed his complaint in 2004. As discussed elsewhere, the Court believes that Defendant's argument is unavailing. Therefore, Defendant's motion to dismiss Counts XI and XIII is denied.

III.    The Question of Laches Is Not Generally Amenable To Resolution on a Motion to Dismiss

The City also asserts that Plaintiff's claims should be barred under the doctrine of laches

32

because Plaintiff delayed in filing his claims in a manner that "is unreasonable and inexcusable" and that has "materially prejudice[d] the defendant." (D.E. 20 at 11 (collecting cases).) Accordingly, the City suggests that "fairness requires dismissal of [P]laintiff's complaint in its entirety." (*Id.* at 13.) The Court respectfully rejects this argument as a basis to dismiss the Complaint.

First, the nature of the inquiry needed to fully and fairly evaluate any laches claim "is such that most courts have found the defense of laches to present questions of fact unsuitable for resolution at the pleading stage." *Abbott Laboratories v. CVS Pharmacies, Inc.*, No. 01 C 2772, 2001 WL 777060, at *3 (N.D. Ill. July 11, 2001) (Kocoras, J.) (collecting authorities); *accord Nissan Motor Co., Ltd. v. BMW (US) Holding Corp., et al.*, No. 02 C 1945, 2002 WL 31426654, at *1 (N.D. Ill. Oct. 28, 2002) (Hibbler, J.) (collecting authorities and stating that "[o]rdinarily, a motion to dismiss is not the appropriate vehicle to raise the defense of laches."). The Court believes the presumptive path—*i.e.*, of not trying to resolve laches issues until a full factual record can be assessed—is the most sensible one to follow here. This case involves an atypical, perhaps even unique, factual setting, with two separate gubernatorial pardons and a claim of serious police and prosecutorial misconduct concerning a serious felony conviction that was rendered some half century ago. More information, rather than less, will facilitate an analysis of the issues attendant to any laches defense.

The Court further notes that the potential applicability of any laches defense to some or all of Plaintiff's claims appears to implicate at least one meaningful legal issue that has not been addressed by the parties. In *Maksym v. Loesch*, 937 F.2d 1237 (7th Cir. 1991), the Seventh Circuit notes that "[i]n Illinois . . . the great weight of authority is that laches is a defense only in

33

equity cases." *Id.* at 1248; *accord Hot Wax, Inc. v. Turtle Wax, Inc.* 191 F.3d 813, 820 (7th Cir. 1999) (quoting *Maksym*, 937 F.2d at 1248)). Because the plaintiff in *Maksym* was suing exclusively for damages (as Plaintiff is doing here) the defense of laches was inapplicable. *Id.* Although the Court need not decide the issue now, to the extent any laches defense might be raised in a summary judgment motion, the parties likely should explore whether a laches defense is even in play with respect to the state law claims.

CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is denied in substantial part and granted in part, as to Plaintiff's Fourth Amendment claim for unlawful imprisonment after his arraignment and as to Plaintiff's Sixth Amendment claim.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: *April 25, 2005*