September 16, 2007

John L. Stainthorp
People's Law Office
1180 N. Milwaukee
Chicago, IL 60622

Re: Walden v. City of Chicago, 04 C 0047

Dear Mr. Stainthorp,

I am writing in response to your request for my analysis of several alleged *de facto* policies, practices, and/or customs of the City of Chicago and its Police Department, in existence in 1951-2 at the time of the arrest and prosecution of Oscar Walden, Jr. I am currently a researcher and doctoral candidate at the University of Illinois—Chicago completing my dissertation on the relationship between African Americans and the police in Chicago throughout the 20th century.

The alleged policies and practices that you requested I consider include:

a) whether the City of Chicago and its police department had a *de facto* policy, practice and/or custom of conducting physically, psychologically or otherwise illegal or improper coercive interrogations of suspects and arrestees in order to obtain confessions and wrongful convictions, particularly where the suspect was a black man accused of raping a white woman;

b) whether the City of Chicago and its police department had a *de facto* policy, practice and/or custom of allowing the physical abuse of African-American men accused of raping white women;

c) whether the City of Chicago and its police department had a *de facto* policy, practice and/or custom of failing to allow arrestees access to counsel.

What follows is an historical assessment of the existence and extent of each of the alleged policies listed above. In addition to the footnoted references, Appendix A at the end of this document includes a description of the sources that I consulted in the process of providing this analysis. Five documents in particular were most useful in addressing the specific interest in the alleged policies listed above. These include the Wickersham Commission Report of 1931; two reports by the John Howard Association, *Held Without Bail* (1949) and *Chicago Police Lockups* (1963); a 1952 report by the Chicago City Council's Emergency Committee on Crime; and a 1959 report by the American Civil Liberties Union (ACLU), *Secret Detention by the Chicago Police Department*. I have chosen to quote extensively from these sources in an effort to provide you, the court, and the city's attorneys with an in-depth understanding of the extent and nature of alleged

abuses by the Chicago Police Department around the time of Oscar Walden's arrest and interrogation in 1951-2.

Before examining the findings of the various reports and studies mentioned above, I begin with a discussion of the historical context into which the Wickersham Commission report was released and the response to it by Chicago police officials. I then provide a brief history of police and race relations in Chicago around the time of Oscar Walden's arrest and interrogation. Finally, the remainder of this report examines the alleged practices listed above using the documents cited to assess the allegations under consideration.

2

## The Wickersham Commission in the context of American policing history

The Wickersham Commission report, published in 1931, was unique in comparison to other studies of the police and law enforcement produced in the same period. The two-volume report marks an important transition in the field of American criminology, which began to flourish in the 1930s with the work of urban sociologists at the University of Chicago. The Wickersham Commission strongly advocated the sociological and scientific approach to the study of crime, as opposed to the prevailing psychological and/or biological approaches. The authors of the report consulted and interviewed judges, prosecutors, police commissioners, detectives, public defenders, social workers, newspaper editors, police reporters, law professors, and prison wardens.

That the commission made a distinct effort to study police misconduct was also unique. At the time, there was no powerful political constituency calling for a national investigation into police abuses. Rather, the commission's study of police lawlessness originated out of a conservative tradition of "good government" reform.

Furthermore, the Wickersham Commission's report was extraordinary in three other ways. First, the degree of detail provided by the study's participants and researchers is astonishing. Secondly, the survey was national in scope with ample evidence culled from an extensive study of fifteen major cities across the country. Finally, the writers of the report carefully considered the official repudiations of the existence of police abuses and, in light of the overwhelming evidence to the contrary, rejected the official denials.[1]

---

[1] *Guide to the microfilm edition of Records of the Wickersham Commission on Law Observance and Enforcement.* Samuel Walker (Ed.), (Bethesda, MD.: University Publications of America), 1997.

Official response to the Wickersham Commission's accusations of use of the "Third Degree" by Chicago Police

Not surprisingly, police officials across the nation denounced the report and immediately rejected its findings. CPD Commissioner John Alcock issued a strong statement of denial and dismissed the allegations as complaints of criminals and their lawyers. He defended the department and his administration of it by claiming that he had given an order when he took over the police department not to abuse or mistreat a prisoner. He even repeated the Wickersham Commission's findings that torture and the third degree were ineffective and therefore had no place in his police department. In the face of the report's overwhelming evidence to the contrary, Alcock's chief of detectives John Norton claimed those tactics were not in use and never had been. Accusations of police mistreatment were "the old cry of the thief," attempting to get the "sympathy of the juries," according to Norton. Mayor Anton Cermak and Cook County State's Attorney John Swanson denied the use of the "third degree" in Chicago and roundly criticized the inclusion of Chicago in the Wickersham study.[2]

The report was wholly dismissed and scorned by police officials who ridiculed the concern for prisoner's rights displayed in the Wickersham report. The following exchange among police officials recorded by the *Chicago Tribune* fairly represents the contempt with which many police departments viewed the findings of the Wickersham Commission's report on *Lawlessness in Law Enforcement*:

> "I suppose that you mustn't ask a guy about how he got the blood on his hands…I should say not. You should not question the dear boys about how they happened to kill the old lady…Don't you fellows know, that you shouldn't annoy a prisoner in any way? You should send out for some pumpkin pie and milk and feed it to him with a spoon."[3]

Such condescending public statements disregarding the seriousness of the commission's findings highlight the police department's general lack of interest in respecting the constitutional protections of the accused and demonstrate why, according to subsequent studies, the use of the 'third degree' and incommunicado detentions by the Chicago Police continued unabated. Furthermore, there is no evidence that the CPD engaged in any investigation or study to determine the validity of the Wickersham Commission's allegations of abuse within the CPD.

But the Wickersham commission was not alone in its identification and denunciation of the use of torture and the third degree by the Chicago Police Department in this period. The Illinois Crime Survey of 1929 also found that the Chicago Police Department engaged in illegal methods:

> Criticized for their inability to discover the perpetrator of a particular crime, scolded by the press and the public, and smarting under the criticism of failure, they have resorted to the "third degree" and other improper and other dishonest police methods…Instead of being a purely

---

[2] *Chicago Tribune*, Aug. 11, 1931, pp. 1 and 13; Aug. 12, 1931, pp. 6 and 13.
[3] *Chicago Tribune*, Aug. 11, 1931, p. 13.

crime detecting and apprehending agency, the police force of Chicago has been through all the history of our City, the adjunct of whatever political faction happened to be in power. Its activities have been limited to the policy of the administration, instead of being governed and controlled by the letter of the law.[4]

However, police abuse was not the main focus of the Illinois Crime Survey of 1929 and its findings on this matter were not highly publicized and thus did not attract similar denials by police and public officials like those of the Wickersham Commission.

