**Judge R. Eugene Pincham**
**9316 S. Michigan**
**Chicago, IL 60619**

August 6, 2007

John L. Stainthorp
People's Law Office
1180 N. Milwaukee
Chicago, IL 60622

Re: *Walden v. City of Chicago*, 04 C 0047

Dear Mr. Stainthorp,

You have asked for my opinion in relation to several alleged *de facto* policies, practices

and/or customs of the defendant City of Chicago and its Police Department, in existence in 1952

at the time of the arrest and prosecution of the plaintiff in this case, Rev. Oscar Walden Jr. These

alleged policies include:

1.    Whether the City of Chicago and its police department had a *de facto* policy, practice and

      custom of coercing statements from suspects in criminal cases through the use of physical

      and psychological abuse, and whether this coercion and abuse were particularly likely to

      occur in cases where a Black man was accused of raping a White woman.

2.    Whether it was the *de facto* policy, practice and custom of the City of Chicago and its

      police department to conceal the coercion set forth above, by the police officers filing

      false reports, giving false testimony and concealing that coercion and abuse had occurred.

3.    Whether it was the *de facto* policy and practice of the City of Chicago and its police

      department to deny arrestees timely access to counsel, and to interrogate arrestees in the

absence of counsel until they made an inculpatory statement.

4.  Whether the City of Chicago and its police department had a *de facto* policy, practice and custom of failing to discipline and otherwise control police officers who engaged in coercion and physical and psychological abuse of arrestees, and who denied arrestees access to counsel and failed to take them to court in a timely manner.

My opinions are based, in significant part, on my own experiences with the Chicago Police Department as a citizen of Chicago, an attorney, a Judge on the Circuit Court of Cook County, a Justice on the 1st District Appellate Court and involvement in the political process attempting to ensure equal political recognition for all racial and ethnic groups within Chicago. In light of this, my brief biography is as follows:

> I was born in Chicago, Illinois, on June 28, 1925 but moved as a baby to Alabama. I briefly returned to Chicago in 1941, then moved to Tennessee in 1942 to attend college. I graduated from Tennessee A & I State University in Nashville, Tennessee in 1947 and was accepted at Northwestern University School of Law in Chicago, and started there in January 1948.

> Upon graduation from law school in January 1951, local law firms and government agencies would not even interview me or other Blacks for employment. I took the bar in April 1951, but was unable to find a job as a lawyer and ended up working at the Jack and Jill restaurant, washing dishes.

> In the Summer of 1951 I started working with attorney Joseph Clayton, although I still kept my dishwashing job. Joe would have me handle the cases which he did not have time to deal with, and I soon began to concentrate almost entirely on criminal cases, at both the trial and appellate level. In this work, I became very knowledgeable about the inner workings and the policies and practices of the Chicago Police Department, and especially how CPD police officers would often treat Black citizens.

> I worked for attorney Clayton until 1955. Joe was a brilliant lawyer when he was healthy, and on his day was the best trial lawyer that ever walked into a courtroom. Unfortunately, he started to suffer from ill-health in the early 1950s, but he remained extremely kind to me and molded me as a lawyer and an advocate. In 1955 I began

my own practice, and joined up with an older lawyer by the name of Charles B. Evans. Shortly after I left Clayton's office he passed away, and many of his clients gravitated to me. My own practice prospered, and I worked hard and long hours at it. I tried cases, civil and criminal, in state and federal courts throughout the length and breadth of the country. I perfected over 250 appeals in my career, and was successful in about 85% of them. I argued three times before the United State Supreme Court.

In 1976 I was elected as a Judge of the Circuit Court of Cook County and was assigned to the Criminal Division of that court, where I stayed until 1984. In 1984, I was appointed by the Illinois Supreme Court to serve on the First District Appellate Court in Chicago, and in 1986, I was elected to a full term on that court. I served as a Justice on that court until January 1990.

In 1990 I resigned from the Appellate Court so that I could run for Cook County Board President. I lost that election and subsequently ran for Mayor of Chicago, in 1991, and for Cook County State's Attorney in 1996. Since 1990 I have also remained active as an attorney in private practice.

