UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OSCAR WALDEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 0047 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Oscar Walden, Jr. ("Plaintiff" or "Walden") has sued the City of Chicago ("City" or

"Defendant"), Chicago Police Department ("CPD") Captain William Ryan, CPD Lieutenant

Golden, CPD Detective Leon Sweitzer ("Detective Sweitzer"), and CPD Officers Joseph Faculak

("Officer Faculak"), William O'Brien ("Officer O'Brien"), William Murphy ("Officer Murphy"),

and Edward Walsh ("Officer Walsh"), alleging multiple claims under both state and federal law

of police misconduct relating to his arrest and prosecution for rape in 1952.[1]  (R. 1, Compl.)

Presently before the Court are Defendant's motion for summary judgment, (R. 219), and motion

to bar Plaintiff's expert witness.  (R. 225.)  For the reasons set forth below, Defendant's motion

for summary judgment is granted in part and denied in part, and Defendant's motion to bar

Plaintiff's expert is denied.

---

[1]  The claims currently pending are only against the City as Walden has been unable to
locate any of the individual defendants and believes that they are deceased.  (R. 259, Joint
Status Report at 2.)  Thus, "Defendant" in this opinion refers only to the City.

# RELEVANT FACTS[2]

Nearly 60 years ago, on November 24, 1951, Elsie Anderson ("Anderson") was attacked and raped by an African-American man on the south side of Chicago. (R. 220, Def.'s Facts ¶ 6.) Several weeks later, on January 11, 1952, Walden was arrested on his way to work by Chicago Police officers, including Officers Faculak, O'Brien, and Walsh. (R. 237, Pl.'s Facts ¶ 2.) Walden was twenty years old at the time of his arrest. (*Id.*)

After his arrest, Walden was taken to the Kensington police station, where he was questioned by several police officers in front of Anderson, who did not state that Walden was her attacker. (*Id.* ¶ 3.) Walden was then brought to another room for questioning, where the police officers questioning him kicked his shins while interrogating him in an attempt to coerce him to confess to the attack. (*Id.* ¶ 4.)

After being held at another police station overnight, Walden was brought back to the Kensington police station, where he was questioned by Officer Faculak and Detective Sweitzer, a detective from the 11th Street police station. (*Id.* ¶ 5.) Detective Sweitzer threatened to have Walden transferred to 11th Street where he said that they treated prisoners brutally. (*Id.*) While Detective Sweitzer and other officers went to lunch, Officer Faculak continued to pressure Walden to confess, saying "you had better speak up, because when [Detectice Sweitzer] comes back it will be bad. I hate to give you into his hands, because they are pretty rough at 11th Street." (*Id.* ¶ 6.)

---

[2] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R. 220, Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Facts"); R. 237, Pl.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Facts"); R. 242, Def.'s Local Rule 56.1(a) Response to Pl.'s Local Rule 56.1 Statement of Material Facts ("Def.'s 56.1 Resp."); R. 236, Pl.'s Local Rule 56.1(a) Response to Def.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s 56.1 Resp.").)

When Detective Sweitzer returned, he sat directly in front of Walden, while Officer Faculak grabbed Walden's hand, bending his fingers back and scratching them until they were bleeding, causing Walden excruciating pain. (*Id.* ¶ 7.) Walden begged the officers to stop, but Officer Faculak continued to bend his fingers back and kick him in the shins. (*Id.* ¶ 8.) At the same time, Detective Sweitzer knocked Walden's head from side to side, accusing him of assaulting Anderson. (*Id.*) When Walden denied attacking Anderson, Detective Sweitzer said, "You are lying, nigger." (*Id.*) Officer Faculak then ordered another officer to "go get the rope," and told Walden that they were going to string him up to a high bar, take off his clothes, and whip him with a rubber hose until he confessed. (*Id.* ¶ 9.) Officer Faculak also threatened Walden that if he did not confess, he would cause his father to lose his job, his parents and family would be evicted from their house, and the police would arrest Walden's parents, sisters, and brothers. (*Id.* ¶ 10.) Walden then agreed to confess in the manner that Officer Faculak had ordered. (*Id.* ¶ 11.)

Following Walden's confession, he was forced to enter a room with Anderson and apologize to her. (*Id.* ¶ 12.) Prior to Walden's second encounter with Anderson, several police officers, including Officer Walsh, had gone to Walden's house and, without a warrant, entered and taken Walden's coat and hat. (*Id.* ¶ 13.) The officers then soiled Walden's coat and hat to make them look more like the clothing that Anderson had described her attacker was wearing. (*Id.*) Walden was forced to wear the soiled coat and hat when he was brought before Anderson. (*Id.*)

Walden then signed a written statement, typed by Officer Murphy, admitting that he had raped Anderson. (*Id.* ¶ 14.) During the time Walden was being held at the police station, he had

repeatedly asked to be allowed to contact an attorney and his wife, but the officers had refused all of his requests. (*Id.* ¶ 16.)

At 6:45 p.m. on Monday, January 14,1952—three days after he was picked up by the police—Walden was booked as an arrestee. (*Id.*) The police provided Walden's confession to the prosecuting state's attorneys. (*Id.* ¶18.) All of the officers involved in Walden's interrogation denied to the state's attorneys that he had been abused in any manner. (*Id.* ¶ 17.) Defendant now admits that Walden's admissions "were false, fabricated, and coerced through torture." (R. 242, Def.'s 56.1 Resp. ¶ 19.)

Walden was arraigned on February 4, 1952. (R. 220, Def.'s Facts ¶ 12.) His criminal trial began June 24, 1952. (*Id.* ¶ 13.) At trial, Walden's confession was admitted against him, and Anderson identified Walden as her attacker. (*Id.* ¶¶ 14-15.) Walden challenged the validity of his confession at trial, and testified that it was coerced. (*Id.* ¶ 16.) On July 2, 1952, Walden was convicted of rape, by jury verdict, and received a sentence of 75 years of imprisonment. (*Id.* ¶¶ 17-18.) Walden was released from prison on parole on November 18, 1965. (*Id.* ¶ 19.)

On December 30, 2002, Governor George Ryan granted Walden a pardon of innocence. (*Id.* ¶ 20.) Walden was not aware that he had been pardoned until he received a letter from the Illinois Prisoner Review Board in a letter sent January 13, 2003. (R. 237, Pl.'s Facts ¶ 21.)

## PROCEDURAL HISTORY

Walden brought suit in this case on January 6, 2004, alleging claims under state and federal law. (R. 1, Compl.) Under 42 U.S.C. §1983 ("Section 1983"), Walden alleges deprivation of a right to a fair trial and wrongful conviction (Count I); coercive interrogation

(Count IV); and an Equal Protection claim under Sections 1983 and 1985 (Count V).[3] (*Id.* at ¶¶ 89-103.) Walden also alleges a *Monell* policy claim against the City relating to Counts I, IV, and V (Count VI). (*Id.* ¶ 106.) Under state law, Walden alleges claims for malicious prosecution (Count VIII); intentional infliction of emotional distress (Count IX); conspiracy (Count X); and a *respondeat superior* claim and an indemnification claim against the City (Counts XI and XIII). (*Id.* at ¶¶ 115-127, 131.)

On August 27, 2004, Defendant filed a motion to dismiss, which was denied in substantial part and granted in part on April 25, 2005 by Judge Filip.[4] (R. 33, Min. Order; R. 34, Mem. Opinion and Order of Apr. 25, 2005.) On July 16, 2010, Defendant moved for summary judgment, (R. 219, Def.'s Mot. for Summ. J.), and to bar Plaintiff's expert. (R. 225, Def.'s Mot. to Bar Pl.'s Expert.) Defendant argues that Walden's claims are time-barred or lack evidentiary support to maintain any violation of his constitutional rights. (R. 221, Def.'s Mem. of Law in Support of Its Mot. for Summ. J. ("Def.'s Mem.") at 2.) Specifically, Defendant argues that all of Walden's federal and state-law claims, with the exception of his fair trial claim under the

---

[3] Counts II, III, VII, XII, and XIV were dismissed by the Court or voluntarily dismissed by Walden. (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 21 (Count II); R. 235, Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 4, 6 (Counts III and VII); R. 7, Notice of Dismissal (Counts XII and XIV).)

[4] This case has passed through the hands of several judges since the filing of the complaint, and was most recently reassigned on October 29, 2010. (R. 256, Exec. Comm. Order.)

Fourteenth Amendment in Count I, are time-barred.[5] (*Id.*) Defendant further claims that Walden's fair trial claim fails as a matter of law, and that even if Walden establishes a threshold constitutional injury, he has failed to produce evidence of a *Monell* violation. (*Id.*) Regarding Walden's proposed expert, Defendant claims that his opinions are inadmissible because he is not qualified to serve as an expert in this case and the methodology upon which his opinions are based is unreliable. (R. 225, Def.'s Mot. to Bar Pl.'s Expert.)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In resolving a motion for summary judgment, the Court draws all reasonable inferences and resolves all factual disputes in the non-moving party's favor. *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009).

---

[5] The Court notes at the outset that many of the questions regarding the timeliness of Walden's claims were addressed in the Court's Memorandum Opinion and Order on April 25, 2005, and thus the law of the case doctrine applies. (R. 34, Mem. Opinion and Order of Apr. 25, 2005.) While Defendant claims to "re-assert and incorporate[] the arguments made in support of their motion to dismiss," (R. 221, Def.'s Mem. at 3), the Court revisits a "previously decided question" only if the new evidence submitted with Defendant's motion for summary judgment or a change in the law gives the Court "a compelling reason to reopen the previously decided question." *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). The Court thus addresses the arguments made by Defendant in its motion to dismiss only if it has provided the Court with new evidence in support of a previously made argument or a showing of a change in the law.

