### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                         |     |                          |
|-------------------------|-----|--------------------------|
| OSCAR WALDEN, JR.,      | )   |                          |
|                         | )   |                          |
| Plaintiff,              | )   |                          |
|                         | )   | No. 04 C 47              |
| v.                      | )   |                          |
|                         | )   | Judge Ruben Castillo     |
| CITY OF CHICAGO, et al.,| )   |                          |
|                         | )   |                          |
| Defendant.              | )   |                          |

### MEMORANDUM OPINION AND ORDER

Oscar Walden, Jr. ("Plaintiff" or "Walden") sued several Chicago Police officers and the

City of Chicago ("City" or "Defendant"), alleging multiple federal and state law claims of police

misconduct relating to his arrest and prosecution for rape in 1952.[1]  (R. 1, Compl.)  Once this

delayed lawsuit was transferred to this Court, a firm trial date was set and met.  After a six-day

trial, the jury returned a verdict in favor of the City on all of Walden's claims.  (R. 308, Verdict.)

Presently before the Court is Walden's motion for a new trial pursuant to Rule 59 of the Federal

Rules of Civil Procedure.  (R. 311, Pl.'s Mot.)  For the reasons stated below, Walden's motion is

granted.  Walden has been waiting a long time for a fair court hearing; unfortunately, this Court

sadly concludes that he did not receive a fair trial in his delayed lawsuit.

### BACKGROUND

Over 60 years ago, on November 24, 1951, Elsie Anderson ("Anderson") was attacked

and raped on the south side of Chicago.  Several weeks later, on January 11, 1952, Walden, then

twenty years old, was arrested and subsequently charged with the crime.  While in police

custody, Walden was brought before Anderson, who identified him as her attacker.  The next

---

[1] The suit proceeded only against the City as Walden was unable to locate any of the individual
defendants and believes that they are deceased.  (R. 259, Joint Status Report at 2.)

day, Walden confessed to raping Anderson, but he subsequently retracted the confession and

claimed he had been coerced by the police officers who questioned him. The details surrounding

these events, as discussed below, were highly disputed.

At his criminal trial in 1952, Walden's confession was admitted against him, and

Anderson testified regarding her identification of Walden. Walden maintained his innocence and

challenged the validity of his confession throughout his criminal trial, testifying that it had been

coerced through threats and physical abuse. On July 2, 1952, a jury convicted Walden of rape,

and he received a sentence of 75 years imprisonment. He was released from prison on parole on

November 18, 1965. Governor George Ryan ("Governor Ryan") granted Walden a pardon of

innocence on December 30, 2002.

In this lawsuit, Walden sought damages under 42 U.S.C. § 1983 ("Section 1983") and

state law for the conduct of the police officers involved in his arrest and conviction in 1952.

Walden alleged that the police officers coercively obtained his confession through physical abuse

and threats to Walden and his family. He also alleged that he was not permitted to call an

attorney during the three days he was in police custody prior to being booked as an arrestee, and

that Anderson's identification of him as her attacker resulted from an unduly suggestive

identification procedure. These allegations and the admission of his confession and Anderson's

identification of him at trial underpinned numerous federal and state law claims against the City

and the individual police officer defendants.

After the voluntary and Court-ordered dismissal of several claims, Walden proceeded to

trial on the following claims: a coerced confession claim pursuant to Section 1983 (Count IV); an

equal protection claim pursuant to Section 1983 (Count V); a *Monell* policy claim against the

2

City relating to Counts IV and V (Count VI); a state-law claim for malicious prosecution (Count VIII); a state-law claim for intentional infliction of emotional distress (Count IX); and *respondeat superior* and indemnification claims against the City related to Counts VIII and IX (Counts XI and XIII).

At this civil trial for damages, Walden presented three witnesses. Judge George Leighton and Joseph Lipari, a Ph.D. candidate and history instructor at the University of Illinois-Chicago, testified in support of Walden's claim that the City had a de facto policy of coercing confessions from arrestees in 1952, particularly in cases in which an African-American man was accused of raping a white woman.

Walden testified regarding the events that occurred while he was in police custody in January 1952. He stated that he was arrested the afternoon of Friday, January 11, 1952. He was taken to the Kensington Police Station ("Kensington") for questioning, and brought into a room where Anderson was waiting. Walden testified that Anderson had no reaction upon seeing him.

The next day, Walden was questioned again at Kensington. Walden testified that Chicago Police Officers Joseph Faculak ("Faculak") and Leon Sweitzer ("Sweitzer") physically abused him during this interrogation. Walden specifically testified that they kicked his shins, knocked his head from side-to-side, and that Faculak grabbed Walden's left hand, bent Walden's fingers back, and dug his fingers into Walden's fingers, leaving scars that are still visible today. Walden also testified that Faculak and Sweitzer threatened to "string him up," and have his family evicted from their home, and that those threats combined with the physical abuse he suffered caused him to confess to a crime he did not commit. Later that day, when an assistant

3

state's attorney came to take his statement, Walden told him that his confession had been coerced and that it was a lie.