---

4 The Illinois Association of Criminal Justice, *The Illinois Crime Survey*, (Chicago: Blakely Publishing Co.), 1929, p. 289.

Historical context of Chicago race relations and changes in police use of the "Third Degree"

While the coercive practices of the Chicago police represent an historic parallel with the illegal practices of other municipal police departments in this period, Chicago's particular historical context shaped the nature, targets, and form of abuse in which its police officers engaged.

Following the Progressive era of the 1910s, Chicago police officers acquired an enormous degree of police discretion in dealing with young people during the 1920s and 1930s. The police regularly used violence or the threat of violence to control youth behavior and routinely resorted to violence in interrogations of juveniles and young adults. This produced a rough method of dispensing immediate punishment for delinquent behavior, leading to an arbitrary and brutal system of informal discipline regardless of actual guilt or innocence.[5] This practice continued through the end of the 1950s and would have applied to Mr. Walden who was still only twenty years old when he was arrested and allegedly violently interrogated.

In addition, from 1931-1956 a special police unit known as "Scotland Yard" often operated in direct violation of suspects' civil rights. The unit, though focused mostly on organized crime, operated a torture chamber on the second floor of the Canalport Station. This was actually a continuation of an older tradition dating back to the 1890s and early 1900s when the "blue room" at the Harrison Street lockup was employed for purposes of extracting unwilling confessions through torture.[6] Though these particular institutionalized practices were most often used for organized crime suspects from the 1890s through the mid-1920s, the available evidence suggests that by the mid-1920s the same tactics were increasingly being used against African American arrestees and less employed against members of organized crime who the police came to fear because of threats of reprisals.[7] Over the course of the 1920s and 1930s, young black men in Chicago became the primary population susceptible to illegal and coercive police interrogations.

A number of important transitions began to unfold in 1945 that critically shaped police-civilian relations in post-World War II Chicago. In particular, racial and ethnic animosities flared amid post-war competition over housing and employment, with many "ethnic" (Irish, Italian, Eastern European) neighborhoods resisting the expansion of black residential patterns by employing organized campaigns of violence and intimidation. After several years of open conflict, it became a political liability for Chicago mayors or police personnel to appear to openly defend black Chicagoans.[8]

In addition, with the takeover of illicit gambling operations in predominately black neighborhoods by the Italian syndicate beginning in the early 1940s, black politicians' prior influence over police behavior (through gambling financed graft) in

---

5 Wolcott, David. *Cops and Kids: Policing Juvenile Delinquency in Urban America, 1890-1940.* (Columbus: Ohio State University Press, 2005), pp. 120-124.

6 Lindberg, *To Serve and Collect*, p. 292.

7 Wickersham Commission report, pp. 125-126. See also, report by Judge Eugene Pincham, on file with the People's Law Office, p. 7.

8 Hirsch, Arnold. *Making the Second Ghetto: Race and Housing in Chicago, 1940-1960.* (Chicago: University of Chicago Press, 1998); Hirsch, Arnold. "Massive Resistance in the Urban North: Trumbull Park, Chicago, 1953-1966." (*Journal of American History*, No. 92, September 1995); Kimbal, *Combating the City of Neighborhoods* (Ph. D. dissertation, Carter G. Woodson Library).

6

black areas diminished.[9] This loss of black political influence with South and West Side police, coupled with rising post-war racial animosities, produced a culture of impunity among many Chicago police officers and officials especially towards low-income African American males in Chicago.

Chicago was unique in this period for the degree of power over policing operations that it continued to grant to ward committeemen even after most other municipal governments had ended this practice during the Progressive era.[10] The protection of police misbehavior by white ward committeemen and police officials, and the failure of the police department to investigate and take disciplinary action against abusive officers, made possible the development of an internal police culture that promoted and protected aggressive police practices such as illegal detentions and the "third degree," especially against African American male defendants.

---

9 Demaris, Ovid. *Captive City* (New York: Pocket Books, 1970); Lombardo, Robert. *The Black Mafia: African-American Organized Crime in Chicago, 1890-1960*; Lindberg, Richard. *To Serve and Collect: Chicago Politics and Police Corruption from the Lager Beer Riot to the Summerdale Scandal, 1855-1960.* (Carbondale: Southern Illinois University Press, 1998); Grimshaw, William. *Bitter Fruit: Black Politics and the Chicago Machine, 1931-1991.* (Chicago: University of Chicago Press, 1992); Cayton, Horace and St. Clair Drake. *Black Metropolis: A Study of Negro Life in a Northern City, Vol. I and II.* (New York: Harper & Row, 1962).
10 Bopp, William J. *"O. W.": O. W. Wilson and the Search for a Police Profession* (Port Washington, N.Y.: Kennikat Press, 1977).

A) Coercive Interrogations to Obtain False Confessions

The first alleged practice, using illegal coercive interrogations to obtain confessions and false convictions, is the most important because it is the context in which the two remaining alleged practices occurred. The Wickersham Commission and ACLU reports are the most relevant and provide the most detailed information in regards to police practices of holding someone illegally and the use of physical abuse to coerce confessions. The reports by the John Howard Association and the Chicago City Council are also important because they provide further context, verification, and official acknowledgement of the existence of the alleged practices. Taken together, the reports are remarkably consistent and strongly indicate that the Chicago Police Department did in fact have an historic pattern and de facto policy of illegally detaining suspects and conducting illegal interrogations before, during, and after the period in question. Furthermore, the reports strongly suggest that such policies and practices were increasingly used against black males.