I am a life member of the NAACP, the ACLU and Kappa Alpha Psi Fraternity. I am also a member of the Cook County Bar Association, the Chicago Bar Association and the Illinois Bar Association. I have practiced before practically every United States Circuit Court of Appeals, as well as the United States Supreme Court. I have been a guest lecturer and I have taught trial technique and appellate procedure, constitutional law and other subjects at practically every major law school in the country, including Northwestern, University of Chicago, Harvard, Yale, Stanford, Notre Dame, Loyola, Iowa, Colorado and New Mexico, among others

## My Opinions

The Chicago Police Department practice of secreting arrestees from their family, friends and attorneys, and keeping these arrestees incommunicado, was well established in 1952. Indeed, this practice and policy brought me a lot of business, since a defendant, or his family, who were familiar with the system, would know to contact an attorney as soon as possible after the arrest, and bring a writ of habeas corpus before a judge of the circuit court. This would cause the police to bring the prisoner before the court, and put an end to the unlawful detention. I did

3

this many a time in my practice as a defense attorney. Unfortunately, defendants or their families who were less knowledgeable about the criminal justice system, such as Oscar Walden and his family, would be unaware of this police practice and thus would not know that they could have an attorney bring a writ of habeas corpus.

This police practice of holding arrestees incommunicado was particularly common on the weekends, since the police would claim that they were unable to take the prisoner to court in a timely fashion because it was a Saturday or a Sunday. Many a time, my clients were arrested on a Friday afternoon, as was Rev. Walden, and were not taken to court until Monday or Tuesday. In Reverend Walden's case I believe he was not taken to court until Tuesday, the fourth day after his arrest. Although the law in Illinois at the time called for prisoners to be taken before a judge as soon as possible after they were arrested, this law was consistently ignored by the Chicago Police Department, since it allowed them time to interrogate the prisoner. The failure of the police to take prisoners before a court was greatly facilitated by the police practice of failing to "book" prisoners for several days. This, in turn, brought the police extra days of incommunicado detention of arrestees, and a greater opportunity to coercively question arrestees without a lawyer.

I am familiar with how prolonged incommunicado interrogations facilitate obtaining statements from suspects, both from my experiences in the early 1950s and also from my work as an appellate justice. In *People v. Berrios*, 178 Ill. App. 3d 241 (1988), a case which arose in 1983, Chicago Police Department detectives were quite open that they detained a person for interrogation, and appeared to believe there was nothing wrong with this practice. I also dealt with the Chicago Police Department practice of arresting a suspect without probable cause, and detaining him incommunicado at the police station for questioning, in *People v. Green*, 179 Ill.

4

App. 3d 1 (1988), where I wrote a lengthy dissenting opinion pointing out that the defendant's rights had been violated by holding him for 27 hours at the police station and repeatedly questioning him. The majority's opinion in *Green* was subsequently criticized and not followed in *People v. Plummer*, 306 Ill. App. 3d 574 (1999).

This practice was also graphically described in the landmark civil rights case, *Monroe v. Pape*, 365 U.S. 167 (1961). There, as described in the opinion of Justice Frankfurter:

> On October 29, 1958, at 5:45 a.m., thirteen Chicago police officers, led by Deputy Chief of Detectives Pape, broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room; that the officers roused the six Monroe children and herded them into the living room; that Detective Pape struck Mr. Monroe several times with his flashlight, calling him "nigger" and "black boy"; that another officer pushed Mrs. Monroe; that other officers hit and kicked several of the children and pushed them to the floor; that the police ransacked every room, throwing clothing from closets to the floor, dumping drawers, ripping mattress covers; that Mr. Monroe was then taken to the police station and detained on "open" charges for ten hours, during which time he was interrogated about a murder and exhibited in lineups; that he was not brought before a magistrate, although numerous magistrate's courts were accessible; that he was not advised of his procedural rights; that he was not permitted to call his family or an attorney . . .

*Monroe v. Pape*, 365 U.S. at 203. See also *Escobedo v. Illinois*, 378 U.S. 478 (1964). In Walden's case, he has testified that the police officers called him "nigger," and it is also clear that he was not taken before a magistrate, but rather was detained at various police stations and interrogated, while being brutalized.