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The non-moving party must show that there is evidence upon which a jury reasonably could find for [it]." *Wheeler*, 539 F.3d at 634.

## ANALYSIS

Because Plaintiff may rely only on admissible evidence to defeat a summary judgment motion, *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009), the Court addresses the admissibility of Walden's proposed expert opinions prior to addressing the arguments raised in Defendant's motion for summary judgment.

**I.      The Admissibility of the Opinions of Plaintiff's Expert**

Walden seeks to admit the opinions of Joseph Lipari ("Lipari") regarding the policies, practices, or customs of the Chicago Police Department at the time of Walden's arrest and interrogation in support of his *Monell* claim. (R. 235, Pl.'s Mem. at 16.) At Walden's request, Lipari, a researcher and doctoral candidate in history, conducted a historical study regarding the policies and practices of the Chicago Police Department relevant to Walden's claims, and concluded that "all the available evidence points to the existence of a historic pattern of coercive interrogations and illegal detentions that represented a *de facto* policy and practice of the Chicago Police Department in existence in 1952 at the time of Oscar Walden's arrest and alleged mistreatment." (R. 237, Pl.'s Facts, Ex. G at 18.) His expert report offers three main findings:

(1) In 1952, the City of Chicago and its police department had a *de facto* policy, practice, and custom of coercing statements from suspects in criminal cases through the use of physical and psychological abuse and that, particularly targeted for such treatment were suspects who were poor, African American, and/or uninfluential;

(2) In 1952, the City of Chicago and its police department had a *de facto* policy, practice, and custom of allowing the physical abuse of African-American men, particularly those accused of raping white women; and

(3) In 1952, it was the *de facto* policy and practice of the City of Chicago and its police department to deny arrestees timely access to counsel, and in particular . . . arrestees would be interrogated in the absence of counsel until they made an inculpatory statement."

(*Id.* at 22.)

Lipari based these conclusion on his "understanding of the historical context," his examination and consideration of four government and non-profit reports issued between the years of 1931 and 1959 that describe police practices in Chicago, additional data and secondary sources, and "the lack of documented responses to them by the Chicago police department." (*Id.*)

Defendant argues that Lipari's expert opinions should be excluded under Federal Rule of Evidence 702 because: (1) Lipari is not qualified to serve as an expert in this case; (2) Lipari's opinions are based on insufficient facts and data; and (3) Lipari did not use reliable principles and methods to reach his conclusions. (R. 226, Def.'s Mot. to Bar Pl.'s Expert.)

The admissibility of expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence, which permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "It also requires that (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the

case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010) (citing Fed. R. Evid. 702). The foundation for Rule 702 was laid by Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, in which the Court established the district court's role as a "gatekeeper" required to weigh the reliability and relevance of the proffered expert evidence. 509 U.S. 579, 592 (1993).

Under the *Daubert* framework, the Court must follow a three-step inquiry to determine if Lipari's testimony is admissible. First, Lipari must be qualified to testify in this case "by knowledge, skill, experience, training or education." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Second, Lipari's "reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert*, 509 U.S. at 592-93). While *Daubert* suggested factors courts should consider in determining reliability, courts have "broad latitude when [they] decide[] how to determine reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Finally, the Court must inquire into the relevancy of Lipari's proposed testimony to ensure that it will "assist the trier of fact to understand the evidence or determine a fact in issue." *Ervin*, 492 F.3d at 904.

Although the Court must act as a gatekeeper, "[d]eterminations on admissibility should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). As Walden is the proponent of the proffered expert testimony, he bears the burden of establishing the admissibility of such testimony by a preponderance of the evidence. *Lewis*, 561 F.3d at 705. Because Defendant does not challenge the relevancy of Lipari's proposed testimony, the Court

focuses its analysis on the first two steps of the inquiry, Lipari's qualifications and the reliability of his methodology.

## A.    Lipari's Qualifications

Walden contends that Lipari is qualified to serve as an expert in this case because he is an academic historian whose concentration in historical research has been the Chicago Police Department and its relationship with the African-American community in Chicago. (R. 239, Pl.'s Mem. in Resp. to Def.'s Mot. to Bar Pl.'s Expert at 4.) Walden points to Lipari's education—an undergraduate degree in anthropology, a master's degree in history, and a nearly-complete PhD; his experience as an instructor and teaching assistant; and his research and writing in the area of the relationship of the African-American community with the Chicago Police Department as evidence of his credentials that qualify him to be an expert. (*Id.*)

Regarding Lipari's qualifications, Defendant makes three primary objections. First, Defendant argues that Lipari's education, teaching, research, and writing are not sufficiently focused on the policies, practices, or customs of the Chicago Police Department. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 5.) Second, Defendant claims that the research done by Lipari did not require specialized knowledge. (*Id.*) Finally, Defendant contends that Lipari offers opinions on matters in which he has no expertise. (*Id.* at 6.)

Whether a proposed witness qualifies as an expert is determined by "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). The Seventh Circuit has made it clear that "[t]he notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound. The

10

Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that

expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific

or social scientific) in character." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d

585, 591 (7th Cir. 2000) (citations omitted). Instead, "[a]nyone with relevant expertise enabling

him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert

witness." *Id.* (citations omitted).

Given these liberal parameters for qualifications to be an expert, the Court finds that

Lipari is qualified to serve as an expert in this case. As a researcher and doctoral candidate in

history, Lipari has the background to find, evaluate, and synthesize historical documents

pertinent to the issue of Chicago Police Department policies and practices in 1952. He can also

provide a unique perspective because he has researched and understands the historical context

surrounding the events in this case. Since 2003, Lipari's work in graduate school has focused on

the Chicago Police Department and its relationship with the African-American community. (R.

239, Pl.'s Mem. in Resp. to Def.'s Mot. to Bar Pl.'s Expert, Ex. G at 109.) His doctoral thesis,

which he is still in the process of writing, is called "Policing the Color Line: Race, Power, and

Social Change in 20th Century Chicago," and he has published two other papers related to the

topic. (*Id.*, Exs. F, H, I.) While he has not completed his dissertation, that is not a requirement

to serve as an expert. *Tuf Racing Prod.*, 223 F.3d at 591. Nor does it matter that Lipari has not

served as an expert witness in the past. *See United States v. Parra*, 402 F.3d 752, 758-59 (7th

Cir. 2005).

Defendant's argument that Lipari's research, writing, and teaching experience is not

sufficiently focused on the subject matter of his proposed testimony ignores the unique

circumstances of this case and reads extra requirements into Rule 702. This case deals with events that occurred over half a century ago; finding a witness whose experience or knowledge is precisely the subject of Lipari's proposed testimony—the practices, policies, or customs of the Chicago Police Department in 1952—is unlikely given the amount of time that has passed and that all of the individual defendants in this case are believed to be deceased. Additionally, all that is required for Lipari to be qualified is that he has "relevant expertise" that enables him to offer "responsible opinion testimony helpful to judge or jury." *Tuf Racing Prod.*, 223 F.3d at 591; *see also Lemmermann v. Blue Cross Blue Shield*, 713 F. Supp. 2d 791, 799 (E.D. Wis. 2010) ("[N]othing in Rule 702 or in the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation.") (citing *Beamholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980)); *Paine v. Johnson*, No. 06 C 3173, 2010 WL 785398, at *2 (N.D. Ill. Feb. 26, 2010) ("There is no requirement . . . that the subject of the witness's proposed testimony precisely overlap with his prior experience in both kind and degree.")

Defendant's argument that Lipari's research could have been done by "anyone" with access to the university computer system is also unavailing. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 5.) Contrary to Defendant's suggestion, while internet search engines have made researching on the internet accessible to people of all educational and professional backgrounds, historical research, like legal research, requires far more than simply running a Google search. (R. 239, Pl.'s Resp. to Def.'s Mot. to Bar Pl.'s Expert, Ex. G at 185.) In focusing on the accessibility of the databases that Lipari used, Defendant ignores the other aspects of historical research that require training and education, including knowing where to search for sources,

formulating searches based on an understanding of the history of the period in question, and evaluating the reliability of sources. Lipari's research utilized his experience and education as an academic historian and could not have been completed by "anyone." (*See id.* at 228-31.)

Defendant also claims that Lipari is not qualified because he offers opinions on matters in which he has no expertise. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 6.) Specifically, Defendant finds fault with Lipari's statement that certain interrogation methods were illegal despite not knowing the law of interrogation and his conclusion that there was a "psychological aspect" to the interrogations despite not being a psychologist. (*Id.*) This argument, however, overlooks the nature of Lipari's work; he is an academic historian who uses historical sources to draw conclusions about the time period in question. If the sources upon which his conclusions were based are reliable, which Defendant does not question, he need not also be a lawyer and psychologist to rely upon the expertise of those who authored the reports. The Court thus finds that based on Lipari's educational background, training, and his experience in researching and writing about the relationship between the African-American community and the Chicago Police Department in the 20th Century, he is qualified to testify as an expert in this case.

### B. Lipari's Methodology

Defendant next challenges the methodology used by Lipari in preparing his report. Defendant first argues that the report is based upon insufficient facts and data. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 7.) Defendant further argues that Lipari's opinions are not the product of reliable principles and methods. (*Id.* at 9.) In order to be found reliable, the methodology used by social science experts to reach their conclusions must meet the same standards as the physical sciences, but "the measure of intellectual rigor will vary by the field of expertise." *Tyus*

*v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). Thus, for Lipari's testimony to be admissible, the methodology he used to form his opinions in this case must "adhere to the same standards of intellectual rigor that are demanded in [his] professional work." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (citation omitted).