The City presented a different version of events. In particular, the City argued that Walden was guilty of raping Anderson, and that he suffered no physical abuse or other coercion at Kensington. Having no live witnesses, the City relied entirely on redacted testimony from Walden's criminal trial.

The City first presented the testimony of Patrick Egan, an assistant Cook County state's attorney, Edwin Breen, a first assistant state's attorney, and William Murphy, the secretary to the police captain of the 12th District. They had all interacted with Walden while he was in police custody, and denied seeing any signs that Walden had been physically abused or otherwise mistreated.

The City next presented the testimony of three police officers, Donald Coakley, Maurice Brown, and George Caillouette, who were assigned to the Kensington District and on-duty on January 12, 1952. They testified that they did not see anyone abuse or threaten Walden.

The City next put on the testimony of Faculak. He testified regarding the arrest of Walden and described Anderson's viewing of Walden. He said that Walden was brought to the lobby of the police station, dressed in a coat, and told to walk back and forth in front of Anderson. He also described his questioning of Walden, Walden's confession, and Walden's apology to Anderson. Faculak denied kicking Walden or bending back his fingers, and he also said that he did not see any other police officer abuse Walden. He also denied threatening Walden or his family.

4

The next testimony presented was that of William O'Brien, an officer at Kensington who was on-duty on January 12, 1952, and William Ryan, the captain in command at the Kensington District on January 12, 1952. They denied seeing any officer beat or threaten Walden, and testified that they did not see any marks or bruises on Walden.

The City next put on the testimony of Sweitzer. He testified that he briefly questioned Walden, and that there were no marks or bruises on Walden and that he did not see anyone mistreat Walden. The City then presented the testimony of Edward J. Walsh, a police officer assigned to Kensington on January 12, 1952. He also denied that Walden was abused or threatened.

The final testimony presented by the City was that of Anderson, the rape victim. She testified regarding the rape that occurred on November 24, 1951, and her interactions with Walden at Kensington several weeks later.

On the last day of testimony, Walden dropped his state law claim for malicious prosecution. (R. 298, Min. Entry.) On February 23, 2011, the jury returned a verdict for the City on Walden's coerced confession, equal protection, and *Monell* claims. (R. 308, Verdict.) Walden filed a motion for a new trial on March 21, 2011. (R. 311, Pl.'s Mot.) Walden subsequently filed three motions to supplement his motion for a new trial, (R. 315; R. 317; R. 322), which the Court granted. (R. 312, Min. Entry; R. 326, Min. Entry.)

## ANALYSIS

Rule 59 allows a court to order a new trial if "the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (internal quotation marks and citation omitted). Walden contends that the trial was

5

"infected with unfair prejudice toward" him and posits several grounds for a new trial.[2] (R. 311,

Pl.'s Mot. ¶¶ 3.) Specifically, he argues that he is entitled to a new trial because: (1) the Court

erred in admitting testimony from his criminal trial held in 1952; (2) the Court erred in refusing

to instruct the jury concerning the lack of credibility of the testimony from the 1952 trial

transcript; (3) the Court erred in instructing the jurors to disregard any mention of Governor

George Ryan's criminal conviction; (4) attorneys for the City distributed an unredacted version

of Walden's signed confession that contained highly prejudicial details of the rape; and (5)

attorneys for the City made improper comments, misstated the evidence, and elicited previously

barred testimony during the trial. (*Id.* ¶¶ 4-20.)

## I.    Admission of the 1952 criminal trial testimony

Walden first argues that he is entitled to a new trial because the Court erred in admitting

the testimony from his 1952 criminal trial (the "1952 testimony"). (R. 311, Pl.'s Mot. at ¶¶ 4,

20.) A new trial may be ordered on the basis of an evidentiary error "if the error has a substantial

and injurious effect or influence on the determination of a jury." *Cerabio LLC v. Wright Med.

Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (citation omitted). As discussed above, the City's

case consisted entirely of testimony from Walden's criminal trial. The City presented excerpts

from the testimony of eight police officers and two assistant state's attorneys who were involved

---

[2] The Court notes that aside from requesting relief "pursuant to Rule 59," Walden has failed to
cite a single legal authority in support of his arguments. While Walden's brief arguments in
support of his motion—many of which are only one sentence—come precariously close to being
so perfunctory that the Court deems them waived, the Court nonetheless considers them on the
merits and cautions counsel that "[i]t is not the obligation of this court to research and construct
legal arguments open to parties, especially when they are represented by counsel," and that
"perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent
authority, are waived." *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010).

in Walden's arrest or questioning, or were present at Kensington on the day Walden was allegedly mistreated, as well as the testimony of Anderson, the victim. Walden makes several general arguments that the admission of this testimony was in error, and also raises objections to specific portions of the testimony that were admitted at trial.

### A.    General objections

Walden's first argument appears to be a broad challenge to the admission of *any* of the 1952 testimony. Specifically, Walden contends that the admission of the testimony from his criminal trial was in error because: (1) "it was in contravention of the Plaintiff's right to effectively cross examine with the evidence now known concerning [the police practice of coercing confessions]"; (2) "it lacked sufficient indicia of credibility"; and (3) it "was unduly prejudicial." (R. 311, Pl.'s Mot. ¶¶ 4, 20(a).)