The Wickersham Commission report of 1931 constituted, among other things, a broad inquiry into the practice of the "Third Degree" which the report defined as "a secret and illegal practice," in which the police coercively interrogate a suspect using "infliction of mental or physical suffering."[11] The Wickersham Commission found that:

> Several other illegal practices have important relations to the third degree. These include, (1) illegal arrests; . . . (3) illegal detention without production in court; . . . (5) isolation of the prisoner from his family and friends; (6) denial of the opportunity to get counsel or interview counsel; (7) confinement in bad quarters or under bad living conditions. . . . Prolonged detention of the prisoner, away from family, friends and lawyers affords favorable opportunities for the infliction of the third degree.[12]

The report further noted that "still more important . . . are the legal limits upon detention after arrest, since disregard of these allows more time for possible infliction of the third degree in order to build up the case against the suspect."[13] The report noted that an officer who has arrested a person without a warrant "has authority to detain him in custody only for such time as may reasonably be necessary to procure a legal warrant for his further detention, or until a preliminary hearing of the charge against him can be had... [D]elay is not made reasonable or necessary by the fact that the police or the prosecutor want time in which to interrogate their prisoner."[14]

---

[11] Wickersham Commission Report, pp. 20-21. Officially titled, the Eleventh Report of the National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement, The Third Degree, presented to President Herbert Hoover by the National Commission in 1931 (hereafter, Wickersham Commission Report).

[12] Wickersham Commission Report p. 31

[13] Wickersham Commission Report, p. 33

[14] Wickersham Commission Report, pp. 33-34

8

In investigating the existence of the third degree, the Wickersham Commission cited the 1930 Committee on Lawless Enforcement of Law of the American Bar Association. This committee found that:

> It is common practice to ignore the law which requires that an arrested man be promptly brought before a magistrate... Sometimes he is held without being formally placed under arrest. He is held incommunicado... He is not allowed to see or communicate with attorney, relative, or friend. The common and principal purpose of holding a man incommunicado is to get a confession from him... The boldness with which the sheriffs, police, and State's attorneys practice this lawlessness is astonishing and goes on in spite of protests and rebukes from the courts... To obtain confessions or admission the officers (usually detectives) proceed to "work" the prisoner. "Work" is the term used to signify any form of what is commonly called the third degree, and may consist in nothing more than a severe cross-examination. . . . [R]efusal to answer may be overcome by whipping, by beating with rubber hose, clubs or fists, or by kicking, or by threats, or promises...

> After [detectives] have wrung from the prisoner a confession, he may be asked if he does not wish to talk with the State's Attorney, who is informed that the prisoner has confessed and is there to have his statement put in proper form. The State's attorney, being supposed to have no knowledge of the means used to get the first confession, now obtains a statement from the thoroughly subdued prisoner, a statement apparently voluntary, not induced by promises, threats or violence - fair on its face and ready to be put in evidence unless the prisoner pleads guilty... It is conservative to say that for every one of the cases which do by a long chance find a place in the official reports there are many hundreds and probably thousands, of instances of the use of the third degree in one form or another.[15]

The Wickersham Commission then turned to an examination of the policies and practices of various city police departments, including Chicago. The commission first considered the laws in Illinois and Chicago which forbade the failure of police to promptly take an arrestee before a magistrate, as well as the infliction or threat of violence to obtain a confession, but found that "a consideration of the evidence and of the reported cases leaves *no doubt* that, despite these statutes, *the third degree is thoroughly at home in Chicago*" [emphasis added].[16] The commission referred to "one of the best informed persons on Chicago practices" who told the Commission that "it was an exception when a suspect was not subjected to personal violence."[17] While the Commission noted that some suggested that violence against suspects was diminishing, it attributed this to the fact that "corruption and influence protect certain suspects; that fear

---

[15] Wickersham Commission Report, pp. 47-48.
[16] Wickersham Commission Report, p. 125
[17] Ibid.

of reprisals protects others... *Violence is regarded as general and prevailing in cases outside of the protected groups of suspects*" [emphasis added].[18]

The commission found that the methods of violence used in Chicago to coerce confessions included beating with rubber hoses, beating the shins, hitting the prisoner on the side of the head with a heavy telephone book and suspending a prisoner upside down.[19] The Commission also found that "illegal detention and detention *incommunicado* are said to be common. The police are slow about bringing prisoners into court or even booking them... 'Losing' men for days at a time is common. This absence of record blocks attorneys when they go to the police demanding to see their clients. The professional criminals usually have their attorneys on the watch in advance of arrest, but persons who do not make such arrangements often have difficulty in getting in touch with attorneys."[20]

In addition to the use of violence, the Commission also found that it was a practice of the Chicago Police Department to detain suspects after arrest for the purpose of interrogating them, and that this practice encouraged the use of physical violence and threats. The Commission quoted from the 1927 monograph on the Bail System in Chicago, authored by Professor Beeley, who found:

> A not uncommon practice is to detain a suspect or an offender without booking him. Such a practice is, of course, illegal. It is often done in order to ward off counsel, service of the *habeas corpus* writ, newspaper reporters, etc., until after the police and the public prosecutor have had time to collect the evidence in the case or to extort a confession. Accused persons and suspects are sometimes thus held *incommunicado* for days. In the process of losing them from lawyers, friends, bondsmen, etc., the police may take such persons to half a dozen different police stations.[21]

In a section of the Wickersham Commission Report entitled, "Conclusions as to the Existence of the Third Degree," the report first noted that "[t]he problem is one of police administration and therefore local. Conditions may differ in near-by localities, even in cities in the same State subject to the same laws."[22] The Commission concluded, however, that:

### I. EXISTENCE
The third degree - the infliction of pain, physical or mental, to extract confessions or statements - is widespread throughout the country.

---

[18] Wickersham Commission Report, p. 126 (emphasis added).

[19] Ibid.

[20] Wickersham Commission Report, p.127

[21] Wickersham Commission Report, p. 129; the Commission also cited decisions of the Illinois Supreme Court which found that the third degree had been utilized in criminal investigations in Chicago, including *People v. Sweeney*, 304 Ill. 502 (1922); *People v. Vinci*, 295 Ill. 419 (1920); *People v. Berardi*, 321 Ill. 47 (1926); *People v. Holick* 337 Ill. 333 (1929); *People v. Ziderowski*, 325 Ill. 232 (1927); and *People v. Rogers*, 303 Ill. 578 (1922); as well as nine other cases where there was evidence of the third degree, but the evidence was conflicting.

[22] Wickersham Commission Report, p. 152

## II. PHYSICAL BRUTALITY

Physical brutality is extensively practiced. The methods are various. They range from beating to harsher forms of torture. The commoner forms are beating with the fists or with some implement, especially the rubber hose, that inflicts pain but is not likely to leave permanent visible scars.

## III. PROTRACTED QUESTIONING

The method most commonly used is protracted questioning. By this we mean questioning - at times by relays of questioners - so protracted that the prisoner's energies are spent and his powers of resistance overcome... At times the questioning is accompanied by blows...

## IV. THREATS

Methods of intimidation adjusted to the age or mentality of the victim are frequently used alone or in combination with other practices. The threats are usually of bodily injury.