Also, in my experience as a criminal defense attorney from 1951 to 1976, it was very common for persons who were detained for interrogation by the Chicago Police Department to be subjected to physical and mental coercion, if they initially resisted confessing. Many of my clients were brutalized while detained, especially if they were poor, Black and powerless, which

many of my clients were. Such abuse was particularly likely if the crime involved an issue which the predominantly white and prejudiced police force perceived as an attack on the police or on the white race. In one memorable case which I handled, my client was accused of killing an off-duty police officer at a print shop at 48th and State. After he was arrested, he was beaten mercilessly by the Chicago police, his eye socket was broken and he suffered other facial injuries. The police claimed that they got an inculpatory statement from him and I brought a motion to suppress the statement. All the officers denied any abuse, although my client had incontestable serious injuries. The judge denied my motion to suppress, as I expected since it was my client's word against the police officers' denials. This gave me a perfect self-defense strategy at trial and my client was acquitted. In Rev. Walden's case, he was a Black man accused of raping a white woman, the type of crime which was perceived by prejudiced whites as constituting an attack on their entire race. The ramifications of such an accusation are well known, both in real life, *see, e.g., Powell v. Alabama*, 287 U.S. 45 (1932); *Norris v. Alabama*, 294 U.S. 587 (1935) (Scottsboro case), Emmett Till; and fiction (e.g. To Kill a Mockingbird).

My own experience in the 1950s as a defense attorney substantiates that it was the policy and practice of the Chicago Police Department to routinely use violence against persons who did not have sufficient connections to protect them. Rev. Walden would fall precisely within this group. He had, so far as I know, no connections to powerful figures either within the political establishment or the police department, and he had no violent friends or acquaintances who would take reprisals against the officers who abused him. Indeed, I came to know Rev. Walden, to a limited extent, during the period that he was awaiting trial, since I was working for his attorney, Joseph Clayton, at the time and I assisted Mr. Clayton on the case by filing papers and

6

attending court hearings. From everything I knew about Rev. Walden at that time, he was a gentle, peaceable man, and one who was naive to the ways of the police department and the courts.

As to police discipline of Chicago police officers who engaged in brutality against arrestees, this was nonexistent in Chicago in the 1950s. Indeed, as noted above, it was the policy of the Chicago Police Department to use physical coercion against persons who would not confess, so the idea of disciplining officers for it is absurd. Even in the rare cases where the courts upheld the prisoner's claims of brutality, I am not aware of the Chicago Police Department during that period ever disciplining the officers involved, nor am I aware of any public statements by the Police Commissioner, the Mayor or the City Council condemning police brutality used to extort confessions. Even in cases where the abuse of a suspect was well established, I am not aware of there ever being discipline of the officers involved.

In all my years of practice, as an attorney, judge and justice, it has also become apparent to me that Chicago Police officers will not testify against their fellow officers, and will not report instances of police misconduct, whether it be brutality, withholding of evidence from the defendant, fabrication of evidence, or any other police misconduct. There is an almost complete wall of silence which protects the abuser, and there has been such a wall since I started practicing law in 1951. In my experience, no Police Superintendent, Police Commissioner, Mayor or City Council ever attempted to break down this wall in the 1950s, and certainly there is no evidence that the Police Commissioner in 1952, Timothy O'Connor, ever did so.

In summary, as set forth in more detail above, my opinions are:

1.     In 1952, the City of Chicago and its police department had a *de facto* policy, practice and

7

custom of coercing statements from suspects in criminal cases through the use of physical and psychological abuse, as set forth in more detail above.

2.  In 1952, it was the *de facto* policy, practice and custom of the City of Chicago and its police department to conceal the coercion set forth above, by the police officers filing false reports, giving false testimony and concealing that coercion and abuse had occurred. There was also a police code of silence, where police officers would not testify about or report coercion, abuse or other misconduct by fellow officers.

3.  In 1952 it was the *de facto* policy and practice of the City of Chicago and its police department to deny arrestees timely access to counsel, and in particular, as set forth in more detail above, arrestees would be interrogated in the absence of counsel until they had made an inculpatory statement.

4.  This coercion and abuse was particularly likely to occur in cases where a Black man was accused of raping a White woman

5.  The City of Chicago and its police department had a *de facto* policy, practice and custom of failing to discipline and otherwise control police officers who engaged in coercion and physical and psychological abuse of arrestees, and who denied arrestees access to counsel and failed to take them to court in a timely manner.

Yours truly,

R. Eugene Pincham

8