Defendant's first criticism of Lipari's methodology is that the reports he relied upon in his expert report do not apply to the time of Walden's arrest and interrogation because they were completed before or after 1952. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 7-8.) In his report, Lipari states that the most important sources of information for him were four reports that addressed the conduct of Chicago police officers: (1) a 1931 report by the National Commission on Law Enforcement (the "Wickersham Commission"); (2) a 1949 report by the John Howard Association titled *Held Without Bail*; (3) the 1953 Chicago City Council Emergency Committee on Crime Report; and (4) the 1959 ACLU report titled *Secret Detention by the Chicago Police Department*. (R. 237, Pl.'s Facts, Ex. G at 22.) Although Defendant is correct that none of the reports are from 1952, Defendant does not question their reliability or the reasonableness of Lipari's reliance on them, other than their applicability to the time period in which Walden was arrested and interrogated. However, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citations omitted); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of

14

information which he employed"). The Court thus finds that while it would have been ideal for Lipari to have found and relied upon a report from 1952, the lack of such a report—especially since Defendant points to none that Lipari failed to consult—is not fatal to Lipari's methodology. Instead, whether the conclusions Lipari drew from the reports were reasonable given their dates of publication is a question for the jury.

In a related argument, Defendant also contends that Lipari's failure to identify individual cases of abuse or illegal interrogation other than those in the reports renders the basis for his conclusions unsound. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 8.) Again, as with the dates of the reports Lipari relies upon, the addition of a list of individual cases of police abuse from the time period of Walden's arrest and interrogation to the sources he relied upon would likely increase the weight the jury would give to his conclusions; such evidence, however, is not required for Lipari's methodology to be sound given his reliance on other apparently credible sources to form his opinions. For this same reason, Lipari's failure to interview any current or former Chicago police department employees or City employees does not mean his methodology is unreliable, especially in light of Defendant's failure to identify any possible past or present employees with knowledge relevant to Lipari's research.

Defendant's second main criticism regarding Lipari's methodology challenges the way he conducted the research for the expert report. Defendant claims that because the search engines used by Lipari are not always accurate, using them was not a reliable method of doing research. (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 10.) The same can be said, however, of almost any research method, and if 100% accuracy were required, few methodologies would pass muster. Additionally, Lipari took steps to mitigate the inaccuracies inherent in using search engines,

15

including running multiple searches using different terms in several different databases over a period of several weeks. (R. 239, Pl.'s Mem. in Resp. to Def.'s Mot. to Bar Pl.'s Expert, Ex. G at 187-89.) Lipari's reliance on computer searches of databases, as well as the sources found through those searches, also appears reasonable given that it is a common way for academics to do research, and "Rule 703 of the Federal Rules of Evidence explicitly permits reliance on material 'reasonably relied upon by experts in the particular field in forming opinions or inferences.'" *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) (citing Fed. R. Evid. 703). Defendant's remaining criticisms of Lipari's methodology, including his reliance on newspaper articles and his failure to "specifically look for evidence that the City conducted any analysis of the Wickersham report," (R. 225, Def.'s Mot. to Bar Pl.'s Expert at 6), mischaracterize Lipari's deposition testimony and the nature of historical research.

Regarding the fundamental question in determining whether Lipari's methodology is reliable—whether he "adhere[d] to the same standards of intellectual rigor that are demanded in [his] professional work," *Chapman*, 297 F.3d at 688—the available evidence in the record, including Lipari's deposition testimony, points to the conclusion that he used the "same standards of intellectual rigor" as he does in his academic work. (R. 239, Pl.'s Mem. in Resp. to Def.'s Mot. to Bar Pl.'s Expert, Ex. G at 231-33 (testifying that used the same standards in creating his expert report as he used in his historical research for his PhD).) Thus, the Court finds that Lipari's methodology meets the reliability standards under Rule 702 and *Daubert*.

Defendant does not challenge the relevance of Lipari's opinions, and the Court finds that his opinions pertaining to the practices or customs of the Chicago Police Department in 1952 are relevant to Walden's *Monell* claim. Thus, because Lipari is qualified to testify in this case, his

methodology is reliable, and his testimony is relevant, the Court rejects Defendant's *Daubert* challenge to Lipari's expert opinions. While Defendant points out possible weaknesses in Lipari's qualifications and methodology, the Court is mindful that "[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusion and the facts on which they are based." *Smith*, 215 F.3d at 719.

The Court next addresses the timeliness of Walden's federal and state-law claims and whether Defendant is entitled to summary judgment for Walden's fair trial claim and his *Monell* claim against Defedant.

## II.     Timeliness of Plaintiff's Claims

### A.     Federal Claims

In deciding whether Walden's federal claims are time-barred, the Court considers three major issues. First, the Court must determine the proper statute of limitations for each claim. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Second, the Court must determine when each claim accrued. *Id.* Finally, the Court decides if any claim was tolled for a period of time. Because federal jurisdiction is dependent on Walden's Section 1983 claims, the Court considers them first. *Johnson v. Dossey*, 515 F.3d 778, 781 (7th Cir. 2008).

For claims under Section 1983, the length of the statute of limitations is that which the state in which the cause of action arose provides for personal injury torts. *Kato*, 549 U.S. at 387. In this case, there is no dispute that the Illinois statute of limitations of two years governs for

purposes of Walden's claims brought under Section 1983. 735 Ill. Comp. Stat. 5/13-202.

Similarly, state law controls tolling rules. *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).[6]

In terms of when a Section 1983 cause of action accrues, however, the Court must look to federal law. *Kato*, 549 U.S. at 387-88. "[I]t is the standard rule" that a Section 1983 claim accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Id.* at 388 (internal quotation marks and citations omitted). In *Hileman v. Maze*, the Seventh Circuit set forth a two-part inquiry for determining when a Section 1983 claim has accrued. 367 F.3d 694, 696 (7th Cir. 2004). First, the Court must identify the injury. *Id.* Second, the Court must determine "the date on which the plaintiff could have sued for that injury." *Id.* Generally, that is the date the plaintiff "'knows or should know' that her rights were violated." *Id.* (citing *Kelly v. City of Chi.*, 4 F.3d 509, 511 (7th Cir. 1993)).

In addition to this two-step inquiry, in making the determination of when a plaintiff who has been convicted of a crime could have sued for a cause of action related to the conviction, the Court must also consider the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, "the Court held that a constitutional claim that would undermine a criminal conviction if vindicated cannot be brought until the defendant's conviction is nullified." *Wallace v. City of Chi.*, 440 F.3d 421, 425 (7th Cir. 2006). Thus, the third inquiry the Court must make in analyzing the accrual date of Walden's claims is to determine "whether a judgment in favor of the plaintiff would [have ]necessarily impl[ied] the invalidity of his conviction," had the claim been brought prior to his pardon of innocence. *Heck*, 512 U.S. at 487.

---

[6] Walden has raised to no tolling arguments for his Section 1983 claims so the Court does not address the tolling issue in its analysis.

The Court's determination of when Walden's Section 1983 claims accrued is also controlled by the Supreme Court's most recent case addressing Section 1983 claim accrual, *Wallace v. Kato*. In *Kato*, the Court held that the statute of limitations for a Section 1983 claim seeking damages for false arrest in violation of the Fourth Amendment begins to run at the time the claimant becomes detained pursuant to legal process. 549 U.S. at 397. The Seventh Circuit has held that *Kato* stands for the principle that "a claim that accrues before a criminal conviction may and usually must be filed without regard to the conviction's validity." *Evans v. Poskon*, 603 F.3d 362, 363 (7th Cir. 2010). However, its discussion of the applicability of *Wallace* to Section 1983 claims has been limited to Fourth Amendment claims. *See, e.g., id.*, 603 F.3d at 364-65 ("Many claims that concern how police conduct searches or arrests are compatible with a conviction."); *Johnson*, 515 F.3d at 782 ("*Wallace* . . . deals with the accrual date of a § 1983 claim for false imprisonment . . . A *Brady* claim, on the other hand, is not controlled by *Wallace* but rather by *Heck v. Humphrey* . . ."); *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008) ("*Wallace* . . . holds that *Heck* does not affect litigation about police conduct in the investigation of a crime . . .").[7]

The date of accrual is considered in relation to the nature of the specific constitutional violation alleged, so the Court will consider each claim in turn.

### 1. Count I: Deprivation of the Right to a Fair Trial and Wrongful Conviction under the Fourteenth Amendment

[7] It was because of the Supreme Court's ruling in *Wallace* that Walden voluntarily dismissed his claims for alleged Fourth Amendment violations. (R. 235, Pl.'s Mem. at 4 n.1.)

Regarding Walden's first claim, that Defendant violated his Fourteenth Amendment right to a fair trial resulting in a wrongful conviction, there is little dispute that it was timely filed.[8] The Supreme Court's holding in *Heck* is directly on point—"in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486-87. Thus, "a § 1983 claim for a due process violation based on the denial of a fair criminal trial may be brought only after the conviction is set aside." *Dominguez v. Hendly*, 545 F.3d 585, 588 (7th Cir. 2008); *see also Johnson*, 515 F.3d at 782. In this case, the Court previously ruled that it was Governor Ryan's pardon of innocence that nullified Walden's conviction. (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 13-17.) Thus, Walden's claim for the denial of a fair trial is not time-barred because the claim did not accrue until he received the innocence pardon, and he filed suit within two years of its accrual. However, as discussed below, the Court grants summary judgment for Defendant on this count because Walden's claim in this case does not constitute a constitutional violation.