Before addressing Walden's specific arguments, the Court notes that this issue stems from a problem that plagued this trial—a lack of preparation by both parties. Until at least two weeks before trial, Walden agreed to the admission of the 1952 testimony as long as all of the testimony from the criminal trial was admitted, and even listed witnesses from the 1952 trial on his witness list. (*See* R. 279, Amended Proposed Pretrial Order.) When this agreement between the parties broke down, the City—the party seeking to introduce the testimony that constituted its entire case—did not bring the dispute to the Court's attention until the first day of trial. (Tr. 10-12.) At the Court's urging, the City filed a motion to admit the 1952 testimony under Federal Rule of Evidence 804(b)(1). (R. 288, Def.'s Mot.) Walden presented no arguments undermining the admissibility of the evidence under this hearsay exception, and the Court granted the motion with exceptions for certain portions of the testimony. (Tr. 298-99.)

7

In his present motion, Walden once again makes no mention of Rule 804(b)(1) even though the Court admitted the 1952 testimony pursuant to this rule. Rule 804(b)(1) is an exception to the hearsay rule for prior testimony where: (1) the declarant is unavailable as a witness; (2) the testimony "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one"; and (3) the testimony "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1). The rationale behind Rule 804(b)(1) is that "[i]f the party against whom the previous statement is now offered is the party against whom that testimony was given, it is usually compatible with fair practice to make that party bear the consequences of any deficiencies in the cross-examination or of the decision not to cross-examine." 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 804.04 (Matthew Bender 2d ed. 2009); *see also* Adv. Comm. Note. to Fed. R. Evid. 804 (1972 Prop. Rules). During the trial, the Court determined that the City met its burden of establishing that the three requirements of Rule 804(b)(1) were met. Specifically, the Court found that: (1) the witnesses, all of whom aside from Walden were deceased, were unavailable; (2) the testimony was provided under oath at Walden's criminal trial; and (3) Walden, against whom the testimony was being offered, had an opportunity and similar motive to develop the testimony by cross-examination at his criminal trial. (Tr. 298-99.)

Although Walden has failed to reference Rule 804(b)(1) in his motion, the Court interprets his argument that admission of the 1952 testimony violated "the Plaintiff's right to effectively cross examine with the evidence now known concerning [the police practice of

coercing confessions]," as a challenge to the third required element under the rule.[3] Walden alluded to a similar argument on the fourth day of trial—after the testimony of the police officers from the 1952 trial had been admitted—contending that Walden's attorney at his criminal trial did "not have the same motive and the same tools" as his attorneys in the civil trial. (Tr. 731.)

The third requirement under Rule 804(b)(1) for the hearsay exception to apply to testimony from a prior proceeding is that the party had "an opportunity and similar motive to develop [the testimony now offered against it] by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(B). Under this requirement, "[m]ere 'naked opportunity' to cross-examine is not enough; there must also be a perceived 'real need or incentive to thoroughly cross-examine' at the time [the former testimony was given]." *United States v. Feldman*, 761 F.2d 380, 385 (7th Cir. 1985) (citation omitted). The similar motive "requirement operates to screen out those statements, which although made under oath, were not subject to the scrutiny of a party interested in thoroughly testing its validity." *United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir. 1983). "When considering whether this requirement has been met, courts look to the similarity of issues and the purpose for which testimony is given." *United States v. Reed*, 227 F.3d 763, 768 (7th Cir. 2000).

Here, the testimony from the 1952 trial admitted during this trial met the third requirement of Rule 804(b)(1). Walden has made the same claim of a coerced confession that he

---

[3] To the extent that this argument can be interpreted as raising a claim under the Confrontation Clause, it clearly fails. First, because this is a civil case, the Confrontation Clause is not implicated. *See Am. Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 541 (7th Cir. 1999) ("[T]he confrontation clause does not apply in the present case, a civil suit for damages[.]") Second, even if the Confrontation Clause were implicated, "[t]he right to cross-examine is not unlimited; the Confrontation clause guarantees only effective cross-examination, not cross-examination of any type sought by the defendant." *Brown v. City of Chi.*, 599 F.3d 772, 776, n.2 (7th Cir. 2010) (internal quotation marks and citations omitted).

asserted in this case since being in police custody in January 1952, and the 1952 testimony admitted at this trial was offered by the prosecution at Walden's criminal trial to rebut this claim. He therefore had the opportunity to, and did in fact, cross-examine the police officers, state's attorneys, and Anderson regarding the abuse and threats he allegedly suffered while in police custody at his criminal trial. Walden also had a similar—if not greater—motive to develop the testimony regarding his claims that he was coerced into confessing at his criminal trial because he faced a lengthy prison sentence if convicted. While Walden now contends that the cross-examination that occurred was inadequate because his attorney in 1952 did not have the evidence "now known" regarding police misconduct, this argument fails because "the emphasis in this inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place." *United States v. McClellan*, 868 F.2d 210, 215 (7th Cir. 1989) (citation omitted). This means that the Court's inquiry "focuses not on the extent of cross-examination at the former proceeding, but on whether the party's handling of the testimony was meaningful in light of the circumstances which prevailed when the former testimony was offered." *Pizarro*, 717 F.2d at 349 (citation and internal quotation marks omitted). While Walden's attorneys in this case would have preferred to cross-examine the witnesses from the 1952 trial themselves, this does not mean that the cross-examination at the 1952 trial was not meaningful at the time. This conclusion is underscored by the fact that Walden's attorneys in this case used the cross-examination testimony from the 1952 criminal trial in this trial.