## V. ILLEGAL DETENTION

Prolonged illegal detention is a common practice. The law requires prompt production of a prisoner before a magistrate. In a large majority of the cities we have investigated this rule is constantly violated... The practice of holding persons *incommunicado* - unable to get in touch with their families, friends or counsel, is frequently encountered.[23]

The Commission also noted that where the violence had occurred at police headquarters, as occurred in Chicago in *Sweeney*, "[i]t seems fair to conclude that... it is the *expression of a departmental policy*" [emphasis added].[24] In Appendix VI the Commission concluded that in Chicago, "the special study shows that the third degree exists."[25]

The Commission examined the "General Characteristics of the Third Degree," and found that of the thirty-six appellate court cases finding the 'third degree' in which an age of the victim was cited, thirty one involved victims under 25.[26] The Commission's investigators also "received reports from several communities that *third-degree practices are particularly used against Negroes*" [emphasis added].[27] The report also found that "the third degree is especially used against the poor and uninfluential... and [that this is] confirmed by official informants and judicial decisions. The likelihood of abuse is less when the prisoner is in contact with an attorney."[28]

---

[23] Wickersham Commission Report, pp. 153-54
[24] Wickersham Commission Report, p. 171
[25] Wickersham Commission Report, p. 244
[26] Wickersham Commission Report, p. 157
[27] Wickersham Commission Report, p. 158
[28] Wickersham Commission Report, p. 159

The Wickersham Commission Report considered the existence of the third degree in the years 1921 to 1931, twenty to thirty years before the events in the Walden case. It is reasonable, however, to conclude that the practices identified in the Wickersham Commission Report continued to exist in Chicago at the time of Mr. Walden's arrest, interrogation, and prosecution for several reasons. First, there is no evidence that the City of Chicago or its police department took any steps to address the concerns set forth by the Wickersham Commission Report. In particular, I understand that the City of Chicago has so far failed to identify any investigation, evaluation, report, findings, analysis, or conclusion done or made by, or for, the Chicago Police Department, the Mayor or his Office, or the City of Chicago or any of its subdivisions concerning these allegations as to the existence of the third degree in Chicago, despite the clear findings of the Commission that such abuses existed.[29] I have also examined Chicago newspapers and City Council hearings from the time of the Wickersham Commission and see no evidence of a considered response to the Wickersham Commission's findings. In light of the serious nature of the charges levied against Chicago in the report, and the findings of the report that such abuses did undoubtedly occur in Chicago, the city's apparent failure to respond to the problems identified seems to indicate on the part of city and police officials either an indifference to the existence of these practice or a desire to keep such practices in existence.

Secondly, the continued existence of the policy at the time of Walden's case is indicated by the striking similarities of the abuse identified in the Wickersham Commission Report with the abuses related by Walden. In Walden's case he was arrested on a Friday afternoon and then kept from family, friends and counsel throughout the weekend, while being moved from police station to police station, until after a confession had been allegedly coerced from him. The arrest report in his case indicates that he was not "booked" until 6:45 p.m. on January 14, 1952, although he was arrested over three days earlier, on the afternoon of January 11, 1952. The evidence appears to show that there was no paperwork documenting his location, and that it was impossible for his family and friends to be able to locate him since he was being moved from police station to police station and his family was not being given accurate information as to his location. Moreover, Rev. Walden has testified in his depositions that his parents did not find him until late on Monday evening. It is thus clear that he was held without being formally placed under arrest, and was not allowed to see his family or an attorney, all as described in the Wickersham Commission Report. Significantly, the Wickersham Commission Report described the policy of holding an arrestee incommunicado as a practice which facilitated physical and mental coercion of statements.

The type of violence reported by Rev. Walden also matched in many respects the types of violence reported for Chicago in the Wickersham Commission Report. The Commission reported that the methods of violence included beating with rubber hoses, beating the shins, and suspending the prisoner upside down. In this case, Rev. Walden reported that he was threatened with beating with rubber hoses, that he was kicked on his shins, and that he was threatened with being suspended from the bars of the cell (although the officers did not specify that he would be suspended upside down). The other method

---

29 See, City's Supplemental Response to the Plaintiff's Second Set of Document Requests, where the City states that the City cannot locate any documents dealing with the City's response to the Wickersham Report.

12

of violence used against Walden - bending his fingers back so far that it caused excruciating pain and threatening to break his fingers off and drop them in the wastebasket - is not specifically noted in the Wickersham Commission report, but does parallel other methods of violent coercion identified with the Chicago Police Department in which violence that did not leave obvious marks was used (i.e. hitting the arrestee with a thick telephone book). It is also crucial to note that the Wickersham Commission Report found that there had been a special room set aside for physical abuse at the Chicago Police Headquarters - the "goldfish room" - and that this in itself indicated that such abuse was departmental policy, while in Rev. Walden's case the detectives promised to take him down to Chicago Police Headquarters at 11th and State if he did not confess, and threatened that "they treat [prisoners] awfully bad at 11th Street."[30]

The method of obtaining the statement in this case coincided precisely with the practice set forth in the Wickersham Commission report. First the officers failed to take Walden before a judge, despite their legal obligation to do so. Then, the police officers subjected Walden to extended questioning over several hours and, when he did not confess, they began to use physical force against him, then threats of escalating force and threats against his family, all the while keeping him from any contact with his family or an attorney. Once they had achieved their goal of obtaining a statement they brought him before the state's attorney so that his statement could be officially legitimized. In this case, the legitimization did not work because Walden refused to adopt his statement before the state's attorney, but the officers were clearly following the same procedures outlined in the Wickersham Commission Report when they engaged in this conduct.

Oscar Walden also fit the profile of the type of arrestee identified by the Wickersham Commission who would likely be subjected to physical abuse by the Chicago police. He was young, black, relatively poor, and "uninfluential," all characteristics which the Wickersham Commission Report stated were associated with a greater likelihood of abuse. While organized crime figures were likely to avoid abuse because of their influential contacts, and members of violent criminal enterprises would not be harmed because the police feared reprisals, persons in Oscar Walden's situation were left unprotected from the possibility of physical violence from the Chicago police. Additionally, Mr. Walden fit into a category of those that the Illinois Crime survey noted would be subject to the "Third Degree and other improper police methods" --persons who were arrested for a crime where the police had been unable to discover the perpetrator of the crime for an extended period. Here the rape and robbery occurred Nov. 4 1951 but remained unsolved at the time of Mr. Walden's arrest almost seven weeks later.