### 2. Count IV: Coercive Interrogation under the Fifth Amendment

In Count IV of his complaint, Walden contends that he was coercively interrogated, resulting in his false confession in violation of his Fifth Amendment right against self-

---

[8] Defendant admits that Walden's claim that "he was denied a right to a fair trial" was "potentially timely filed" and makes no arguments that the claim was time-barred. (R. 221, Def.'s Mem. at 5.)

incrimination under *Chavez v. Martinez*, 538 U.S. 760 (2003). (R. 1, Compl. ¶ 100.) While it is clear that the injury alleged here—the coercive interrogation of Walden and the resulting introduction of his confession at trial—occurred in 1952, the more difficult question for deciding when this claim accrued is determining "the date on which plaintiff could have sued." *Hileman*, 367 F.3d at 696. Defendant argues that under *Wallace* and two other cases decided after this Court's Memorandum Opinion and Order of April 25, 2005, this claim accrued when Walden's confession was used against him during his trial in June 1952. (R. 221, Def.'s Mem. at 4.) Walden argues that his coercive interrogation claim attacks the validity of his detention and conviction, and thus, under *Heck*, he could not sue until he was aware that his conviction had been set aside. (R. 235, Pl.'s Mem. at 6.)

The Court previously applied *Heck* to Walden's claim and concluded that "[s]ince Plaintiff's well-pleaded complaint contains allegations sufficient to conclude that his conviction was based primarily on his coerced confession and alleged acts directly related to it, for purposes of the motion to dismiss at least, the Court holds that Plaintiff could not have challenged his alleged torture, physical abuse, or coercive interrogation without impugning his conviction." (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 23.) Because the Court's previous ruling regarding this claim was "for purposes of the motion to dismiss," the Court revisits its ruling for purposes of the motion for summary judgment. The Court finds that neither new case law nor additional evidence provided for Defendant's motion disturbs its previous holding: Walden's claim did not accrue until he received the innocence pardon because he could not have challenged his coerced interrogation without "necessarily demonstrating the invalidity" of his conviction under *Heck*. 512 U.S at 481-82.

Regarding the case law decided subsequent to the motion to dismiss in this case, the Court finds that Walden's claims remain governed by *Heck*. The three cases Defendant relies upon for its argument that Walden's Fifth Amendment claim accrued when it was used against him during his trial in 1952 are clearly distinguishable from this case. First, Defendant cites *Wallace*, 549 U.S. at 388, for the proposition that Fifth Amendment claims accrue at the moment the alleged constitutional violation occurs. (R. 221, Def.'s Mem. at 4.) However, as discussed above, the Supreme Court expressly limited the holding of *Wallace* to Fourth Amendment claims. *Wallace*, 549 U.S at 387 n.1. Additionally, Defendant makes no argument as to why *Wallace* should be extended to cover a Fifth Amendment violation such as in this case, and cites no cases in which a court has done so.

Defendant next relies upon *Lanza v. City of Chicago*, No. 08-5103, 2009 WL 1543680, at *1-2 (N.D. Ill. June 2, 2009), a case in which the district court held that the plaintiff's Fifth Amendment claim accrued when his allegedly unwarned confession was used against him at a pretrial hearing. Importantly, however, the plaintiff in *Lanza* was never tried or convicted; the implications of *Heck* were never at issue. *Wallace*, 549 U.S. at 393 ("[T]he *Heck* rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been . . . invalidated,' that is to say, an 'outstanding criminal judgment.'"). In this case, Walden's allegedly coerced confession was introduced against him at trial and his conviction was based upon that confession and related events; the *Heck* bar was therefore triggered because challenging the Fifth Amendment violation would have necessarily impugned the validity of Walden's conviction.

Finally, Defendant argues that a Fifth Amendment constitutional injury occurs at the time the plaintiff's statement is used against him in a criminal proceeding, relying upon *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1023-27 (7th Cir. 2006). While this argument correctly states the law under *Sornberger*, it addresses only the first prong of the Section 1983 claim accrual inquiry—the identification of Walden's injury—while ignoring the second prong—when Walden could have brought his suit. Additionally, in *Sornberger*, like in *Lanza*, there was no conviction to trigger the *Heck* bar.

Regarding whether new evidence affects the Court's previous conclusion, Defendant has submitted no new evidence that alters the conclusion that, under *Heck*, Walden could not have challenged his coercive interrogation without impugning his conviction. Despite the Court's invitation in its previous ruling, (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 20), Defendant failed to substantiate the record relating to the evidence used to convict Walden. Instead, in choosing to argue that *Wallace* barred Walden's Fifth Amendment claim, Defendant ignored *Heck* and did not argue that Walden's conviction was based on other evidence and did not identify any new evidence in the record.

Thus, the record before the Court at this stage does not disrupt its previous holding that Plaintiff's Fifth Amendment claim did not accrue until he was pardoned because it would have been barred by *Heck*. It appears that the central evidence used against Walden was his confession, the testimony of the police officers involved in his arrest and interrogation, and an identification of Walden by Anderson. (R. 244, Def.'s 56.1 Resp. ¶ 19.) In this suit, Walden contends—and Defendant admits—that his confession was coerced, the testimony of the police officers regarding his confession was fabricated, and the identification by Anderson was based on

23

a suggestive identification procedure, (*Id.* ¶¶ 3-17, 19); these claims necessarily call into question Walden's conviction. Had Walden brought this claim before his conviction was invalidated, it would have been barred by *Heck. See Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *5-6 (N.D. Ill. Jan. 26, 2009) ("[B]ased on *Heck v. Humphrey* . . . Hill's coerced confession claim did not accrue until his conviction was vacated."); *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641, at *7 (N.D. Ill. Mar. 30 2005) ("An evaluation of Orange's § 1983 claim [for coercive interrogation] in the 1980s would have forced the evaluating court to directly determine whether his conviction was invalid.") *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *7 (N.D. Ill. Oct. 25, 2004) ("Since Howard's conviction rested almost entirely on his involuntary confession plus the alleged coerced witness testimony, we conclude that Howard could not have challenged Defendants' acts of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction."); *Patterson v. Burge*, 328 F. Supp. 2d 878, 897 (N.D. Ill. 2004) ("Since Patterson's conviction rested almost entirely on his involuntary confession, and at most on his involuntary confession plus the coerced testimony of a 16 year-old girl, the court concludes that Patterson could not have challenged defendants' act of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction."). Thus, Walden's coercive interrogation claim accrued when he received the innocence pardon, and because he brought suit within two years of the claim's accrual, the claim was timely filed.

> **3.** **Count V: Violation of Equal Protection under the Fourteenth Amendment**

In Count V of his complaint, Walden alleges discriminatory actions in connection with his arrest, interrogation, prosecution and conviction. According to Walden, these actions violated his equal protection rights under the Fourteenth Amendment. (R. 1, Comp. ¶¶ 102-04.) Defendant argues that this claim is time-barred because the facts or injuries that form the basis for the claim occurred in the 1950s. (R. 221, Def.'s Mem. at 5.) In its Memorandum Opinion and Order pertaining to Defendant's motion to dismiss, the Court ruled that "Plaintiff may bring an equal protection claim for those aspects of his other Section 1983 claims that are not time barred or otherwise defective." (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 28.) Because the law of the case doctrine mandates that "a court ought not to re-visit an earlier ruling in a case absent a compelling reason," and Defendant has not pointed to any "manifest error or a change in the law," the Court's ruling stands.[9] *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (citations omitted). Thus, Walden's Equal Protection claim is timely as it pertains to allegations related to his coerced interrogation claim.

### 4.    Count VI: *Monell* Claim

In Count VI, Walden claims that the individual police officers' actions alleged in Counts I through V were the done pursuant to unlawful *de facto* policies, practices, or customs of the City of Chicago and its Police Department. (R. 1, Comp. ¶¶ 106-07.) Defendant argues that this *Monell* claim is time-barred because Walden contends that Defendant had the *de facto* policies,

---

[9] Defendant cites one case regarding the equal protection claim to support its argument that it accrued in the 1950s, *Limestone Development Corp. v. Vill. of Lemont*, 520 F.3d 797, 805 (7th Cir. 2008). (R. 241, Def.'s Reply Mem. at 3.) The court in *Limestone Development Corp.* dismissed the plaintiff's equal protection claim because, unlike in this case, all of the claims upon which the plaintiff relied for its equal protection claim were time-barred. *Id.* The holding in *Limestone Development Corp.* therefore does not conflict with this Court's conclusion that Walden's equal protection claim based on other claims that are not time-barred can proceed.

25

practices, and customs that violated his rights "[a]t all times material to [the] complaint," and all of the actions described in the complaint occurred in 1952.[10] (R. 221, Def.'s Mem. at 5.)

*Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), established that local governments may be held liable under Section 1983 for constitutional violations arising from policy, custom, or practice. As a *Monell* claim is brought under Section 1983, it is governed by the accrual rules applicable to other Section 1983 claims. However, because a *Monell* claim is premised on an underlying constitutional violation, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the claim can go forward when premised on claims that have been timely filed. *See Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *8 (N.D. Ill. Oct. 13, 2004) ("We note that to the extent [plaintiff's] *Monell* claim is based on his timely allegations, it remains timely.") Thus, the Court finds that Walden's *Monell* claim, as it is based on Counts IV and V, is timely.

## B. State-Law Claims

Walden has brought state-law claims for malicious prosecution, intentional infliction of emotional distress, conspiracy, and a corresponding *respondeat superior* claim against the City. (R. 1, Compl.) For these claims, the Court applies Illinois law to determine the statute of limitations, the accrual of the claims, and whether any claim has been tolled for a period of time. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). Under the Illinois Tort Immunity

---

[10] This argument was not addressed at the motion to dismiss stage because the Court's analysis focused on Defendant's argument, which it rejected, that Plaintiff failed to state a claim because his *Monell* claim did not exist at the time of his injury. (R. 34, Mem. Opinion and Order of Apr. 25, 2005 at 28-30.) The Court notes, however, that Defendant's statute of limitation argument regarding Walden's *Monell* claim has changed since its original articulation in Defendant's motion to dismiss. While Defendant originally argued that Walden's claims regarding the alleged wrongful policies and practice of Defendant would have accrued at the time of Walden received his pardon, (R. 20, Def.'s Mot. to Dismiss at 10.), Defendant now argues that the claim would have accrued in 1952. (R. Def.'s Mem. at 5.)