Walden's argument that the Court erred in admitting the 1952 testimony because it was not reliable also fails. The Court did express strong doubts that the evidentiary standards of the state court proceedings in 1952 would meet current evidentiary standards, but those doubts were

10

not sufficient to overcome the "circumstantial guarantees of trustworthiness" that justify

excepting testimony from a prior proceeding that was subject to cross-examination from the

general rule excluding hearsay. *See* 2 McCormick on Evid. § 253 (6th ed. 2009). Further,

Walden has raised no specific issue regarding his criminal trial that indicates that the testimony

was unreliable other than general arguments regarding the "wild and wooly" nature of Cook

Country criminal courts in the early 1950s. (R. 311, Pl.'s Mot. at 1.) Indeed, the evidence at trial

established that the attorney who represented Walden during the 1952 trial was a well-respected

and talented attorney.[4] (Tr. 212, 440.) Thus, because the 1952 testimony met the requirements

of Rule 804(b)(1) and Walden has failed to overcome the presumption of reliability afforded

such testimony, the Court concludes that it did not err in admitting portions of the testimony at

trial.

Walden's final general argument is that admission of the 1952 testimony was unduly

prejudicial. When the Court concluded that the testimony given at Walden's criminal trial met

the requirements of the Rule 804(b)(1) hearsay exception, the Court noted that the testimony

could still be excluded on other grounds under Rule 403 if the probative value of the testimony

was "substantially outweighed by the danger of unfair prejudice, confusion of the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 403. (Tr. 299.)

In his current motion, as at trial, Walden primarily focuses his Rule 403 objections on

specific portions of the 1952 testimony, which the Court discusses below. While Walden fails to

specify a general objection as to why admission of *any* of the 1952 testimony would be unduly

---

[4] Additionally, when Walden objected to one portion of the 1952 testimony as hearsay, the Court
sustained the objection and did not permit its admission. (Tr. 666-68.)

prejudicial, he argues that the City's trial strategy of showing that Walden was guilty of Anderson's rape was unduly prejudicial because it took the focus off the primary issues to be decided in this case. The Court interprets Walden's argument as a challenge to the City's use of the 1952 testimony as unduly prejudicial due to possible confusion of the issues.

As mentioned above, the City argued that Walden fabricated the false confession story after confessing to a crime of which he was guilty. The City argued that whether Walden was guilty of the crime was clearly relevant to the malicious prosecution claim, and was also relevant to the issue of whether the police officers coerced the confession. Under the City's theory, if Walden were guilty and Anderson identified him as her attacker, there was no incentive for the police officers to coerce a confession. Alternatively, the City argued that even if the jurors believed that Walden's confession was coerced, if Walden were actually guilty of the crime, he would not be entitled to damages for the fourteen years he spent in prison. While the Court strongly discouraged this trial strategy fearing that it could lead to a trial-within-a-trial situation and distract the jurors from the ultimate issues in the case, it ultimately concluded that it could not prohibit the City from pursuing this strategy if the parties could not agree on a set of stipulations regarding these issues.

The Court's concerns about possible juror confusion caused by the City's strategy were confirmed on the third day of trial when a member of the jury submitted the following question to the Court during Walden's cross examination: "We, the jury, are working to determine the potential for abuse, coercion, not guilt or innocence correct?" (Tr. 398; R. 307.) In response to the juror question, the Court read the following statement agreed to by the parties:

12

> The primary issue in this case is whether the Chicago police violated Mr. Walden's
> constitutional rights by the manner they treated Mr. Walden when he was in their
> custody in 1952. Mr. Walden's guilt or innocence of the criminal charge which led
> to his detention is not directly before you except to the extent that the defendants
> claim that Mr. Walden's potential guilt of that charge tends to indicate that his
> constitutional rights were not violated after he was taken into custody.

(Tr. 532.) While this statement was obviously not a panacea to the confusion created by the

dispute over Walden's innocence, the Court believes it clarified the issues sufficiently to focus

the jurors on the fundamental issues they were to decide.