In 1952, the very same year Mr. Walden was arrested and interrogated, the Chicago City Council's Emergency Crime Committee released a report that provides insight into the responsibility of top city and police officials for the police department's pattern of unlawful detentions. In the report, Police Commissioner Timothy O'Connor frankly admits that as a matter of policy the Chicago Police Department engages in unlawful arrests of certain persons. He explained how he maintains his office in City Hall, rather than police headquarters, since he is part of the mayor's staff. In the Commissioner's words, "I take orders from the Mayor . . . whose policies are mine."[31] In

---

[30] On the existence of the "goldfish room," see the Wickersham Commission Report, pp. 126 and 131.
[31] Emergency Committee on Crime Report, 1953 edition, p. 89

13

a remarkable admission, the Commissioner then acknowledged his endorsement of illegal detentions:

> *My policy has always been that while it may be illegal*, and I have received some complaints from the civil-liberties group relative to orders to pick up criminals simply because they are criminals, I still think *they should be picked up and locked up on every occasion possible*…my policy is the policy of the Department while I am Commissioner [emphasis added].

The report points out that "the rest of the Department knows that his policy is to be considered an order." [32]

Therefore, it is clear that in 1952 the Chicago Police Department was led by a Police Commissioner who openly instructed police officers that they did not have to perform investigations, arrests, and interrogations in conformity with the constitution and the laws of the state or nation. The city council committee unequivocally concluded in its report that "the Police Commissioner admits that it is his policy to ignore the constitutional rights of civilians by arresting them without conforming to legal provisions." [33]

A report entitled "Secret Detention by the Chicago Police" published in 1959 by the American Civil Liberties Union (ACLU) examined some of the same issues studied by the Wickersham Commission in 1931 and the city council committee in 1952. Remarkably, the report found that the police practice of detaining persons unlawfully after arrest, the practice that the Wickersham Commission found to facilitate the illegal coercion of confessions and the infliction of mental and physical abuse, continued during the 1950s in a substantially unaltered form from the manner in which it had existed in 1931. The report found that the Chicago police continued the "practice of holding arrested persons secretly for long periods of time without bringing them promptly before a magistrate, as the law requires." The study provided a quantitative assessment of the extent of such practices based upon cases in the files of the Municipal Court of Chicago. The report found that:

> Thousands of people in Chicago each year . . . are held in police stations for extended periods of time without being charged with any crime, without bail and without communication with the world outside. A projection of the cases sampled in the ACLU study indicates that in 1956 approximately 20,000 defendants were held incommunicado for at least 17 hours in cases eventually brought before the nine branches of the Municipal Court studied. Almost 2000 of these defendants were held for

---

[32] Emergency Committee on Crime Report, 1953 edition, p. 87

[33] Emergency Committee on Crime Report, 1953 edition, p. 108. The 1952 Committee report called for the immediate replacement of Commissioner O'Connor. However, he served for another 8 years, until 1960, when he left in the midst of the Summerdale corruption scandal.

> 48 hours or more... The poor, and racial and ethnic minorities - these are
> the people who suffer most...[34]

Much like the Wickersham Commission Report twenty years earlier, this report noted
that people are held in this illegal fashion and denied their basic constitutional rights, and
that such detention increased the likelihood of physical and/or mental abuse:

> When the prisoner is brought to court he can have bail set, he has the
> opportunity to be advised by his lawyer and is able to let his family know
> where he is. Every prisoner not brought promptly to court, but instead
> held incommunicado, is denied these rights which are guaranteed by law.
> He may also be exposed to physical or psychological mistreatment
> designed to induce a confession or to punish him without a trial.[35]

The report also found that "widespread secret detention has existed for many
years in Chicago."[36] The report chronicled the ACLU's attempts to remedy the practice,
but found despite their campaign, illegal detention continued to be "a regular Chicago
police practice." The report continued, "The reaction of police officials has been either
silence or a refusal to acknowledge that any real problem exists... [T]he practice of secret
detention is common knowledge to lawyers and other persons who have day to day
experience with law enforcement in Chicago...[37]

The report noted that the purpose of secret detention was in many cases the
coercive interrogation of that person in the police station. According to the report, police
even considered secret detentions and coercive interrogations as a necessary tool in
solving crimes:

> Our courts have said time and again that the police have no right to detain
> a person suspected of crime for the purpose of questioning him in a police
> station, the police... insist that they cannot function without the
> opportunity to question suspects while under arrest and in seclusion...
> The main reason for questioning a suspect in a police station is the
> coercive influence of arrest and incommunicado detention. . . . A man who
> is restrained and held in isolation from the outside world is more likely to
> answer questions. This is borne out by the widespread practice of the
> Chicago police of refusing to allow an arrested person to call a lawyer
> before he is questioned.[38]

Under the title "The Third Degree" the report found that the quest for confessions from
suspects who are held incommunicado inevitably produces three related problems:

> 1. Police Brutality;

---

34 Secret Detention by the Chicago Police, pp. 5-6

[35] Secret Detention by the Chicago Police, p. 7

[36] Ibid.

[37] Secret Detention by the Chicago Police, pp. 7-8

[38] Secret Detention by the Chicago Police, p. 10-11

15

2. The conviction of innocent persons, and

3. The deterioration of police efficiency.

Each of these evils is traceable to *systematic flouting of the law* which requires the prompt production of criminals in court. Incommunicado detention is the condition under which coercive interrogation flourishes. Since police brutality takes place behind closed doors, the charges frequently made by prisoners that they have been beaten are almost impossible to prove. The police are usually the only witnesses to a beating, and they invariably deny such charges. Nevertheless, there is ample evidence that the practice of Third Degree methods continues, almost always the fruit of lengthy secret detentions [emphasis added].[39]

The ACLU study also found that race was an important factor in determining who was most vulnerable to such treatment. It noted that "lawyers with experience in the criminal courts know the techniques [of physical abuse] most often employed...Negroes are particularly vulnerable to police beatings because their skin color tends to obscure bruises."[40] Although the claim that skin color obscures bruising is arguable, it is significant that the authors of the report suggest that people with darker skin were more likely to be mistreated and less likely to receive a fair and impartial hearing of their claims of abuse and mistreatment, whatever the actual cause.