Act, the statute of limitations for civil actions commenced under state law against state employees and entities is one year from the date that the injury was received or the cause of action accrued. 745 Ill. Comp. Stat. 10/8-101(a). As with the federal claims, the important question regarding the timeliness of Walden's state-law claims is thus the date upon which they accrued. Walden contends that, under the discovery rule, all of his state-law claims accrued only when he became aware of Governor Ryan's pardon of innocence on January 13, 2003. (R. 235, Pl.'s Mem. at 7.) Defendant argues that all of Walden's state-law claims accrued in 1952, or, at the latest, on December 30, 2002, the date Governor Ryan signed the pardon. (R. 241, Def.'s Mem. at 6.) As the complaint in this case was filed January 6, 2004, unless the discovery rule applies to Walden's claims, they are barred by the statute of limitations.

Under Illinois law, statutes of limitations generally begin to run as soon as a person suffers injury. *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135 (1995). "Literal application of the statute of limitations, however, sometimes produced harsh results, and in response, the discovery rule was developed." *Id.* Under the discovery rule, the commencement of the relevant statute of limitations is delayed until "the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Jackson Jordon, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627, 630-31 (1994). The discovery rule was first adopted by the Illinois Supreme Court in *Rozny v. Marnul*, in which the court explained the circumstances in which the rule should apply:

> The basic problem is one of balancing the increase in difficulty of proof which accompanies the passage of time against the hardship to the plaintiff who neither knows nor should have known of the existence of his right to sue. There are some actions in which the passage of time . . . so greatly increases the problems of proof that it has been deemed necessary to bar plaintiffs who had not become aware

27

of their rights within the statutory period as measured from the time such facts occurred. But where the passage of time does little to increase the problems of proof, the ends of justice are served by permitting plaintiff to sue within the statutory period computed from the time at which he knew or should have known of the existence of the right to sue.

*Rozny*, 250 N.E.2d 656, 664 (1969) (internal citations omitted). Since *Rozny*, "[c]ourts have applied the discovery rule on a case-by-case basis, weighing the relative hardships of applying the rule to both plaintiffs and defendants . . . [and the] reasons behind the discovery rule may support application regardless of how an action is characterized." *Hermitage Corp.*, 651 N.E.2d at 1135-36. With this background in mind, the Court now turns to considering the timeliness of Plaintiff's state-law claims.

### 1. Count VIII: Malicious Prosecution

In Count VIII of the complaint, Walden alleges a claim for malicious prosecution. (R. 1, Comp. ¶115.) While Defendant concedes that this claim accrued upon Governor Ryan's pardon, Defendant claims that the pardon was signed and dated December 30, 2002, and that is thus the

proper date to use for accrual.[11] (R. 221, Def.'s Mem. at 6.) Walden, however, contends that the discovery rule should apply in this case so that the running of the limitations period for his malicious prosecution claim did not commence until he become aware of the pardon by receiving a letter from the Prisoner Review Board on January 13, 2003. (R. 235, Pl.'s Mem. at 6.)

Although a cause of action for malicious prosecution generally accrues when the "criminal proceeding on which it is based has been terminated in the plaintiff's favor," *Ferguson v. City of Chi.*, 820 N.E.2d 455, 459 (2004), the Court finds that the equities favor the application of the discovery rule in this case. In order to establish a malicious prosecution claim, Walden must show, among other elements, "the termination of the [criminal] proceeding" in his favor, and the absence of this element "bars a plaintiff from pursuing the claim." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (1996). While in a typical malicious prosecution case, the "termination of the proceedings in the plaintiff's favor" is likely to be an acquittal or other court action that is public and would put a plaintiff on immediate notice of his or her claim, there are no facts in the

---

[11] In its reply brief, Defendant also argues in the alternative that even if the discovery rule applied to Walden's claims, Walden "did not allege in the complaint that the cause of action remained undiscovered" as required by Illinois law. (R. 241, Def.'s Reply Mem. in Support of Its Mot. for Summ. J. at 5.) However, in his complaint, Walden does allege that he received his pardon of innocence on January 13, 2003, not December 30, 2002. (R. 1, Compl. ¶ 13.) More importantly, any heightened pleading requirements under Illinois law do not apply in federal court, where pleading requirements are governed by the federal rules. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Serv.*, 536 F.3d 663, 670 (7th Cir. 2008); *see also Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir. 1997) ("Even if Wisconsin does hold to a heightened pleading standard for malicious prosecution claims . . . it is rudimentary that pleading requirements in the federal courts are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting.") (internal quotation marks and citation omitted). Under federal law, the "basic rule [is] that the statute of limitations is an affirmative defense . . . [c]omplaints need not anticipate defenses." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004) (citations omitted). Therefore Walden need not have pled facts to overcome Defendant's statute of limitations defense.

record to indicate that news of Governor Ryan's signing of Walden's pardon on December 30, 2002 was immediately public or disseminated in the press. *See Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 334 N.E.2d 160, 164 (1975) (distinguishing the applicability of the discovery rule to a defamation claim in which the publication occurred in a subscription-only service, thereby preventing the plaintiff from learning of the allegedly defamatory report, from defamations through mass-media publications in which the plaintiff, "as a member of the public, has had access to such published information"). Nor is the cause of action of malicious prosecution similar to an injury that is single traumatic event, for which the discovery rule generally does not apply. *Ericksen v. Village of Willow Springs*, 660 N.E.2d 62, 66 (Ill. App. Ct. 1995) ("If the injury is traumatic in nature, that is, immediate and caused by an external force or violence, the plaintiff knows or should know of his right to sue when injured."). Additionally, regarding the balance of the hardships under *Rozny*, Defendant has not suggested that the problems of proof have increased significantly because of the passage of time, and "there is no claim of any want of diligence on the part of Plaintiff."[12] *Tom Olesker's Exciting World of Fashion*, 334 N.E.2d at 164.

---

[12] Notably, Defendant admitted in its Answer that "on January 13, 2003, then-governor George Ryan granted Walden a pardon of innocence," (R. 160, Answer ¶ 13), and January 13, 2003 has been the operative date for Governor Ryan's pardon for Defendant and the Court until Defendant's motion for summary judgment. (*See* R. 30, Def.'s Reply in Support of Its Mot. to Dismiss at 1 ("[P]laintiff continues to rely on the innocence-based pardon he received from then-governor George Ryan in 2003 . . ."); R. 34, Mem. Opinion and Order of Apr. 25, 2005 ("On January 13, 2003, fifty-one years after Walden was first taken into custody, he received a pardon of innocence from then-Governor George Ryan for his conviction and seventy-five year prison sentence."); R. 200, Mem. Opinion and Order of Nov. 11, 2009 at 1 ("Then in 2003, Governor Ryan granted Walden a pardon for innocence.").)

While the Court finds that the discovery rule applies to Walden's claim of malicious prosecution, the date on which the claim actually accrued is for the trier of fact to determine, and Walden has the burden of proving the date of discovery at trial. *Jackson Jordan, Inc.*, 633 N.E.2d at 631 ("The time at which a party has or should have the requisite knowledge under the discovery rule to maintain a cause of action is ordinarily a question of fact."). It is undisputed that Walden did not learn of the pardon until he received notification through the mail from the Illinois Prisoner Review Board in a letter sent on January 13, 2003. (R. 244, Def.'s 56.1 Resp. ¶¶ 20-21.). However, as previously noted, there is nothing in the record regarding whether other circumstances might have put Walden on notice of Governor Ryan's pardon prior to receiving the letter, and Defendant is free to put forth admissible evidence at trial to show that Walden "reasonably should [have] know[n]" of the pardon more than a year before the complaint in this case was filed. *Jackson Jordan, Inc.*, 633 N.E.2d at 630-31. Walden's malicious prosecution claim accrued when he knew or should have known of Governor Ryan's pardon, a date that will be determined by the jury.

### 2. Count IX: Intentional Infliction of Emotional Distress

In Count IX, Walden alleges a claim of intentional infliction of emotional distress under state law. (R. 1, Compl. ¶¶ 117-20.) Defendant, relying on *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006), argues that this claim is barred because "a claim of intentional infliction of emotional distress accrues as of the date of the last injurious act," and "there is literally no unlawful interaction alleged to have occurred between Plaintiff and the City's actors after Plaintiff's June 1952 trial." (R. 241, Def.'s Reply Mem. in Support of Its Mot. for Summ. J. at 4-5.) Walden contends that this claim did not accrue until the underlying suit upon which it is

31

based—the criminal proceeding in which he was prosecuted—was terminated in his favor by Governor Ryan's pardon. (R. 235, Pl.'s Mem. at 7. (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (2003).)

Under Illinois law, a cause of action for "continuing torts" such as intentional infliction of emotional distress accrues "at the time the last injurious act occurs or the conduct is abated." *Feltmeier*, 798 N.E.2d at 89. "The doctrine of continuing violation 'does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes.'" *Evans*, 434 F.3d at 935 (quoting *Feltmeier*, 798 N.E.2d at 86). Thus, to determine the point of accrual, the Court must determine what acts or conduct form the basis of Walden's intentional infliction of emotional distress claim.