With this background in mind, the Court concludes that the use of the 1952 testimony

was not unduly prejudicial. First, the juror question came during the cross-examination of

Walden, before the City had presented any of the testimony from the 1952 trial. This shows that

it was the dispute between Walden and the City regarding whether Walden was guilty of the

crime generally that caused any confusion of the issues, not the admission of the 1952 testimony

specifically. Second, the risk of confusion of the issues presented by the 1952 testimony was

minimized by the Court's statement clarifying the issues. Additionally, and most importantly,

the Court vastly limited the admission of testimony from the 1952 trial so as to focus the

testimony on the issue of the coerced confession, or to rebut Walden's testimony on direct

examination. Thus, the probative value of the 1952 testimony admitted at this trial outweighed

the minimal risk of confusion of the issues. Accordingly, Walden's general objections to the

admission of the testimony from the 1952 trial have not convinced the Court that the testimony

was admitted in error. The Court now turns to Walden's objections to two specific portions of

the admitted trial testimony.

**B.      Admission of 1952 trial testimony regarding the details of Anderson's rape**

The first specific portion of testimony that Walden contends was admitted in error was Anderson's testimony containing details of the rape. (R. 311, Pl.'s Mot. ¶ 20(c).) When Walden raised this objection on the second day of trial, the Court agreed and barred much of Anderson's testimony regarding the rape under Rule 403. (Tr. 299-300.) Specifically, the Court concluded that many details of the rape, including the physical abuse Anderson suffered and the sexual acts she was forced to perform upon her attacker, had minimal or no probative value relating to Anderson's identification of Walden, did not rebut any of Walden's testimony, and was clearly inflammatory evidence likely to evoke an emotional response in the jury. Certain details of the rape, however, that were probative as to Anderson's identification of Walden or rebutted Walden's testimony were admissible, including details such as Anderson having bitten the left hand of her attacker, that a dialogue between her and her attacker occurred, and the amount of time she was held captive. The Court accordingly ordered the City to prepare a redacted version of Anderson's testimony, and stated that it would resolve any objections raised by Walden to the redacted testimony. (Tr. 300, 738-56.)

In his present motion, Walden contends that Anderson's testimony that was admitted regarding "the screaming, the rapist's commands, and the length and repeated nature of the assault" was "unduly prejudicial." (R. 311, Pl.'s Mot.) Walden fails to cite to the transcript, however, so the Court is left to speculate as to which specific lines of Anderson's testimony Walden is referencing. The first mention of "the screaming" in Anderson's testimony is found in a line of testimony that was apparently read in error, and when Walden objected, the Court sustained the objection and that line of testimony ceased. (Tr. 763-64.) The additional testimony of "screaming" by Anderson consists of a few brief mentions of her having screamed loudly

14

during the attack. (Tr. 763-66.) While this testimony had little probative value, the Court concludes that it was not unduly prejudicial because the jury had already heard during Walden's opening statement and testimony that the rape had been "brutal" and that Anderson had screamed during the rape. (Tr. 10-11, 315.)

In terms of Walden's objection to the testimony of "the rapist's commands," the testimony of the attacker's commands concerning sexual acts had been redacted from the testimony offered at this trial. This left only Anderson's testimony that her attacker repeatedly told her not to scream. (Tr. 765-70.) This testimony was probative as to Anderson's subsequent voice identification of Walden, and was not likely to evoke an emotional response in the jury given the other facts regarding the rape already known to the jury.

Finally, the testimony regarding the repeated nature of the attack was not unduly prejudicial because the graphic details of the rape had been redacted. (Tr. 767-68.) What remained was testimony such as "He did the same thing," and "He was on top of me again," which provided context to the dialogue that occurred between Anderson and her attacker and the extended duration of the attack. (Tr. 767-69.) Additionally, the repeated nature of the attack had already been alluded to in Walden's testimony. (Tr. 314.) Accordingly, because the graphic details of Anderson's testimony regarding the rape were redacted from the testimony offered at this trial and the probative value of what remained was not substantially outweighed by danger of unfair prejudice, the Court concludes that this testimony was not admitted in error.

### C.    Admission of "identification" evidence from Anderson's 1952 testimony

Walden also contends that the Court erred in admitting "identification" evidence from Anderson's 1952 testimony "because it was so tainted by improper police suggestion as to make

it inadmissible as a matter of law under current U.S. Supreme Court precedent." (R. 311, Pl.'s Mot. ¶ 20(b).)  Although Walden does not identify what testimony he specifically objects to, the Court assumes he is referring to Anderson's identification of Walden when he was brought to the police station on January 11, 1952.  While the Court did not permit the City to put on testimony regarding the 15 to 20 suspects Anderson viewed in the hospital and the police station in the weeks following the rape, the Court did allow Anderson's testimony regarding her identification of Walden when he was brought to Kensington after his arrest. (Tr. 738-56.)  Specifically, the City presented Anderson's testimony that the police called her the afternoon of January 11, 1952, and told her that they had a suspect in custody. (Tr. 772-73.)  She said that the police first brought her to the lobby of Kensington and then brought Walden in, and she identified him and said "that was the man." (Tr. 773-74.)  Anderson also testified that the police officers dressed Walden in old coats, and told him to walk back and forth in front of her. (Tr. 777.)  On cross-examination, Anderson testified that Walden was surrounded by white police officers, and that he "was the only colored person that was brought" in the lobby of Kensington. (Tr. 798.)