The ACLU report cited in particular a case that bears a striking resemblance to Oscar Walden's alleged experience and one that occurred approximately one year after Mr. Walden's arrest. In *People v. Wakat*, 415 Ill. 610 (1953), the Illinois Supreme Court ordered Wakat's release based on the fact that his confession was coerced by flagrant physical abuse after unlawful detention by the Chicago police. Wakat's was an unusual case in the sense that the police had inflicted easily observable injuries - broken bones in his right hand, multiple bruises on his chest, arms, buttocks, shins and shoulders, and serious injuries to his left leg and knee which required eight months of treatment. Wakat subsequently sued the officers who abused him, and recovered a judgment in federal court, which was affirmed on appeal to the Seventh Circuit. Despite this, several years later at the time of the ACLU report there had been absolutely no disciplinary action taken against the officer who abused him or his supervisors.[41] Moreover, in answers to discovery in this case, the City has been unable to produce any documents indicating that any disciplinary action was taken against the officers involved in the Wakat case after the ACLU report appeared.[42] In the event that any such documents are located, I will review them and determine whether they affect this opinion.

The ACLU report also quotes from a proceeding in the Circuit Court of Cook County in 1954 wherein an officer Switzer refers to the routine practice of arresting certain persons, as to whom there was no probable cause, to interrogate them to see if

---

[39] Secret Detention by the Chicago Police, pp. 12-13

[40] Secret Detention by the Chicago Police, p. 13

[41] Secret Detention by the Chicago Police, p. 15-17

[42] See, City's Supplemental Response to Plaintiff's Second Document Request

16

they had any information about the crime being investigated.[43]  This appears to be the same practice which Commissioner O'Connor acknowledged was official policy in the Emergency Crime Commission Report of 1952.  According to the ACLU report, Commissioner O'Connor continued to advocate disregarding the constitution three years later when he stated, with respect to a similar arrest and interrogation, "we will continue functioning as we have in the past."[44]

The ACLU report concluded that its study had proven, "what has long been common knowledge among lawyers and other persons familiar with the operations of the Chicago Police Department - that the practice of holding persons for substantial periods of time in seclusion without bringing them to court is *so widespread as to constitute organized police lawlessness* [emphasis added].[45]

A separate set of reports issued by the John Howard Association in the years just before and after Oscar Walden's arrest in 1952 demonstrate that conditions which contributed to the kind of mistreatment described in the Wickersham Commission and ACLU reports continued to exist just before and well after Mr. Walden's alleged mistreatment.  In a 1949 report entitled, *Held Without Bail*, James Bennett, the Department of Justice's Director of U.S. Bureau of Prisons, provides insight into the prevailing treatment of arrestees and the widespread recognition among experts and administrators of Chicago's mistreatment of prisoners.  Making a connection between the neglect of physical facilities and police violation of detainees' rights, Bennett notes that such police detention centers are "breeders of disrespect for the law and crucibles for all kinds of crime, chicanery and corruption."[46]  Bennett, the DOJ's own Director of U.S. Prisons further observed that:

> Most of those held in antiquated detention facilities are the poor people
> who cannot afford a bond or have no influential friends to assist them.
> Moreover, they are there because of shortcomings in the legal system
> which makes impossible their speedy production before a committing
> magistrate.  And a considerable percentage of those detained are: (1)
> citizens who accidentally or unknowingly violate the law; (2) citizens who
> are in financial distress or temporarily unable to care for themselves, and
> (3) youthful offenders.[47]

Such official acknowledgement demonstrates a widespread recognition of the continued pattern of illegal detentions just two years prior to Oscar Walden's arrest.  Bennett's statements support the conclusion that a pattern of police mistreatment of poor, young, and/or non-influential people continued to exist in Chicago's police stations.

Moreover, a set of annual reports issued by the John Howard Association further demonstrate that a pattern of impunity existed within the Chicago Police Department in

---

[43] Secret Detention by the Chicago Police, p. 20.  It seems possible that this is a misspelling of the name of officer Sweitzer, a named defendant in this case who was the principal abuser of plaintiff.

[44] Secret Detention by the Chicago Police, p. 20

[45] Secret Detention by the Chicago Police, p. 30

[46] *Held Without Bail*, p. vii.

[47] Ibid.

1952 with respect to arrest and detention of innocent individuals. From 1947-1962, researchers commissioned by the John Howard Association conducted a series of ten reports on Chicago police lockups. A 1963 summary of the studies reports that, "For many years the history of Chicago police lockups was one of material neglect and disregard for human rights."[48] Year after year, the annual reports call on the police department to further develop statistical data on the volume and duration of individual detentions in Chicago lockups and to examine and reform booking procedures to accurately represent handling of prisoners. The reports make clear that it was common practice for officers to not properly follow booking procedures when arresting and/or detaining prisoners. In particular in 1952, the same year of Mr. Walden's arrest and interrogation, the report highlights "the holding of 'open' prisoners without communication," and encourages the department's "compliance with the State laws in this regard." The report of 1952 even recommends "the more frequent and general use of the District Captain's power of inquiry into an arrest and release of prisoner if circumstances so warrant," with a simplified process of reporting such cases to the police commissioner.[49] Such recommendations clearly demonstrate that in 1952, a pattern existed in which large numbers of individuals arrested or detained by the Chicago Police department were brought in and held with little or no justifiable reason.

In summary, the remarkable consistency among the 1931 Wickersham Commission Report, the 1952 City Council Committee report, the 1959 ACLU report, *Held Without Bail* (1959), and *Chicago Police Lockups* (1963) suggests only one conclusion. All the available evidence points to the existence of an historic pattern of coercive interrogations and illegal detentions that represented a *de facto* policy and practice of the Chicago Police Department in existence in 1952 at the time of Oscar Walden's arrest and alleged mistreatment. The reports make clear that young, African American men were particularly and increasingly vulnerable to these practices. There is no evidence to suggest that the Chicago Police Department or the city of Chicago took any actions to curtail or eliminate this pattern of coercive interrogations and illegal detentions. On the contrary, the police Commissioner in 1952 clearly condoned and endorsed the practices despite knowing they were illegal.

---

[48] *Chicago Police Lockups*, p. 7.
[49] Ibid., pp. 7-15.