In his complaint, Walden alleges intentional infliction of emotional distress based on the conduct of the arresting and interrogating officers that included "torturing a false confession from plaintiff, by fabricating the details of said confession, by procuring his prosecution, conviction, and 75 year sentence for a rape he did not commit by means of said confession, by fabricating, coercing, and suppressing other evidence, by continuing his false imprisonment after procuring his wrongful conviction, and by otherwise abusing and defaming plaintiff." (R. 1, Compl. ¶ 118.) The Court finds that Walden's intentional infliction of emotional distress claim, as it relates to the underlying claim of malicious prosecution, did not accrue until Governor Ryan's pardon because the allegedly tortious conduct did not "abate" until the favorable termination of the criminal proceedings. *See Caroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("[C]ourts in this district have consistently held that IIED claims based on facts parallel to

claims for malicious prosecution accrue only when state criminal proceedings are terminated."); *Bergstrom v. McSweeney*, 294 F. Supp. 2d. 961, 969 (N.D. Ill. 2003) ("As [Plaintiff's intentional infliction of emotional distress] claim incorporates the conduct underlying the malicious prosecution claim, the cause of action did not accrue until the state criminal proceedings against him were terminated."); *Pierce v. Pawelski*, No. 98 C 3337, 2000 WL 1847778, at *3 (N.D. Ill. Dec. 14, 2000) ("[Plaintiff's] IIED claim is based not just on the events occurring on the day of his arrest, but on defendants' participation in his wrongful prosecution and their allegedly false testimony at his trial. Accordingly, the IIED claim did not accrue until [Plaintiff's] trial concluded and he was acquitted."). Thus, because Walden's allegations of intentional infliction of emotional distress claim are intertwined with the allegations of his malicious prosecution claim, it is not time-barred to the extent the malicious prosecution claim is found to be timely by the jury.

### 3. Counts X, XI, and XIII: Conspiracy, *Respondeat Superior*, and Indemnification

Under state law, Walden also alleges claims for conspiracy for false imprisonment, malicious prosecution, and intentional infliction of emotional distress (Count X); for *respondeat superior* liability against the City (Count XI); and indemnification by the City (Count XIII). (R. 1, Compl. ¶¶ 121-32.) Defendant's only argument regarding these claims is that they are contingent upon other state-law claims and thus cannot stand independently. (R. 241, Def.'s Mem. at 6.) Given their relationship, the Court thus finds that to the extent the conspiracy, *respondeat superior*, and indemnification claims are based on Walden's malicious prosecution

claim, they are not barred by the statute of limitations if the jury finds that the malicious prosecution claim is timely.

Because the Court finds that Walden's fair trial and *Monell* claims are timely, the Court now addresses Defendant's arguments pertaining to the merits of those claims.[13]

## III.   The Fair Trial Claim

While Defendant concedes that Walden's Count I fair trial claim was timely filed, Defendant argues that it must fail as a matter of law because the allegations in Count I—and the evidence put forth by Walden to support them—do not create a federal claim under the Fourteenth Amendment.  (R. 221, Def.'s Mem. at 6.)  In Count I of the Complaint, Walden alleges that the individual police officers caused his "wrongful charging, prosecution, and conviction" in violation of the Fourteenth Amendment by: (1) fabricating and coercing his false confession; (2) manipulating the unduly suggestive identification procedures; and (3) writing false reports, giving false testimony, and withholding from the prosecutors and judges involved in his prosecution the fact that his confession and identification were false.[14]  (R. 1, Compl. ¶¶ 90-91.)

Defendant argues that the only due process claim available to Walden is a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), in which "the Supreme Court held that the right to due process and a fair trial requires that the prosecutor turn over to the defense all potentially

---

[13]  The Court notes that Defendant has raised no arguments on the merits of the other federal and state-law claims that the Court has found to be timely filed, and thus the Court does not address whether a genuine issue of material fact exists as to those claims.
[14]  Walden originally asserted these allegations were a violation of "the Fourth and/or Fourteenth Amendments." (R. 1, Compl. ¶ 90.)  However, as Walden has voluntarily dismissed his claims regarding the Fourth Amendment post-*Wallace* because they would be barred by the statute of limitations, the Court only addresses whether the allegations in Count I constitute a violation of the Fourteenth Amendment.

exculpatory evidence." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). A *Brady* violation has three basic elements: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued." *Carvajal*, 542 F.3d at 566-67 (citations omitted). "Suppression" of evidence occurs when "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* (citation omitted). The Supreme Court in *Brady* emphasized that the fundamental principal at stake in the suppression of potentially exculpatory evidence is the "avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87.

Defendant contends that Walden's allegations do not constitute a valid *Brady* claim because *Brady* is not violated where: (1) a plaintiff was not deprived of evidence held by the police or prosecutor; or (2) where a plaintiff is aware of the alleged misconduct involving the withholding of exculpatory evidence. (R. 221, Def.'s Mem. at 6-7.) Defendant further argues that a federal malicious prosecution claim is not actionable under Section 1983 as Walden is currently receiving all the process he is due because state law remedies exist for the allegations brought in Count I. (*Id.*)

The Court now turns to addressing whether each allegation constitutes a violation under the Fourteenth Amendment.

## A.    Coerced Confession

The first element of Walden's fair trial claim alleges that "by fabricating and coercing the false admission . . . [the police officers] deprived plaintiff of his liberty and violated his right to a

35

fair and impartial trial and not to be wrongfully convicted." (R. 1, Compl. ¶ 90.) Defendant argues that Walden does not allege a due process violation regarding the confession because he was aware of the confession, and thus cannot claim anything was withheld from him as is required for a *Brady* claim. (R. 221, Def.'s Mem. at 6.) Walden contends that the admission of the coerced testimony at trial is a violation of due process because this case deals with the coercion of evidence, which is a different issue than whether the defendant knew about contested evidence. (R. 235, Pl.'s Mem. at 9-10.)

As an initial matter, the Court notes that Walden's coerced confession claim in Count I is framed as a violation of procedural due process. Although Walden argues that his coerced confession claim in Count I is about the "coercion of evidence," his specific allegations demonstrate that the claim is not about the right to be free from coercive police conduct rooted in substantive due process. *See Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994) ("Coercing witnesses to speak . . . is a genuine constitutional wrong . . . Overbearing tactics violate the right of the person being interrogated to be free from coercion."). Instead, Walden is challenging the denial of his procedural due process right to a fair trial and the resulting wrongful conviction. (*See* R. 1, Compl. ¶ 90 ("by fabricating and coercing the false admission . . . [the police officers] deprived plaintiff of his liberty and violated his right to a fair and impartial trial and not to be wrongfully convicted").) Unlike Count III, in which Walden alleges that the police officers violated his Fourth and Fourteenth Amendment rights by "torturing and physically abusing [him] and threatening him with additional torture and physical abuse," (R. 1, Compl. ¶ 96), there is no mention in Count I of the police conduct that occurred during Walden's interrogation; rather, Walden is claiming the coerced confession violated his right to a fair trial.

This version of a coerced confession claim–a fair trial claim as opposed to a freedom-from-coercive-tactics claim—has grown increasingly disfavored, and the Seventh Circuit in *Wallace* rejected the notion that "there is a free-standing due process claim whenever unfair interrogation tactics . . . are used to obtain a confession." 440 F.3d at 429.[15] Instead, due process claims involving coerced confessions must "shock the conscience and thereby implicate the Supreme Court's substantive due process rulings" or be "grounded in traditional notions of what is required for a fair trial, including the *Brady* right to be given exculpatory material." *Id.* Thus, Walden's coerced confession claim alleging a violation of procedural due process must merge with a *Brady* claim. *See Ollins v. O'Brien*, No. 03 C 5795, 2006 WL 1519286, at *3 (N.D. Ill. May 26, 2006) ("*Wallace* . . . requires that plaintiffs' separately pleaded [] claims based on unfair interrogation tactics substantively merge with their *Brady* claims based on the Fourteenth Amendment's guarantee of a fair trial."); *Patterson*, 328 F. Supp. 2d at 889 ("Most notably, in addition to charging defendants with hiding the fact that his confession was coerced and fabricated—an allegation which by itself might not state a *Brady* claim . . .–Patterson accuses [the] defendants of obstructing justice and violating his right to a fair trial through actions they

---

[15] The two cases cited by Walden in support of his free-standing due process claim for the coerced confession, *Brown v. Mississippi*, 297 U.S. 278 (1936), and *Jackson v. Denno*, 378 U.S. 368 (1963), were decided prior to *Malloy v. Hogan*, 378 U.S. 1, 6-7 (1964), in which the Supreme Court held that the Fifth Amendment applies to the States. The Court explained its prior rulings, noting that, "[t]he Court in *Brown* felt impelled, in light of *Twining* [*v. State of New Jersey*, 211 U.S. 78 (1908)], to say that its conclusion did not involve the privilege against self-incrimination. 'Compulsion by torture to extort a confession is a different matter.' 297 U.S., at 285 . . . But this distinction was soon abandoned, and today, the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897 . . . that in criminal trials . . . wherever a question arises whether a confession is incompetent because not voluntary, this issue is controlled by . . . the Fifth Amendment . . ." (internal quotation marks and citation omitted).

took outside the interrogation room."); *Orange*, 2005 WL 742641, at *11 ("The defendants allegedly caused Orange to experience an unfair trial through their false testimony and other acts taken to cover up the torture obtained confession from Orange. They would have had an obligation under *Brady* to disclose their other alleged acts of deceit to Orange in order to ensure him a fair trial."). Importantly, however, a coerced confession alone cannot constitute a *Brady* violation, as no "suppression" occurs because the plaintiff is aware of his own confession. *Wallace*, 440 F.3d at 429-30 ("A section 1983 plaintiff cannot base his *Brady* claim on a defendant's failure to disclose plaintiff's own false confession."); *Sorenberger*, 434 F.3d at 1006 ("Theresa knew herself what occurred during the interrogation, and the police were under no obligation to tell her again that they coerced her into confessing.").