When Walden raised this argument at trial, the Court agreed that Anderson's identification resulted from a highly suggestive procedure, and that Supreme Court precedent decided after Walden's criminal trial clearly would have led to the suppression of the identification at a criminal trial. (Tr. 741.)  The Court ultimately permitted this testimony, however, for three reasons.  First, just as Walden's attorneys recognized at trial, this was a civil case for damages and "suppression" of the identification was not at issue.  Second, Walden had already testified regarding his encounter with Anderson at Kensington, and said that when he was brought before her, she did not say anything or react in any way. (Tr. 268-69.)  The City was

thus entitled to rebut this testimony with Anderson's testimony that she said "that was the man" upon seeing him. Finally, the details of the identification indicating its suggestive nature were made clear through the cross-examination testimony of Anderson, and the Court indicated that Walden was free to argue to the jury all of the reasons that the identification was not reliable.

## II.     The Court's instructions to the jury

### A.     Lack of specific jury instruction regarding the 1952 testimony

Walden next argues that the Court erred in refusing to include his proposed instruction concerning the lack of credibility of the 1952 transcript and the credibility of the victim's identification. (R. 311, Pl.'s Mot. ¶ 20(e).) Walden proposed the following instruction regarding the 1952 testimony: "Testimony from Mr. Walden's 1952 criminal trial has been read to you. In determining the weight, if any, to be given to that testimony, you should take into consideration that Mr. Walden's current attorneys were unable to question these witnesses and much of the documentary evidence relevant to this case no longer exists." (Tr. 841.) Walden also proposed the following instruction regarding Anderson's identification of Walden at Kensington: "An identification that is obtained after a procedure where the crime victim views the suspect one on one is inherently unduly suggestive." (Tr. 840.) The Court refused to give either instruction, concluding that these contentions were more properly the subject of argument, not the subject of an instruction. (Tr. 840-41.) The Court advised Walden's attorneys that they were free to make arguments regarding the development of the law of identification procedures and the unduly suggestive nature of Anderson's identification of Walden. (Tr. 840.) The Court also stated that Walden's attorneys could comment on the limitations of the 1952 testimony in closing arguments, which they did extensively. (Tr. 841) In his current motion, Walden has not

17

expanded upon his argument that refusal to give these instructions was in error, and the Court stands by its prior conclusion that these proposed instructions were more properly addressed by the parties during closing arguments. Accordingly, Walden is not entitled to a new trial based on the Court's refusal to give his proposed jury instructions regarding the 1952 testimony.

### B.    Reference to Governor Ryan's convictions

Walden also contends that he is entitled to a new trial due to the Court's spontaneous instruction that the jury was not to concern itself with the fact that Governor Ryan had been convicted of criminal offenses. (R. Pl.'s Mot. ¶ 20(d).) Walden contends that this instruction was in error because it violated Walden's motion *in limine* to bar any references to Governor Ryan's convictions that the Court had previously granted. (R. 276, Min. Entry.) While the reference to the convictions by the Court was not in accord with the motion *in limine*, it did not have a prejudicial impact on Walden's case for two reasons. First, the jurors likely already knew that Governor Ryan had been criminally convicted. Second, and more importantly, the reference to the convictions was in a curative instruction telling the jurors to disregard the fact that Governor Ryan had been convicted. Given the presumption that jurors follow the Court's instructions, which Walden has not attempted to overcome, the Court cannot conclude that this curative instruction prejudiced Walden's case.

### III.    Conduct by the City's attorneys[5]

In addition to the objections to the evidentiary rulings and jury instructions discussed above, Walden raises numerous instances of inappropriate conduct on the part of the City's

---

[5] Walden raises numerous instances of inappropriate conduct by the City's attorneys outside the presence of the jury, after the trial, or in other cases. The Court addresses these arguments only as they relate to the determination of whether Walden received a fair trial in this case. If Walden wants to seek relief for such conduct, he must file a separate motion for sanctions.

attorneys as grounds for a new trial. "To obtain a new trial on attorney misconduct grounds, the [moving party] must show both that misconduct occurred and that it prejudiced their case." *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002) (citations omitted).

### A.    Distribution of the unredacted confession to the jury

The first, and most egregious, misstep by the City's attorneys that Walden relies upon in his motion for a new trial is the City's distribution of an unredacted version of Walden's signed confession to the jury during Walden's cross-examination. (R. 311, Pl.'s Mot. ¶¶ 5-9.) The Court permitted the City to admit into evidence and distribute a redacted version of Walden's confession to the jury during his cross-examination after Walden's attorneys had extensively read from it on direct examination. (Tr. 528-29.) What ensued on cross-examination, however, was a series of follies that reflected a lack of care and preparation on the part of the City's attorneys that deeply concerns the Court.

The City's first attempt to distribute the confession failed because the confession had been improperly copied and was incomplete, requiring the collection of the copies from the jury. (Tr. 541-42.) The second set of copies was similarly incomplete due to a copying error. (Tr. 543.) It was the City's third attempt, however, that exhibited a level of carelessness that had the potential of prejudicing Walden's case. Instead of distributing a copy of the confession with the graphic details of the rape redacted, the City put the complete version in the hands of the jury. When the Court noticed this error, it immediately ordered a recess and collected the copies of the confession. (Tr. 572-73.)