B) Abuse and Mistreatment of African-American Men Accused of Raping White Women

In the context of the heightened racial animosity of post-WWII Chicago and the police department's pattern of treatment towards young black people in this era, it is not surprising that the rape of a white woman, by a young black man, allegedly produced such illegal behavior by Chicago police officers.[50] In fact, an historical expert on the topic of race and rape cases in Chicago in this period found that, "African American men who stood trial for rape often faced abusive Chicago police."[51] It was more than just the expression of racist beliefs by individual officers however. The study notes that,

> Given the history of the city's tense race relations, the largely white
> Chicago police force tended to believe that African American men were
> prone to sexual violence... The Chicago police were highly prejudicial in
> this regard, arresting many more African American men for rape than they
> did white men, adhering to historical beliefs about the racial rape myths...
> and the righteousness of vigilante "justice."[52]

In 1945, just seven years before Rev. Walden's arrest, the Chicago suburb of Evanston received a detachment of Chicago police as an auxiliary addition to the Evanston police to provide extra patrol after a series of alleged rapes there. After only a few weeks of patrols by Chicago police officers working under the Cook County Sheriff, the local Evanston population, including the mayor and council members, faced a new dilemma, the "Chicago patrols...arrested random black men who only vaguely fit the known descriptions of the suspects without rigorously investigating them."[53] In a report issued to Evanston residents, the concerned mayor of Evanston suggested that his local officers would not demonstrate the same racial bias of the Chicago police. According to the author of the study, "racial bias... seemed to rule the investigations of the Chicago police."[54]

More specifically, the author highlights the racial discrimination inherent in the Chicago Police Department's practice of bringing individual black suspects before white victims for identification instead of using police lineups or photographs. It was a common practice when the suspect was black to bring him before the victim with no other potential suspects present and request the victim to identify the presented black suspect as the perpetrator (typically the only black person in the room). Indeed, the study found that, "bringing suspects to the victim for identification made it easier for police to discriminate against black rape defendants."[55] This was precisely the same practice used against Mr. Walden in 1952.

---

[50] Dawn Flood, *Proving Rape: Sex, Race, and Representation in Chicago Trials and Society, 1937-1969* (Ph.D. Dissertation, University of Illinois Urbana); Darlene Conley, *Race, Class, Gender and Justice in the United States*, (2002) p. 15-16. See also, Gary D. la Free, *Variables Affecting Guilty Pleas and Convictions in Rape Cases: Toward a Social Theory of Rape Processing.* Social Forces, Vol. 58, No. 3. (Mar., 1980), pp. 835-836.

[51] Flood, pp. 111-112.

[52] Ibid. pp. 79, 83, and 108.

[53] Ibid. p. 90.

[54] Ibid. p. 91.

[55] Ibid. p. 126.

19

Again, there is a striking consistency between the available evidence in the historical record and the alleged mistreatment of Mr. Walden in 1952. Indiscriminate arrests and illegal interrogations resulting in physical abuse of black suspects, particularly in cases of white women allegedly raped by black men, were an accepted practice within the Chicago Police Department before, during, and after 1952.

C) Failure to Allow Arrestees Access to Counsel

Much evidence for the existence of a pattern of failure to allow arrestees' access to legal counsel has already been presented above. The 1931 Wickersham Commission, the 1949 John Howard Study *Held Without Bail*, and the 1959 ACLU report *Secret Detention by the Chicago Police*, all point to a consistent pattern within the Chicago Police Department of a failure to allow access to counsel, especially for young, African American males with no connection to anyone who could serve as an influential broker on his behalf.

As cited previously, The Wickersham Commission found that:

Several other illegal practices have important relations to the third degree. These include, (1) illegal arrests; . . . (3) illegal detention without production in court; . . . (5) isolation of the prisoner from his family and friends; (6) *denial of the opportunity to get counsel or interview counsel*; (7) confinement in bad quarters or under bad living conditions. . . . *Prolonged detention of the prisoner, away from* family, friends and *lawyers* affords favorable opportunities for the infliction of the third degree [emphasis added].[56]

The available evidence suggests that this practice was not accidental or unintended. In fact, the evidence indicates that the failure to provide prompt access to an attorney was part of the Chicago Police Department's interrogation strategy against youthful, low-income, African Americans. Again, quoting Prof. Beeley, author of the 1927 report on the bail system in Chicago cited by the Wickersham Commission:

A not uncommon practice is to detain a suspect or an offender without booking him. Such a practice is, of course, illegal. *It is often done in order to ward off counsel*, service of the habeas corpus writ, newspaper reporters, etc., *until after the police and the public prosecutor have had time to collect the evidence in the case or to extort a confession.* Accused persons and suspects are sometimes thus held incommunicado for days. *In the process of losing them from lawyers*, friends, bondsmen, etc., *the police may take such persons to half a dozen different police stations* [emphasis added].[57]

The existence of the de facto practice of not allowing arrestee's access to counsel was clearly established in the Wickersham Commission Report and further elaborated upon in the 1959 report by the ACLU, *Secret Detentions by the Chicago Police*, which referred to the "widespread practice of the Chicago police of refusing to allow an arrested person to call a lawyer before he is questioned."[58] The ACLU report pointed out the importance of promptly bringing arrestees before a court, "[w]hen the prisoner is brought

---

[56] Wickersham Commission Report p. 31
[57] Wickersham Commission Report, p. 129.
[58] Secret Detention by the Chicago Police, p. 10-11

21

to court he can have bail set, *he has the opportunity to be advised by his lawyer... Every prisoner not brought promptly to court*, but instead held incommunicado, *is denied these rights which are guaranteed by law* [emphasis added]."[59] The fact that two different reports from two different agencies published with an interval of thirty years between them came to the same conclusion is historically significant. This supports the finding that at the time of Mr. Walden's arrest and interrogation in 1952, the same pattern of failing to allow access to counsel was still in place at the Chicago Police Department.

_____ _____ _____ _____ _____ _____

       In summary, as set forth in more detail above, I intend to offer the following opinions in this case, based upon my understanding of the historical context, my examination and consideration of the 1931 report issued by the National Commission on Law Enforcement, the 1949 report by the John Howard Association titled *Held Without Bail*, the 1953 Chicago City Council Emergency Committee on Crime Report, the 1959 ACLU report: "Secret Detention By the Chicago Police Department," and the additional data cited above and the lack of documented responses to them by the Chicago Police Department that:

1. In 1952, the City of Chicago and its police department had a *de facto* policy, practice, and custom of coercing statements from suspects in criminal cases through the use of physical and psychological abuse and that, particularly targeted for such treatment were suspects who were poor, African American, and/or uninfluential, as set forth in more detail above;

2. In 1952, the City of Chicago and its police department had a *de facto* policy, practice, and custom of allowing the physical abuse of African-American men, particularly those accused of raping white women; and

3. In 1952, it was the *de facto* policy and practice of the City of Chicago and its police department to deny arrestees timely access to counsel, and in particular, as set forth in more detail above, arrestees would be interrogated in the absence of counsel until they had made an inculpatory statement.