That Walden's coerced confession allegation in Count I is a procedural due process claim would not be fatal but for the fact that, as discussed below, none of his other allegations in Count I constitute a valid *Brady* claim. The Court thus finds that Walden's fair trial claim premised on a coerced confession fails because it does not constitute a *Brady* violation itself, the claim cannot stand alone as a procedural due process violation, and as discussed below, there is no other viable *Brady* claim with which it can merge. Accordingly, Walden's allegations in Count I related to his coerced confession do not constitute a Fourteenth Amendment violation.

## B.     Unduly Suggestive Identification Procedures

The second element of Walden's fair trial claim in Count I is that the police officers caused the his "wrongful charging, prosecution, and conviction . . . by manipulating the unduly suggestive identification procedures which led to the 'identification'" of Walden. (R. 1, Compl. ¶ 90.) Defendant has admitted that the police officers involved in Walden's investigation soiled

Walden's coat and hat to make them look more like the clothing Anderson described her attacker as wearing, and forced Walden to wear the coat and hat in front of Anderson. (R. 244, Def.'s 56.1 Resp. ¶ 13.) Defendant claims that this evidence alone, while proof of a suggestive show up, does not constitute a violation of due process. (R. 241, Def.'s Reply at 6.)

An unduly suggestive identification procedure does not itself violate the Constitution. *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987). Instead, the Fourteenth Amendment is violated only "if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006). The "prophylactic rule" against unduly suggestive identification procedures "is designed to protect a core right, that is the right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983." *Alexander*, 433 F.3d at 555 (citing *Hensley*, 818 F.2d at 649). Thus, since "flawed identification procedures are not themselves constitutional violations," the Seventh Circuit has held that a defendant cannot be liable under Section 1983 unless the plaintiff shows how the flaws in the defendant's identification techniques made his trial unfair. *Id.* In order to demonstrate that "unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial," the plaintiff must do more than "say[] that a witness was shown a suggestive photo array or lineup and later testified." *Id.* at 556. Nor is it enough to show that the plaintiff was later exonerated. *Id.* Instead, the plaintiff must put forth specific evidence that "shows *how* those flawed procedures compromised the constitutional right to a fair trial." *Id.* at 555 (listing several factors that would have a bearing on whether a defendant received a fair trial).

In this case, Walden has failed to put forth any evidence showing "how the police identification procedures tainted his trial." *Id.* at 556. Although Walden spends four pages of his brief describing cases that hold that using fabricated evidence violates due process, he does not once cite to the record to show the role of the unduly suggestive identification procedure in his trial. (R. 235, Pl.'s Mem. at 11-14.) The only evidence before the Court is that Walden was subjected to an unduly suggestive identification procedure when he was brought before Anderson, (R. 236, Pl.'s Facts ¶ 9), and Anderson later testified at trial. (R. 220, Def.'s Facts ¶ 15.) While it is easy to imagine how the identification procedure could have tainted the trial, the Court "cannot connect the dots" for Plaintiff. *Alexander*, 433 F.3d at 556. The Court thus finds that Walden's Count I allegation of the use of an unduly suggestive identification procedure, without any evidence of how that procedure tainted his trial, does not constitute a due process violation.

## C.     False Reports and Testimony

In addition to alleging the coerced confession and unduly suggestive identification elements in his due process claim, Walden also alleges that the police officers deprived him of a fair trial by (1) "withholding from prosecutors and judges involved in plaintiff's prosecution the fact that [Plaintiff's] admissions and 'identification' were false, fabricated, manipulated, and coerced," and (2) "by writing false reports and giving false testimony, by otherwise giving a false and incomplete version of events to prosecutors." (R. 1, Compl. ¶ 90.) These allegations—focusing on the withholding of information that is exculpatory to the defendant—are a quintessential *Brady* claim. However, Defendant correctly argues that this allegation does not constitute a *Brady* violation because Walden was aware that the confession

40

was false and the identification procedure was manipulated, and thus he "was not deprived of evidence held by the police or prosecutor that would have helped him question the officers' version of events in court." (R. 221, Def.'s Mem. at 7).

Nor does *Brady* require police officers to be truthful with prosecutors when the defendant is aware of their fabrications. The Seventh Circuit has made it clear that "a lying witness is certainly not a *Brady* violation. It is already established law that *Brady* does not extend so far as to provide relief in a situation where 'a police officer makes a false statement to a prosecutor.'" *Carvajal*, 542 F.3d at 567 (citing *Harris*, 486 F.3d at 1017); *see also Sornberger*, 434 F.3d at 1029 ("Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose these circumstances [a coerced confession] to the prosecutor. *Brady* rights run to the criminal defendant, not to the prosecution. The Constitution does not require that police testify *truthfully*; rather the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies.") (citation omitted); *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) *overruled in part on other grounds by Wallace*, 440 F.3d at 423 ("We find the proposed extension of *Brady* [to require the police to render truthful records of interrogations to the prosecution] difficult even to understand. It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence. Indeed the duty to disclose falls out, because [plaintiff] knew what he had said during the interrogation.") (internal citations omitted). This is not a case in which police officers fabricated evidence of which Walden was not aware. Indeed, Walden even challenged the officers' fabricated stories regarding his interrogation and false confession at his trial. (R. 236, Def.'s Facts at ¶ 16.) Thus, because Walden points to no evidence withheld by police from prosecutors that he did not know or could not have discovered

himself through reasonable diligence, this allegation of false reports and testimony does not constitute a *Brady* violation and cannot form the basis of Walden's due process claim in Count I.

### D.    Malicious Prosecution

Just as the individual elements of Walden's Count I claim do not constitute either substantive or procedural due process violations as alleged, nor are they a due process violation when viewed as a whole. While Walden is careful to frame his due process claim in terms of his right to a fair trial, the Court notes the similarity of the claim to a federal malicious prosecution claim, which is "knock[ed] out" by "the existence of a tort claim under state law." *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001). The Seventh Circuit has repeatedly rejected attempts to "combine what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment." *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009) (quoting *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003)). Like in *Brooks*, Walden's "complaints about the conduct of the defendant officers leading to his [] arrest are merely improper attempts to recast his untimely unlawful arrest claim as a due process claim," and his "allegations that criminal proceedings were instituted against him based on false evidence or testimony . . . 'is, in essence, [a claim] for malicious prosecution, rather than a due process violation.'" *Id.* (quoting *McCann*, 337 F.3d at 786). Thus, as Walden has also brought a malicious prosecution claim under Illinois law, he cannot bring an action for malicious prosecution under the due process clause of the Fourteenth Amendment. *See Parish*, 594 F.3d at 552 ("Seventh Circuit precedent does not permit an action for malicious prosecution under Section 1983 if a state remedy exists.") Additionally, as discussed above, Walden does not have

42

a *Brady* due process claim because no exculpatory evidence was withheld from him by the police or prosecutors. Because Walden's allegations in Count I do not constitute either a substantive or procedural due process violation, the Court grants Defendant's motion for summary judgment regarding Walden's fair trial claim in Count I.

## IV.   The *Monell* Claim

In Count VI, Walden seeks to hold the City liable for the actions of the individual police officers involved in Walden's arrest and interrogation under *Monell*. 436 U.S. at 690. Walden claims the police officers' actions "were done pursuant to one or more interrelated *de facto* policies, practices, and/or customs" of the City. (R. 1, Compl. ¶ 106.) As discussed above, because a *Monell* claim is predicated on an underlying constitutional injury, *Heller*, 475 U.S. at 799, only Walden's claims that have not been dismissed can form the basis of his *Monell* claim. Thus, the policies and practices alleged that are not related to Walden's existing predicate constitutional injuries cannot form the basis of his *Monell* claim, including the filing of false reports and the giving of false testimony related to the coercive interrogations; the physical abuse of African-American men accused of raping white women; and maintaining a system of concealing exculpatory evidence from criminal defendants. Additionally, the Court notes that Walden has put forth no evidence or arguments regarding certain alleged policies or practices, including the failure to train, supervise, discipline, transfer, monitor, counsel and otherwise control police officers and maintaining the police code of silence, and thus the Court finds for Defendant regarding these alleged policies.

The alleged policies and practices relevant to Walden's Fifth Amendment coercive interrogation claim and Fourteenth Amendment Equal Protection claim for which he has

43

produced evidence are the alleged City policies of: (1) conducting coercive interrogations in order to obtain confessions and wrongful convictions, particularly where the suspect was a black man accused of raping a white woman; and (2) failing to allow arrestees access to counsel. (*Id.* ¶ 107.) Defendant argues that, even assuming Walden can establish a predicate underlying constitutional injury, he has failed to produce evidence of City customs, policies, or practices, fault, and causation as required by *Monell*.[16] (R. 221, Def.'s Mem. at 8.)

In *Monell*, the Supreme Court held that civil rights plaintiffs suing a municipal entity under Section 1983 must show that their injury was caused by a municipal custom, policy, or practice. 436 U.S. at 690-91. The Court rejected the idea that a municipality could be held liable solely because it employs a tortfeasor. *Id.* at 691. Instead, the municipality is only liable "if the unconstitutional act complained of is caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citations omitted). Walden asserts his *Monell* claim based on the second category, alleging that Defendant had "interrelated *de facto* policies, practices, and customs" that led to the violation of Walden's rights. (R. 1, Compl. ¶ 106.)