At Walden's attorneys' suggestion, the Court conducted a *voir dire* of each jury member in chambers to determine whether they had seen the full confession, and if so, its potential impact

on the juror. (Tr. 574-87.) Through the *voir dire*, the Court learned that three of the eight jurors may have read details of the rape that were supposed to be redacted. All three jurors, however, said that having read those details would not impact any decision that they would make in the case. The Court disclosed these findings to the parties, and told them they could evaluate the transcripts from the *voir dire* and decide what to do. (Tr. 587.)

At the time, Walden did not move for a mistrial. Now, however, he argues this misconduct by the City's attorneys was extremely prejudicial and warrants a new trial. Although the Court clearly agrees with Walden that this type of carelessness and unpreparedness on the part of the City's attorneys is inexcusable, the Court concludes that it does not entitle Walden to a new trial. Given the *voir dire* results and the lack of any reasons to believe the jurors were not being truthful in their responses, the Court cannot find that the erroneous distribution of the unredacted version of the confession had a prejudicial impact on Walden's case sufficient to warrant a new trial.

## B. Improper opening statement

Walden next argues that the City's opening statement was argumentative and contained references to evidence that was barred or otherwise not admitted, and that those references were prejudicial. (R. 311, Pl.'s Mot. ¶¶ 11-13.) As the sheer number of sustained objections indicates, the Court agrees that much of the City's opening statement was entirely inappropriate.[6] The Court is most troubled by the City's attorney's numerous references to evidence that the Court warned was not guaranteed would be admitted given the City's failure to file a motion *in limine* regarding the 1952 testimony. (Tr. 11-12.) The City's attorney threw caution to the wind,

---

[6] According to Walden, Walden's attorneys lodged at least 21 objections during the City's opening statement, of which 19 were sustained. (R. 321, Pl.'s Reply at 5.)

however, and referred extensively to the 1952 testimony throughout his opening statement. While some of this testimony was ultimately admitted, and thus reference to it was clearly not prejudicial, the Court excluded certain portions of the 1952 testimony that the City's attorney mentioned in his opening. This includes the mention of Anderson viewing 15 to 20 individuals while she was in the hospital, at home, and at the police station following the rape, (Tr. 32-33), reference to Anderson's testimony that she identified Walden at a drugstore on December 23, 1951, (Tr. 33), and statements Walden allegedly made while in police custody regarding using drugs and "running around with harlots."[7] (Tr. 35.) The Court also sustained numerous objections to the improper arguments the City's attorney made during the City's opening statement.

While the inappropriateness of many aspects of the City's opening statement is clear, the more difficult task for Walden is proving that its prejudicial effect rose to the level sufficient to warrant a new trial. The Court sustained Walden's numerous objections to the improper arguments and references to barred evidence, and admonished the City's attorney that he needed to refrain from improper argument and stick to the facts of the case. (Tr. 30, 40.) The Court also warned the City's attorney that he needed to be careful with what he was promising the jury, and cautioned that it would be problematic if there was not evidence to support what he was saying. (Tr. 31, 34.) Additionally, the harm that may have occurred because of the City's attorney's improper references to barred testimony was mitigated by the Court's instruction to the jury that "the lawyers' opening statements and closing arguments to you are not evidence. Their purpose

---

[7] As Walden acknowledges, the Court ultimately allowed the City's attorney to ask Walden about this statement on cross-examination, (Tr. 418-20), but he denied making the statement and that was the end of the matter. (Tr. 512-13.)

is to discuss the issues and the evidence. If the evidence as you remember differs from what the lawyers said, your memory is what counts." (R. 306, Jury Instructions at 5.) Absent some indication to the contrary, there is a presumption that juries follow the instructions that they are given. *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 388 (7th Cir. 2011). Accordingly, because the Court sustained Walden's objections, admonished the City's attorney, and instructed the jury that opening statements are not evidence, the City's attorney's improper comments during the City's opening statement do not warrant a new trial. *See Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008) (holding that any harm caused by improper opening statements "was undone when the court sustained [the moving party's] objections and admonished [counsel] to stick to the admissible evidence); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999) ("Moreover, any potential prejudice to [plaintiff] by defense counsel's argument . . . was lessened considerably by the fact that the district court instructed the jury that statements and arguments made by counsel were not to be considered evidence and that the jury should base its verdict solely on the evidence admitted in the case. We have repeatedly found that jury instructions of this sort mitigate any prejudicial effect of potentially improper remarks made by counsel . . .") (citations omitted).