Sincerely,

Joseph Lipari
University of Illinois at Chicago
Departments of History and African American Studies

_____

[59] *Secret Detention by the Chicago Police*, p. 7

22

# Appendix A

Wickersham Commission Report, 1931

United States Government Report entitled the Eleventh Report of the National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement, The Third Degree, presented to President Herbert Hoover by the National Commission in 1931. The commission was created by President Hoover in 1929 and was chaired by George W. Wickersham, a prominent New York lawyer and former U.S. attorney general. Also on the commission were Roscoe Pound, dean of Harvard Law School; Newton D. Baker, former Secretary of War; and Ada Comstock, president of Radcliffe College. The Commission's focus was the ten year period from 1921-31.

The report obtained information about the Third Degree from a large variety of sources, including pre-existing literature concerning the practice, adjudicated cases, appeal briefs, statutes, newspaper reports (although no individual report was accepted as authenticated), questionnaires to officials, bar associations and attorneys, and field work in 15 cities, including Chicago, where the commission interviewed judges, present and former prosecutors, directors of public safety, past and present police commissioners and police chiefs, present and former detectives, leaders of the bar, public defenders, representatives of the ACLU, agents of prison associations, social workers, newspaper editors, police reporters, law professors, members of citizens' committees, commissioners of correction, prison wardens and some prisoners or ex-prisoners.

*Held Without Bail*, John Howard Association, 1949
The majority of this report investigates and condemns the physical conditions of Chicago's police lock-ups and detention facilities in 1949.

*Chicago Police Lockups, 1947-1962*, John Howard Association, 1962
From 1947-1962, researchers commissioned by the John Howard Association conducted a series of ten reports on Chicago Police lockups.

1952 Chicago City Council Emergency Crime Committee Report
This is the 1952 report of the Emergency Committee on Crime, an official committee of the Chicago City Council, also known as the Kohn Report. The committee was created following the high profile murder on February 6, 1952 of the acting Republican Committeeman for the 31st ward. While this report deals primarily with issues of incompetence and corruption within the Chicago Police Department, especially with regards to "the syndicate," taverns, bribery and narcotics, it does contain some information relative to Chicago Police Department policies at the time of Rev. Walden's arrest and prosecution. The report contains extensive interviews with the Chicago Police Department Commissioner at the time of Rev. Walden's arrest and prosecution, Timothy O'Connor.

Secret Detention by the Chicago Police, American Civil Liberties Union, 1959
This report examines some of the same issues that were studied by the Wickersham Commission in its 1931 report, although it focuses more on unlawful detention than on physical and mental abuse used to coerce confessions.

23

In reaching my opinions in this matter, I have reviewed the following material specific to this case:

1. Complaint, Walden v. City of Chicago
2. Deposition of Rev. Oscar Walden Jr., March 24, 2005
3. Deposition of Rev. Oscar Walden Jr., December 9 and 19, 2005
4. Abstract of Record, People v. Walden
5. Arrest slip, Oscar Walden
6. Judge Filip Memorandum and Order April 25, 2005
7. Deposition of George N. Leighton, Walden v. City of Chicago, December 7, 2005
8. Report of Judge Eugene Pincham, August 6, 2007
9. The case of *People v. Wakat*, 415 Ill. 610 (1953)
10. *Ebony Magazine* article on Oscar Walden, February 1979
11. Answers of the City of Chicago to the Plaintiff's Second Document Request
12. Illinois Crime Survey, 1929
13. Cited articles from the *Chicago Tribune*
14. *Guide to the microfilm edition of Records of the Wickersham Commission on Law Observance and Enforcement.* Samuel Walker (Ed.), (Bethesda, MD.: University Publications of America), 1997.
15. Annual Reports of the Chicago Police Department, 1930-1955.
16. In an effort to provide historical context, the following secondary sources were consulted:
    a. Bopp, William J. *"O. W.": O. W. Wilson and the Search for a Police Profession* (Port Washington, N.Y.: Kennikat Press, 1977).
    b. Cayton, Horace and St. Clair Drake. *Black Metropolis: A Study of Negro Life in a Northern City, Vol. I and II.* (New York: Harper & Row, 1962).
    c. Conley, Darlene. Race, Class, Gender and Justice in the United States, (Boston: Allen & Bacon, 2002).
    d. D. la Free, Gary. "Variables Affecting Guilty Pleas and Convictions in Rape Cases: Toward a Social Theory of Rape Processing," in *Social Forces*, Vol. 58, No. 3, (March, 1980).
    e. Demaris, Ovid. *Captive City* (New York: Pocket Books, 1970).
    f. Flood, Dawn. *Proving Rape: Sex, Race and Representation in Chicago Trials and Society, 1937-1969* (Ph. D. dissertation, University of Illinois at Urbana-Champaign, 2003).
    g. Harold Gosnell, *Negro Politicians* (Chicago: University of Chicago Press, 1967).
    h. Grimshaw, William. *Bitter Fruit: Black Politics and the Chicago Machine, 1931-1991.* (Chicago: University of Chicago Press, 1992).
    i. Hirsch, Arnold. *Making the Second Ghetto: Race and Housing in Chicago, 1940-1960.* (Chicago: University of Chicago Press, 1998).
    j. Hirsch, Arnold. "Massive Resistance in the Urban North: Trumbull Park, Chicago, 1953-1966." (*Journal of American History*, No. 92, September 1995).
    k. Kimbal, Lionel, Jr. *Combating the City of Neighborhoods: Employment, Housing, and Civil Rights in Chicago, 1935-1955* (Ph. D. dissertation, Carter

G. Woodson Library, 2004).

l.  Lindberg, Richard. *To Serve and Collect: Chicago Politics and Police Corruption from the Lager Beer Riot to the Summerdale Scandal, 1855-1960.* (Carbondale: Southern Illinois University Press, 1998).

m.  Lombardo, Robert. *The Black Mafia: African-American Organized Crime in Chicago, 1890-1960.*

n.  Allan Spear, *Black Chicago: The Making of a Negro Ghetto* (Chicago: University of Chicago Press, 1967).

o.  Wolcott, David. *Cops and Kids: Policing Juvenile Delinquency in Urban America, 1890-1940.* (Columbus: Ohio State University Press, 2005).

25