To sustain his Section 1983 claim, Walden must prove that the alleged policies or customs of conducting coercive interrogations and failing to allow arrestees access to counsel were the "direct cause" or "moving force" of his constitutional injury. *See Bd. of Cnty. Comm. of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). To meet this burden, Walden must

---

[16] The Court assumes for purposes of this section that Walden can establish the underlying predicate constitutional violations alleged in Counts IV and V.

prove three elements. First, Walden must show "a widespread custom or practice" of coercing confessions and denying access to counsel. *Thomas*, 604 F.3d at 303. Next, because a municipality is only liable for deliberate conduct, Walden must show that City policymakers acted with "deliberate indifference" as to the known or obvious consequences of the municipal policy or custom. *Brown*, 520 U.S. at 407. Finally, to prove that the City's policies are the "moving force" behind the constitutional violation, Walden must show that there is a "direct causal link between the municipal policy or custom and the alleged constitutional deprivation." *Id.*

### A. "Widespread Custom or Practice"

The first element Walden must prove to maintain his *Monell* claim is the existence of a "widespread custom or practice" of coercing confessions and denying arrestees access to counsel. The Seventh Circuit has refused to "adopt any bright line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. "There is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability except that it must be more than one instance, or even three." *Id.* (internal quotation marks and citations omitted.) However, a plaintiff must show that there is a policy at issue, not just a random event. *Id.* "This may take the form of an implicit policy or gap in expressed policies." *Id.* (citation omitted). Custom can also be established through widespread, enduring practices that violate constitutional rights in a systematic matter, *Cornfield by Lewis v. Consol. High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993), or by establishing that the policymaking authority acquiesced in a pattern of unconstitutional conduct. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993).

In this case, to prove the existence of a custom or policy, Walden relies upon the expert report provided by Lipari, the Wickersham Report, the absence of any evidence that the City addressed the Wickersham Report's findings, subsequent government and non-profit reports with findings consistent with the Wickersham Report, and the lack of any reported response to cases of police abuse. (R. 235, Pl.'s Mem. at 16-18.) While Walden admits that the Wickersham Commission predated the events pertaining to his claim by twenty years, he argues that a jury could reasonably conclude that the policies outlined in the report continued until 1952. (*Id.* at 17.) The Court agrees, especially in light of the subsequent government and non-profit reports cited by Lipari in his report that made related findings regarding police practices in Chicago, and the fact that the City failed to identify any reforms or other responses to the reports.

In his expert report, Lipari concludes that the City had a *de facto* policy in 1952 of coercing statements from suspects in criminal cases, especially when the suspects were poor, African-American, and uninfluential. (R. 237, Pl.'s Facts, Ex. G at 22.) He also concluded that the City had a *de facto* policy of denying arrestees timely access to counsel. (*Id.*) He based these conclusions on several reports issued by the government and non-profit organizations from the years 1931 to 1959, the lack of documented responses to the reports by the Chicago Police Department, and additional secondary sources. (*Id.*) While Defendant has questioned Lipari's qualifications and methodology, the Court has found his opinions admissible, and the issue of how much weight should be given to his opinions is a question for the jury to decide.

The main report relied upon by Lipari is the Wickersham Report, which was issued by the Wickersham Commission (the "Commission") in 1931. (*Id.*) The report, the reliability of which Defendant does not challenge, found that "a consideration of the evidence and of the reported

cases leaves no doubt that despite [statutes forbidding police abuse], the third degree is thoroughly at home in Chicago." (*Id.* at 9.) The "third degree" was the term used by the Commission to describe "'a secret and illegal practice' in which the police coercively interrogate a suspect using 'infliction of mental or physical suffering.'" (*Id.* at 8.) The Commission was told by "one of the best informed persons on Chicago practices" that "it was an exception when a suspect was not subjected to physical violence." (*Id.* at 10.) The Commission also found that "the methods of violence used in Chicago to coerce confessions included beating with rubber hoses, beating the shins, hitting the prisoner on the side of the head with a heavy phone book and suspending a prisoner upside down." (*Id.*) The report also described the "not uncommon practice" of "detain[ing] a suspect or offender without booking him" to "ward off counsel, service of the *habeas corpus* writ, newspaper reporters, etc., until after the police and the public prosecutor have had time to collect the evidence in the case or to extort a confession." (*Id.*) The Commission also found that young African Americans were particularly susceptible to being the victims of the "third degree." (*Id.* at 11.) While the Wickersham Report focused on the years 1921 to 1931, Lipari found that it is reasonable to conclude that the practices in the report continued to exist in Chicago in 1952 because there is no evidence the City took steps to address the concerns in the report, and Walden's allegations have a "striking similarity" with the abuses identified in the report and Walden fit the profile of an arrestee that would likely be subjected to coercive police tactics. (*Id.* at 13-18.)

Lipari also relied upon several other reports published subsequent to the Wickersham Report to conclude that the practices described in the Wickersham Report were still in existence in 1952. First, he cites a 1953 report by the Chicago City Council's Emergency Crime

47

Commission, in which Police Commissioner Timothy O'Connor endorsed a policy of illegal detentions, saying that "My policy has always been that while it may be illegal, and I have received some complaints from the civil-liberties group relative to orders to pick up criminals simply because they are criminals, I still think they should be picked up and locked up on every occasion possible . . . my policy is the policy of the Department while I am Commissioner." (*Id.* at 14.) Lipari concluded from this report that "in 1952 the Chicago Police Department was led by a Police Commissioner who openly instructed police officers that they did not have to perform investigations, arrests, and interrogations in conformity with the constitution." (*Id.*) Other reports cited by Lipari, including "Secret Detention by the Chicago Police," published in 1959 by the American Civil Liberties Union, and a series of reports issued by the John Howard Association in the years before and after Walden's arrest that led Lipari to conclude that a "pattern of impunity existed within the Chicago Police Department in 1952 with respect to arrest and detention of innocent individuals." (*Id.* at 17-18.)

Drawing all reasonable inferences from this evidence in Walden's favor, the Court concludes that a reasonable jury could find that there was widespread custom of coercing confessions and denying arrestees access to counsel in 1952.

**B.      Deliberate Indifference**

In addition to proving the existence of policies or practices of coercing confessions and denying arrestees access to counsel, Walden must prove that the "municipal action was taken with the requisite degree of culpability." *Brown*, 520 U.S. at 404. Thus, Walden must show that City policymakers were "deliberate[ly] indifferen[t] as to [the custom's] known or obvious consequences." *Montano v. City of Chi.*, 535 F.3d 558, 570 (7th Cir. 2008) (citing *Brown*, 520

48

U.S. at 407). "'Deliberate indifference' is a 'stringent standard of fault.'" *Id.* (quoting *Brown*, 520 U.S. at 407). Policymakers were "deliberately indifferent" when they were "aware of the risk created by the custom or practice" and "failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. "The longstanding or widespread nature of a particular practice would support the inference that policymaking officials must have known about it but failed to stop it." *McNabola*, 10 F.3d at 511 (internal quotation marks and citations omitted).

Here, based on the reports discussed above and Lipari's analysis of the reports, a jury could reasonably infer awareness on the part of policymakers of the practice of coercing confessions and denying access to counsel to arrestees. Additionally, while Walden has produced no specific evidence stating that the police department did not respond to the allegations in the reports, Defendant's failure to take action can reasonably be inferred from the absence of any official reports, news coverage, mention of the allegations in the annual police department reports, or any other documentation demonstrating a response to the serious allegations put forth in the Wickersham and subsequent reports. A reasonable jury could also find that the statements of the Police Commissioner in 1952 discussed above, in which he promoted a policy of arrest and detention that he knew was illegal, demonstrates "deliberate indifference." Although his comments were about illegal arrests and not specifically about the conduct at issue here, a logical inference could reasonably be made by a jury that the comment was indicative of "deliberate indifference" towards other unconstitutional police conduct, including coercive interrogations and denying arrestees access to counsel. Thus, taken in the light most favorable to Walden, a reasonable jury could find that City policymakers were

deliberately indifferent to the consequences of the customs or practices of coercive interrogations and denying arrestees access to counsel.

## C.    Causation

Finally, to establish *Monell* liability against the City, Walden must prove that there was "a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. "It is when execution of an entity's . . . custom inflicts the injury that the [entity] is responsible under § 1983." *Woodward Corr. Med. Serv. of Ill.*, 368 F.3d 917, 928 (7th Cir. 2004) (citation omitted). Walden's main evidence regarding causation is the similarity of the abuse he alleges to the customs and policies of abuse described in the reports relied upon by Lipari. (R. 235, Pl.'s Mem. at 21.) Specifically, Walden points to his allegations of being held "incommunicado" for several days without being able to see his family or an attorney, the type of violence inflicted upon him while being interrogated, the method of obtaining his statement, and that he fit the profile of the type of arrestee most likely to suffer from abuse by the Chicago police. (*Id.* at 21-22.) Given this evidence, and making all inferences in favor of Walden, a reasonable jury could conclude that Walden's injuries were the "plainly obvious consequence" of the City customs or policies of permitting coercive interrogation tactics and denying suspects being interrogated access to an attorney, and that such policies were "highly likely to inflict the particular injury suffered by" Walden. *Brown*, 520 U.S. at 412.

The Court finds that viewing all facts and all reasonable inferences in Walden's favor, he has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant had policies, practices, or customs of coercing confessions and preventing arrestees access to counsel, particularly in the case of African-American men, and whether those policies

were the "moving force" behind Walden's Fifth and Fourteenth Amendment injuries. The Court thus denies Defendant's motion for summary judgment regarding Walden's *Monell* claim in Count VI.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (R. 219) is granted in part and denied in part. Summary judgment is DENIED as to Count IV, Count V (as it pertains to Count IV), and Count VI (as it pertains to Counts IV and V). Summary judgment is also DENIED on all of Plaintiff's remaining state-law claims, Counts VIII, IX, X, XI, XIII. Summary judgment is GRANTED in favor of Defendant and against Plaintiff as to Count I. Defendant's motion to bar Plaintiff's Expert (R. 225) is DENIED.

Mr. Walden will finally be entitled to his fair day in court on the claims that remain in this delayed lawsuit. The parties are urged to reconsider their final settlement positions in light of this opinion.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** December 21, 2010