### C.      Elicitation of previously barred testimony

Walden next argues that the City's attorneys improperly elicited testimony regarding evidence the Court had ruled was inadmissible, and specifies four specific instances of such misconduct. (R. 311, Pl.'s Mot. ¶ 14.) He first points to testimony elicited from Walden regarding Anderson's 1952 testimony that she saw him at a drugstore on December 23, 1951. (Tr. 487-88.) Walden's attorneys did not object to these questions at trial, and the Court

22

concludes that there was minimal prejudice caused by the City's attorney pursuing this line of questioning because the questioning was not fruitful for the City, it related to a corollary issue, and there was no additional mention of this identification the rest of trial.[8] Walden next points to mention of "other suspects" in two of the City's attorney's questions of Lipari, the reading of a document not admitted into evidence in a question to Lipari, the reading of the previously barred testimony regarding details of the rape, including that the rapist had a knife and zipped down his pants. (Pl.'s Mot. ¶ 14.) The objections to these questions, however, were sustained and the line of questioning ceased, and thus any prejudice that resulted was minimized. (Tr. 204-05, 216, 763-64.) Accordingly, while the Court is disappointed by the City's attorney's conduct in questioning witnesses about previously barred evidence, the Court concludes that it did not sufficiently prejudice Walden to entitle him to a new trial.

### D. Misstating the evidence in closing arguments.

Walden also contends that he is entitled to a new trial because the City's attorney misstated the evidence in the City's closing argument. (R. 311, Pl.'s Mot. ¶ 15.) The Seventh Circuit has "stated repeatedly that improper comments during closing arguments rarely amount to reversible error." *Schandelmeier-Bartels*, 634 F.3d at 388 (listing cases). Additionally, there is a presumption that "curative instructions to the jury mitigate harm that may otherwise result from improper comments during sometimes heated closing argument." *Id.* (citation omitted). Here, the Court has reviewed all of the specific instances in which the City's attorneys misstated the evidence or the law, and although some of the City's attorney's statements during the closing were improper, they were not so unfairly prejudicial as to require a new trial. Additionally, any

---

[8] In fact, Walden's attorneys argued in closing that Anderson had never seen Walden before she identified him on January 11, 1952. (Tr. 890.)

possible harm was mitigated by the Court's jury instructions. Also, in any instance in which the City's attorney actually did misstate the evidence or the law, the Court sustained Walden's objections, (Tr. 922), the City's attorney withdrew the question, (Tr. 937), or the Court instructed the jury that they would have to recall the evidence. (Tr. 939, 947.) Any prejudice to Walden's case based on these improper statements was thus minimized.

### E.    Cumulative effect of inappropriate conduct by the City's attorneys

Finally, Walden argues that the cumulative effect of all of the inappropriate conduct by the City's attorneys discussed above resulted in severe prejudice, necessitating a new trial. (R. 321, Pl.'s Reply at 3.) Walden maintains that because he was the only live occurrence witness, the trial hinged on his credibility, and the misconduct by the City's attorneys "so infected [the trial] with unfair prejudice" that "his credibility could not be weighed fairly by the jury." (R. 311, Pl.'s Mot. at 1.) He also contends that the cumulative effect of the misconduct was especially prejudicial in this case given the short duration of trial—only four and a half days of evidence. (R. 321, Pl.'s Reply at 8.)

As discussed above, each specific instance of inappropriate conduct by the City's attorneys alone was not sufficiently prejudicial to warrant a new trial. The harm caused by the distribution of the unredacted testimony, the improper statements during the City's opening, the elicitation and reference to barred evidence, and the misstatements of the evidence in the City's closing—when viewed individually—was insufficient to independently warrant a new trial. The same can not be said when analyzing the impact of this inappropriate conduct in the aggregate, and the Court concludes that the cumulative effect of these occurrences when viewed in the context of the entire trial unduly prejudiced Walden's case. *See Adams Laboratories, Inc. v.*

24

*Jacobs Eng'g Co., Inc.*, 761 F.2d 1218, 1227 (7th Cir. 1985) (remanding case for new trial due to

the cumulative effect of misconduct of attorney for the prevailing party). The improper conduct

tainted the trial from opening statements through closing arguments, and the Court is not

confident that the sustained objections, admonishing of counsel, and jury instructions sufficiently

minimized the harm that resulted from the numerous inappropriate statements, questions, and

arguments that occurred throughout trial. While there is insufficient evidence that the pattern of

misconduct by the City's attorneys was intentional, their repeated disregard for the Court's

rulings and careless presentation of barred evidence to the jury prejudiced Walden's case and

entitle him to a new trial.

There must be a bright line between aggressive advocacy and "win-at-all costs" unethical

conduct. This bright line has been crossed by defense counsel's repeated ill-advised actions in

this case. Walden is not entitled to a perfect trial nor is he guaranteed success at trial. Instead, he

is entitled to a fair trial conducted within the legitimate contours of advocacy. He did not receive

one.

This Court will redouble its efforts to make sure Walden receives a fair trial. It is the

Court's hope that trial counsel—for both sides—will also redouble their trial preparation efforts

to ensure that the multiple errors depicted herein do not reoccur at retrial.

## CONCLUSION

For the foregoing reasons, Walden's motion for a new trial (R. 311) is GRANTED. The

parties shall appear for a status on April 7, 2012, at 9:45 a.m. to set a new trial date.

Entered:

**Judge Ruben Castillo**
**United States District Court**

Dated: March 6, 2012